1  Alex L. Fugazzi, Esq.
Nevada Bar No. 9022
2  Brian Reeve, Esq.
Nevada Bar No. 10197
3  SNELL & WILMER L.L.P.
1700 S. Pavilion Center Drive, Suite 700
4  Las Vegas, Nevada 89135
Telephone: (702) 784-5200
5  afugazzi@swlaw.com
breeve@swlaw.com
6

7  Benjamin R. Walker *Pro Hac Vice Forthcoming*
James M. McDonald *Pro Hac Vice Forthcoming*
Yaira Dubin *Pro Hac Vice Forthcoming*
8  Akash M. Toprani *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
9  125 Broad Street
New York, NY 10004
10  Tel: (212) 558-4000
walkerb@sullcrom.com
11  mcdonaldj@sullcrom.com
dubiny@sullcrom.com
12  toprania@sullcrom.com

Jeffrey B. Wall *Pro Hac Vice Forthcoming*
Rishabh Bhandari *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C., 20006
Tel: (202) 956-7500
wallj@sullcrom.com
bhandarir@sullcrom.com

13  *Attorneys for Plaintiff Coinbase*
*Financial Markets, Inc.*

14  **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
15

16  COINBASE FINANCIAL MARKETS, INC.;                Case No.:

17            Plaintiffs,

18        v.                                          **COMPLAINT FOR DECLARATORY**
                                                      **AND INJUNCTIVE RELIEF**
19  AARON D. FORD, in his official capacity as
Attorney General of Nevada; MIKE DREITZER,
20  in his official capacity as Chairman of the Nevada
Gaming Control Board; GEORGE ASSAD, in his
21  official capacity as a Member of the Nevada
Gaming Control Board; CHANDENI K.
22  SENDALL, in her official capacity as a Member
of the Nevada Gaming Control Board;
23  JENNIFER TOGLIATTI, in her official capacity
as a Member of the Nevada Gaming Commission;
24  ROSA SOLIS-RAINEY in her official capacity
as a Member of the Nevada Gaming Commission;
25  BRIAN KROLICKI, in his official capacity as a
Member of the Nevada Gaming Commission;
26  GEORGE MARKANTONIS, in his official
capacity as a member of the Nevada Gaming
27  Commission; ABBI SILVER, in her official
capacity as a member of the Nevada Gaming
28  Commission

          Defendants.

Plaintiff Coinbase Financial Markets, Inc. ("Coinbase"), by and through undersigned counsel, brings this complaint for declaratory and injunctive relief against Defendants Aaron D. Ford, Mike Dreitzer, George Assad, Chandeni K. Sendall, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, and Abbi Silver, in their official capacities, alleging as follows:

**INTRODUCTION**

1. Coinbase brings this action to prevent Defendants from unlawfully applying Nevada gambling laws to federally regulated transactions that are subject to uniform federal law under the exclusive jurisdiction of the Commodity Futures Trading Commission (the "CFTC" or "Commission"). Defendants seek to prohibit Coinbase from offering Nevada customers access to event contracts—a type of derivative instrument extensively regulated by federal law that can be traded only on federally registered exchanges in transactions facilitated by federally registered intermediaries. The CFTC's exclusive jurisdiction and that comprehensive federal regulatory framework leave no room for Defendants to graft on Nevada law to expose Coinbase to significant liability for facilitating federally regulated transactions. Simply put, Nevada law is squarely preempted as applied to event contracts traded on federally regulated exchanges. But absent this Court's intervention, Coinbase will suffer multiple species of immediate and irreparable harm from Defendants' attempts to intrude on this federal sphere. Declaratory and injunctive relief is warranted.

2. Coinbase, Inc., through its affiliates like Coinbase Financial Markets, is a pioneer in the cryptocurrency industry and has focused on updating the financial system for its users while complying with all relevant federal and state laws. For that reason, it has led the industry in advocating for responsible rules and calling for clarity on critical regulatory questions, carefully safeguarding the company's reputation as a trustworthy financial platform focused on creating economic freedom in the United States and around the world.

3. In January 2026, Coinbase began offering event-contract trading to its customers throughout the United States, including in Nevada. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event—which may relate to

economics, or elections, or climate, or sports, or anything else of potential commercial consequence—will occur. Because these event contracts are paradigmatic "swaps" as defined by the Commodity Exchange Act ("CEA" or "the Act"), they can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the Commodity Futures Trading Commission.

4.    The event contracts that Coinbase offers fully comply with the comprehensive framework of federal laws and regulations that govern derivative trading on federal exchanges. Indeed, event-contract markets have flourished under the CFTC's supervision.[1]  These markets have grown into a multi-billion-dollar industry as investors, market participants, and the public at large have found these contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks. Businesses like Coinbase's have also invested considerable resources to ensure they comply with federal law. Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2025 alone.

5.    To make event contracts available to its millions of users, Coinbase entered into an agreement with KalshiEX, LLC ("Kalshi") that will enable Coinbase customers to use Coinbase's platform as an access point to trade event contracts listed on Kalshi's exchange. Kalshi has been a CFTC-registered Designated Contract Market ("DCM") since November 3, 2020. *See* Ex. E at 2. Kalshi began listing event contracts in January 2025, after complying with all applicable requirements under federal law. *See* Ex. A at 1. Coinbase Financial Markets, Inc. is a CFTC-registered Futures Commission Merchant ("FCM"), and it serves as an intermediary for customers trading regulated derivatives listed on a DCM, including event contracts on Kalshi.

6.    Coinbase, Kalshi, and the event contracts themselves are all closely regulated by the CFTC. The CEA grants the CFTC "exclusive jurisdiction" over commodity derivatives—including

---

[1] Derivatives markets have thrived under federal jurisdiction. The Chicago Mercantile Exchange reports a trading volume of more than a million contracts per day, *see* Pritam Biswas & Laura Matthews, *CME Group's Profit Rises as Hedging Demand Lifts Trading Volume*, Reuters (Feb. 12, 2025), https://tinyurl.com/94wj92ju; the average daily futures turnover globally surpasses $12.83 *trillion*, *see* Rena S. Miller, Cong. Rsch. Serv., R48451, Introduction to Derivatives and the Commodity Futures Trading Commission (2025), https://www.congress.gov/crs-product/R48451.

event contracts—that are traded on federally registered derivatives exchanges. *See* 7 U.S.C. § 2(a)(1)(A). And pursuant to its exclusive jurisdiction, the CFTC has constructed and enforced a comprehensive regulatory regime governing both the exchanges (DCMs) that list derivatives— such as Kalshi—and the intermediaries (FCMs) that facilitate customer access to those derivatives exchanges—like Coinbase.

7.    Despite the CFTC's exclusive jurisdiction over the event contracts that Coinbase has made available to its Nevada customers, Defendants have brought a civil enforcement action in Nevada state court against Coinbase on the grounds that the company is engaged in unlawful "gaming" under the Nevada Gaming Control Act because Coinbase is facilitating trading in event contracts listed by Kalshi to consumers—as permitted by federal law—and without having first obtained a license from the Nevada Gaming Commission. *See* Ex. C at 1. In the state court action, Defendants seek a declaratory judgment that the Nevada Gaming Control Act prohibits Coinbase from "making event-based contracts concerning the outcomes, or partial outcomes, of sporting or other events available on its market in Nevada without the required gaming licenses" and "to persons under the age of 21." *Id.* at 10-11. Defendants have also filed an application for an *ex parte* temporary restraining order and motion for preliminary injunction enjoining Coinbase from "operating a market that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining all required Nevada gaming licenses, and prohibiting Coinbase from allowing its market to accept wagers from persons under the age of 21." *See* Ex. D at 12-13.

8.    Nevada's enforcement of its state laws is preempted several times over. The CEA's grant of "exclusive jurisdiction" to the CFTC over event contracts traded on DCMs forecloses any state claims. And pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate these transactions. Permitting States like Nevada to encroach on the CFTC's jurisdiction would frustrate Congress's efforts to guarantee nationwide uniformity in the futures market by subjecting companies like Coinbase to state laws that are fundamentally inconsistent with federal law requirements. Federal law leaves no room for concurrent state regulation in this field.

9.    Coinbase thus seeks declaratory and injunctive relief under the Declaratory Judgment Act and the Federal Constitution. *See* 28 U.S.C. §§ 1651, 2201, 2202. Federal law directly preempts the Nevada laws that Defendants have invoked as justifications for regulating and targeting event-contract transactions in Nevada. But given the State's mistaken view, Coinbase now faces significant civil liability. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007) (internal quotation marks and citation omitted).

10.    And without this Court's prompt intervention, Coinbase will necessarily incur irreparable harm from Nevada's intrusion into the CFTC's domain. If, on the one hand, Coinbase continues to offer Nevada users access to event contracts in the face of Nevada's enforcement, the harm to Coinbase would not be limited to the potential for liability itself. Nevada's enforcement action, premised on the theory that Coinbase is violating state law notwithstanding Coinbase's full compliance with federal law, undermines Coinbase's hard-earned reputation as a leader in this space and as a public company that values compliance and follows all applicable laws. The risk of such sanctions constitutes a here-and-now injury for Coinbase. It casts a cloud of uncertainty over the company's platform and threatens to disrupt the company's relationships with millions of customers who have relied on Coinbase, Inc. and its affiliates to facilitate nearly $1 trillion in trading volume every year across multiple products and who collectively have custodied more than $500 billion in digital assets.

11.    On the other hand, if Coinbase is forced to refrain from offering Nevada users access to event contracts because of Nevada's demand that Coinbase comply with preempted Nevada state law, Coinbase will be forced to forgo a critical part of its business plan, disrupt its partnership with Kalshi, and abandon a market for a product that the company invested substantial resources in developing—in full compliance with federal law. Coinbase will lose market share and risk spoiling the goodwill of its customers, who use Coinbase's platform precisely because they trust Coinbase as a one-stop shop for their investment and trading needs. And because of Nevada's sovereign

immunity, Coinbase could never be compensated for that lost revenue and business harm, no matter how meritless the State's legal position.

12.     These irreparable harms independently—and all the more so collectively—warrant equitable relief.  And Coinbase also satisfies the other factors for seeking a preliminary injunction: both the balance of the equities and the public interest militate in favor of prompt injunctive and declaratory relief.

13.     Because the specter of Nevada's enforcement is existential to Coinbase's event-contract operations in Nevada, Coinbase respectfully seeks expedited consideration of its request for a preliminary injunction.

**PARTIES**

14.     Plaintiff Coinbase Financial Markets, Inc. is incorporated in Delaware with its principal place of business in New York, New York.  It has been registered with the CFTC and National Futures Association as a Futures Commission Merchant since August 16, 2023.

15.     Defendant Aaron D. Ford is sued in his official capacity as Attorney General of Nevada.

16.     Defendant Mike Dreitzer is sued in his official capacity as Chairman of the Nevada Gaming Control Board.

17.     Defendant George Assad is sued in his official capacity as a Member of the Nevada Gaming Control Board.

18.     Defendant Chandeni K. Sendall is sued in her official capacity as a Member of the Nevada Gaming Control Board.

19.     Defendant Jennifer Togliatti is sued in her official capacity as a Member of the Nevada Gaming Commission.

20.      Defendant Rosa Solis-Rainey is sued in her official capacity as a Member of the Nevada Gaming Commission.

21.     Defendant Brian Krolicki is sued in his official capacity as a Member of the Nevada Gaming Commission.

22. Defendant George Markantonis is sued in his official capacity as a Member of the Nevada Gaming Commission.

23. Defendant Abbi Silver is sued in her official capacity as a Member of the Nevada Gaming Commission.

24. Together, Defendants Aaron D. Ford, Mike Dreitzer, George Assad, Chandeni K. Sendall, Jennifer Togliatti, Rosa Solis-Rainey, Brian Krolicki, George Markantonis, and Abbi Silver are responsible for enforcing the demand that Coinbase comply with preempted Nevada state law.

### JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction over Coinbase's claim pursuant to 28 U.S.C. § 1331. This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, preempts Nevada's gambling laws insofar as they purport to regulate trades on a CFTC-designated contract market.

26. The Court can award injunctive relief under 28 U.S.C. § 1651, and it can award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202. The Eleventh Amendment does not bar this Court from exercising jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. "[A] state official . . . is not the State for sovereign-immunity purposes." *Virginia Off. for Protection and Advoc.* v. *Stewart*, 563 U.S. 247, 255 (2011). Where, as here, a plaintiff seeks to enjoin a state official from enforcing state laws in violation of federal law, injunctive relief is available. *See Verizon Md., Inc.* v. *Pub. Serv. Comm'n*, 535 U.S. 635, 645-46 (2002) (recognizing the availability of an *Ex parte Young* action for injunctive relief against regulatory commissioners).

27. This Court has personal jurisdiction over the Defendants. The Defendants are domiciled and perform their duties in Nevada.

28. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to Coinbase's claims occurred in this District, and Defendants reside within Nevada.

1

**FACTUAL ALLEGATIONS**

2

    A.      **Event Contracts Provide Valuable Investment Opportunities And Generate**

3

              **Real-Time Data About Consequential Economic, Political, And Commercial Events**

4

      29.     This is a case about derivatives, *i.e.*, financial instruments whose value depends on,

5

or "derives" from, an underlying asset, rate, or variable, known as the underlier. The universe of

6

potential underliers includes "commodities," a term the CEA defines broadly to include virtually

7

anything that can serve as a basis for trade or pricing—from tangible goods like wheat, oil, or gold

8

to intangible variables such as financial indices, interest rates, or the occurrence (or nonoccurrence)

9

of an event associated with financial, commercial, or economic consequences. *See* 7 U.S.C.

10

§ 1a(9), (19).

11

      30.     One common type of derivative is a swap. A swap is an agreement in which two

12

parties exchange payments based on the value or performance of an underlying reference—such as

13

an interest rate, commodity price, or real-world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n*

14

v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014). As particularly relevant here, event contracts are

15

a species of swaps that enable customers to trade on their predictions about whether a future real-

16

world event will occur. Typically, event contracts are structured as binary, yes-or-no questions

17

where each "yes" position corresponds to an opposing "no" position. When the contract expires,

18

the party who correctly predicted the occurrence or nonoccurrence of the future event receives a

19

payout.

20

      31.     To take one example, an exchange may list an event contract that asks whether it

21

will rain in Las Vegas next week. Once the defined occurrence has taken place (here, rain falls in

22

Las Vegas next week), the contract settles accordingly: The side representing the occurrence (*i.e.*,

23

"rain in Las Vegas") receives the contract payout, while the side representing the nonoccurrence

24

(*i.e.*, "no rain in Las Vegas") receives nothing. The event contract settles with one side receiving

25

$1 and the other $0; the specified contingency either occurs or does not occur.

26

      32.     Importantly, parties can sell their positions before the event contract expires.

27

Accordingly, the contract's price will fluctuate based on supply and demand, reflecting the market's

28

real-time views regarding the probability of the underlying future event based on, among other

SNELL
& WILMER

things, new data. Take the Las Vegas rain example. For an event contract worth $1, if the "Las Vegas rain" position is trading at 65 cents, that means that market participants predict there is a 65% chance that the defined occurrence (Las Vegas rain) will take place and a corresponding 35% probability that the nonoccurrence (no rain in Las Vegas) will occur. But if new information emerges suggesting rain is more or less likely to occur, the trading price will change. Thus, if a winter storm approaches the region, the price of the "yes" and "no" positions will likely change. Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's profitability and evolving market realities—event contracts likewise reflect the market's up-to-date prediction of the probability that a particular event will transpire.

33.    Like many financial instruments, event contracts can be employed as an investment tool or as a mechanism to mitigate risk for market participants with an offsetting underlying exposure. For instance, a hotel owner in Tampa may hedge against the risk of reduced tourism by purchasing event contracts that predict a hurricane in Florida during the 2026 hurricane season. Or a Midwestern corn farmer worried about drought conditions could buy event contracts predicting below-average rainfall. Similarly, movie producers in Los Angeles concerned about a poor box-office performance could purchase event contracts that predict a low Rotten Tomatoes rating; if the movie flounders, the event contracts would help offset the studio's revenue shortfall.

34.    At the same time, event contracts provide valuable information to market participants and the general public through their price-discovery dynamics.[2] Event-contract buyers and sellers often take positions after carefully researching and studying the relevant issues, so trades serve as important information-sharing events. And all market participants play a key role in the price-discovery process by supplying liquidity and depth to the market; widespread participation enables hedgers and other traders to enter and exit positions efficiently, which in turn enhances the

---

[2] *See* Friedrich A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519, 526 (1945) ("the price system" serves as a "mechanism for communicating information"); Robin Hanson, *Shall We Vote on Values, But Bet on Beliefs?*, 21 J. POL. PHIL. 151 (Jan. 12, 2013) (arguing that prediction markets are predictively superior to polls and experts).

accuracy of price signals and overall stability of the markets.  Consumers can then look at event-contract prices to inform their understanding about how consequential world events will unfold.

35.    For example, event-contract platforms have proven wildly successful when it comes to predicting elections.  During the final weeks of the 2024 presidential election, American media companies released polls that showed a slight Vice President Harris lead among likely voters.[3] Prediction markets, on the other hand, showed that President Trump's chances of winning were nearly 10 percentage points higher than his competitor's, a prediction that eventually came to fruition.  *Id.*  Moreover, political prediction markets provide real-time data that traditional polls and election analysts often cannot replicate.  In the 2025 Democratic primary for the New York City mayoral election, Zohran Mamdani's chances of winning on prediction-market platforms shot from 42% to 68% within just a few minutes of the polls closing.[4]

36.    Given their predictive value and hedging utility, prediction markets have become widespread.  Prediction-market platforms have reported billions of dollars in transaction volume and hundreds of millions of dollars in revenue in 2025.[5]  And the community of users is rapidly growing.[6]  Indeed, in the final months of 2024 alone, millions of people traded more than $3 billion dollars on these markets to predict the winner of the presidential election.[7]

---

[3] Sydney Lake, *Harris-Trump Polls Tighten, But PredictIt And Polymarket Tell A Different Story*, Yahoo! Finance (Oct. 14, 2024), https://finance.yahoo.com/news/harris-trump-polls-tighten-predictit-173916471.html.

[4] Calder McHugh, *Pollsters Have A New Kind Of Competitor. They Should Be Worried.*, Politico (Oct. 24, 2025), https://www.politico.com/news/magazine/2025/10/24/political-betting-markets-political-predictions-accuracy-00620431.

[5] *See* Stacy Elliott, *Prediction Markets Hit All-Time High of $2 Billion in Weekly Volume*, Yahoo! Finance (Oct. 20, 2025), https://finance.yahoo.com/news/prediction-markets-hit-time-high-200142742.html; Paul R. La Monica, *Robinhood, Other Trading Firms See Profit in Prediction Markets. Should You Take a Gamble?*, Barron's (Nov. 6, 2025), https://www.barrons.com/articles/robinhood-prediction-markets-polymarket-kalshi-b8541eb4.

[6] *See* Anna Lyudvig, *Prediction Markets Gain Ground: Navigating Regulation and Innovation*, Traders Magazine (Aug. 22, 2025), https://www.tradersmagazine.com/featured_articles/prediction-markets-gain-ground-navigating-regulation-and-innovation/.

[7] *See* Jeff John Roberts, *Investors Are Betting Big On 'Prediction Markets' Kalshi And Polymarket—Will The Gamble Pay Off?*, Yahoo! Finance (Sep. 29, 2025), https://finance.yahoo.com/news/investors-betting-big-prediction-markets093000379.html.

37.    Prediction markets have also emerged as a valuable source of real-time data for both retail and institutional market participants.  For example, CNN recently announced that it would feature prediction-market data in its on-air news reporting.[8]  And major financial platforms such as Google Finance and Bloomberg now display prediction market prices from CFTC-registered exchanges alongside traditional asset prices from other federally registered exchanges, in a sign of prediction markets' growing role as a unique, continuously updated measure of market expectations and public sentiment.[9]  By "challenging how finance measures truth and probability," prediction markets have become "a growing corner" of the financial industry.[10]

**B.    Congress Grants The CFTC "Exclusive Jurisdiction" Over Derivatives Traded On Federally Registered Exchanges, Including "Swaps."**

38.    The federal government has regulated the derivatives market for over a century. Before 1922, many States and regulators held commodities futures contracts in low regard, viewing such contracts as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508-09 (1884).  Accordingly, States sought to prohibit—or at least restrict—their use.  But the value of these derivatives as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want" became better appreciated over time, as derivative markets developed and matured.  *Bd. of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905) (Holmes, J.).

39.    Thus, Congress passed the Grain Futures Act in 1922 to centralize futures trading on federally approved "contract market[s]."  Grain Futures Act, ch. 369, 42 Stat. 998, 1000-02

---

[8] *See* Sara Fischer, *Exclusive: CNN Strikes Prediction Data Partnership with Kalshi*, Axios (Dec. 2, 2025), https://www.axios.com/2025/12/02/cnn-kalshi-prediction-market-data.

[9] *See* Denitsa Tsekova, *Google to Offer Kalshi and Polymarket Data on Finance Searches*, Bloomberg (Nov. 6, 2025), https://www.bloomberg.com/news/articles/2025-11-06/google-to-offer-kalshi-and-polymarket-data-on-finance-searches; Samuel Haig, *Bloomberg Terminal Integrates Polymarket Election Data*, The Defiant (Sep. 4, 2024), https://thedefiant.io/news/defi/bloomberg-terminal-integrates-polymarket-election-data.

[10] Charles-Henry Monchau, *Betting on Future Events: The Rise of Prediction Markets*, Investing.com (Nov. 7, 2025), https://www.investing.com/analysis/betting-on-future-events-the-rise-of-prediction-markets-200669613.

(1922). And 14 years later, Congress enacted the CEA, which expanded federal oversight over derivatives exchanges. Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

40.    Critically, the original CEA expressly preserved "any State law applicable" to "transaction[s]" regulated by the Act. *Id.* at 1494. But in 1974, Congress established a federal agency, the CFTC, to oversee the Act's regulatory framework, charging the CTFC with regulating registered derivatives exchanges and promoting the "integrity, resilience, and vibrancy of the U.S. derivatives markets."[11] And this time, with the benefit of hindsight, Congress granted the CFTC "exclusive jurisdiction" over transactions involving derivatives instruments that are listed and traded on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A).

41.    In amending the Act to establish the CFTC, Congress sought to centralize authority over regulated derivatives markets in the federal government and ensure nationwide uniformity in those markets. The Act's drafting history makes that plain. Specifically, in establishing the CFTC and conferring on the CFTC "exclusive jurisdiction" over transactions regulated by the Act, Congress also eliminated the existing provision of the CEA that preserved "any State law applicable" to futures trading. *See* H.R. Rep. No. 93-1383, at 35 (1974); *see also* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete"). And when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "*except as hereinabove provided*" in the grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

42.    The 1974 amendments to the CEA reflected Congress's concerns that the regulation of derivatives exchanges under "different State laws would just lead to total chaos." *Commodity Futures Trading Comm'n Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (statement of Sen. Clark); *see also Review of Commodity Exch. Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Ag.*, 93d Cong. 10-11 (1973) (statement of Rep. Smith) (advocating that "trading in all

---

[11] *See The Commission*, CFTC, https://www.cftc.gov/About/AboutTheCommission.

SNELL
& WILMER

1    futures should be under Federal regulation").  Congress thus created a federal regulatory regime in

2    which there would be no "need for any supplementary regulation by the States"; instead, "[u]nder

3    the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange

4    Act . . . would preempt the field insofar as futures regulation is concerned."  S. Rep. No. 93-1194,

5    at 35-36 (1974); *see Effex Cap., LLC* v. *Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (the

6    "history of the [1974 amendments]" shows that Congress "fear[ed]" that "states would regulate the

7    futures markets to a chaotic effect" "without increased federal regulation").

8       43.    As part of the 1974 amendments, Congress also expanded the CEA's definition of

9    "commodity" to include "all other goods and articles . . . and all services, rights, and interests . . .

10   in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).  That

11   amendment extended the CFTC's jurisdiction to reach all "futures trading that might now exist or

12   might develop in the future."  H.R. Rep. No. 93-975, at 76 (1974).

13      44.    In 2010, Congress again amended the CEA and broadened the CFTC's exclusive

14   jurisdiction over derivatives traded on federally registered exchanges to specifically cover "swaps."

15   In pertinent part, the Act grants the CFTC "*exclusive jurisdiction . . . with respect to . . . transactions*

16   *involving swaps* or contracts of sale of a commodity for future delivery . . . *traded or executed on*

17   *a contract market designated* pursuant to section 7 of this title."  7 U.S.C. § 2(a)(1)(A) (emphasis

18   added); *see* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC*

19   *Derivatives*, 13 Va. L. & Bus. Rev. 1, 13 (2019) (noting that the 2010 amendment gave the CFTC

20   an "explicit congressional mandate to carry out regulation of the swap markets under federal law

21   free from potential state interference").[12]  Congress expansively defined the term "swap" to include,

22   among other things, any "agreement, contract, or transaction" that "provides for any purchase, sale,

23

---

24   [12] The CEA's grant of exclusive jurisdiction to the CFTC contains limited carveouts.  The first
     preserves the independent jurisdiction of the SEC and other federal agencies over instruments
25   within their statutory mandates (for example, the SEC retains authority over security-based
     swaps).  *See* 7 U.S.C. § 2(a)(1); 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The second provides a
26   narrow grant of authority to States to enforce generally applicable laws against *off*-exchange
     transactions—*i.e.*, those not conducted on a DCM—or against *un*registered entities.  7 U.S.C. §
27   16(e)(1).  Neither exception applies to the event contracts that Coinbase will make available to its
     customers because those products are traded exclusively on a CFTC-registered contract market
28   and do not fall within the portfolio of another federal agency.

payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(i)-(ii).

45.    As courts have emphasized, "the definition of a 'swap' in the CEA is broad"; indeed, Congress expressly extended the definition to cover "yet unknown 'agreement[s], contract[s], or transaction[s] that [are], or in the future become[], commonly known to the trade as a swap.'" *United States* v. *Phillips*, 690 F. Supp. 3d 268, 286 (S.D.N.Y. 2023) (quoting 7 U.S.C. § 1a(47)(A)(iv). In defining the term "swap" expansively, Congress sought to prevent regulated entities from "'gam[ing] the system' by labeling or structuring transactions that are swaps" to appear outside the CEA's reach. 156 Cong. Rec. S5924 (daily ed. July 15, 2010) (statement of Sen. Lincoln).[13]

### C.    Because Event Contracts Are "Swaps," The Entities That Offer Event Contracts For Public Trading Must Comply With The Comprehensive Regulatory Framework Established By The CEA And CFTC

46.    As the CFTC has consistently recognized, event contracts are "swaps," subject to the CFTC's exclusive jurisdiction.[14]  That is because event contracts are binary contracts that pay

---

[13] In scoping the bounds of the CEA's "swap" definition, the CFTC has long recognized that a product's classification as a swap turns on its transactional and structural characteristics along with how market participants are historically regulated rather than the subject matter underlying the transaction. *See* Further Definition of "Swap," "Sec.-Based Swap," and "Sec.-Based Swap Agreement; Mixed Swaps; Sec.-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48211, 48246 (Aug. 13, 2012) (recognizing that the CEA's "swap" definition could be read in an overly broad manner so as to improperly "include certain types of agreements, contracts, and transactions that [historically] have not been considered swaps" such as "agreements to purchase home heating fuel" or "insurance products"). Under that approach, the CFTC concluded, for instance, that certain insurance products were not covered by the CEA's definition of a swap because nothing in the CEA indicates that Congress intended for those products, which were historically regulated under state law, to be regulated as swaps. *Id.* at 48212-48220.

[14] *See, e.g., In re Trade Exchange Network*, CFTC No. 05-14 (Sep. 29, 2005) (entering a consent order against defendant who solicited and accepted orders from U.S. residents for binary options, structured similarly to modern event contracts); *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options"); *In re Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09, 2, 5 (Jan. 3, 2022) ("Polymarket is an online trading platform that offers binary options in the form of winner-take-all 'event contracts' . . . . Binary options are swaps as defined under Section 1a(47) of the [CEA]."); *Clarke* v. *CFTC*, 74 F.4th 627, 633-634 (5th Cir. 2023) (CFTC staff have permitted PredictIt to operate a "futures market for politics" under a no-action letter issued in 2014); Appellant CFTC's Brief at 12 & 12 n.11, *KalshiEX, LLC* v. *CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205) ("Kalshi's event contracts are a form of options, typically known as binary options. . . . [T]hese particular binary options fall within the definition of a swap.").

out depending on the "occurrence [or] nonoccurrence" of a future "event or contingency."[15]   7 U.S.C. § 1a(47)(A)(ii).   And the underlying event is "associated with a potential financial, economic, or commercial consequence."  *Id.*  For example, whether a hurricane bombards Florida's Gulf Coast bears obvious financial implications for hotel owners and the entire Tampa economy.

47.     Instruments with this structure have long been recognized by courts, the CFTC, and market participants as standard forms of swaps.  For example, one-touch or "digital" options on major currency pairs or commodities pay a fixed amount if a specified condition occurs—such as the euro-dollar exchange rate exceeding a threshold or oil prices closing above a specified strike price.  *See, e.g.*, *Phillips*, 690 F. Supp. 3d at 285 (holding that one-touch or "barrier" options on the USD/ZAR exchange rate are swaps).  Event contracts, too, provide for payment upon the occurrence or nonoccurrence of a defined condition.  7 U.S.C. § 1a(47)(A)(ii), (iv).[16]  And event contracts, too, are swaps subject to the CFTC's exclusive jurisdiction.[17]

48.     Indeed, Congress enacted a Special Rule to govern CFTC review and approval of "event contracts."  *See* Dodd-Frank Wall St. Reform Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).  As further detailed below, event contracts that comply with the relevant statutory requirements can be "listed" for "trading" on federally registered exchanges.  That Congress expressly vested the CFTC with authority to review and approve "event contracts" underscores that

---

[15] Depending on how a particular event contract is structured, it could also fall within other prongs of the CEA's "swap" definition.  *See* 7 U.S.C. § 1a(47)(A).  For example, a contract referencing whether it will rain in Las Vegas could also be structured as a binary option that pays out based on whether the total of inches of rain exceeds a certain number.  In that case, the contract could be a swap under the first prong of the "swap" definition, which covers "any agreement, contract, or transaction" that is an "option of any kind" based on the value of one or more "quantitative measures."  *Id.*  Similarly, the CFTC has also recognized that event contracts may be structured as futures contracts.  Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670 (May 7, 2008).  In all events, the CEA's preemptive force would remain the same:  Section 2(a)(1)(A) confers exclusive jurisdiction on the CFTC over swaps, commodity options, and futures contracts traded or executed on DCMs.  7 U.S.C. § 2(a)(1)(A).

[16] *See, e.g.*, CME Group, *CFTC Regulation 40.2(a) Certification.  Initial Listing of Event Contract Swaps on Pro Basketball Games, Pro Football Season Championship, and College Football Games*, CME Submission No. 25-466 (Nov. 19, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/11/ptc11192532737.pdf (explaining that sports event contracts were swaps based on "the occurrence or non-occurrence of a specified event").

[17] *See* Braeden Anderson, *The Tricky Issues Underscoring Prediction Market Regulation*, Law360 (Dec. 15, 2025), https://www.law360.com/articles/2420739/the-tricky-issues-underscoring-prediction-market-regulation.

- 15 -

1  these instruments are "swaps" falling within the CFTC's "exclusive jurisdiction," as the "swap"

2  definition itself makes clear.  *See* 7 U.S.C. § 1a(47)(A).

3       49.     To offer event contracts (like other derivatives) for public trading, exchanges must

4  be designated by the CFTC as a contract market and comply with the Commission's extensive

5  regulations governing the buying and selling of derivatives.  To be designated under Section 7 of

6  the CEA as a DCM, an exchange must demonstrate its ability to comply with the CFTC's

7  comprehensive regulatory regime, which includes a list of 23 "Core Principles."  *See* 7 U.S.C.

8  §§ 2(e), 7(a); *see also* 17 C.F.R. 38.3(a)(2).  An exchange's status as a "[designated] contract

9  market [DCM] imposes upon it a duty of self-regulation, subject to the Commission's oversight,"

10  such as "enact[ing] and enforc[ing] rules to ensure fair and orderly trading." *Am. Agric. Movement,*

11  *Inc.* v. *Bd. of Trade*, 977 F.2d 1147, 1150-1151 (7th Cir. 1992), *abrogated on other grounds by*

12  *Time Warner Cable* v. *Doyle*, 66 F.3d 867 (7th Cir. 1995).  And if a DCM fails to fulfill its ongoing

13  responsibility to comply with the relevant regulations, the CFTC may suspend or revoke the

14  exchange's official designation.  7 U.S.C. § 8(b).

15       50.     Similarly rigorous regulations apply to FCMs, the intermediaries like Coinbase that

16  facilitate customer access to derivatives traded on DCMs.  As with DCMs, FCMs must register

17  with the CFTC and adhere to comprehensive statutory and regulatory requirements, including

18  reporting rules, public disclosure obligations, financial requirements, and recordkeeping demands.

19  *See* 17 C.F.R. 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00.  FCMs must further "establish,

20  maintain, and enforce a system of risk management policies and procedures designed to monitor

21  and manage the risks associated with" the FCM's activities.  17 C.F.R. 1.11(c), (e).  CFTC

22  regulations also mandate that FCMs "adopt and implement written policies and procedures" to

23  ensure compliance with CFTC conflict-of-interest rules and "establish and enforce internal rules,

24  procedures and controls" relating to certain trading standards.  17 C.F.R. 1.71(b)(1), 155.3(a).  An

25  FCM that does not comply with these and other requirements "must transfer all customer accounts

26  and immediately cease doing business as a futures commission merchant until such time as the firm

27  is able to demonstrate such compliance."  17 C.F.R. 1.17(a)(4).

28

SNELL & WILMER

51.     The CFTC—along with the U.S. Department of Justice—enforces the CEA's requirements and monitors commodity derivatives offered and sold on DCMs.  If a DCM or FCM violates applicable CEA requirements or implementing regulations, the CFTC, which is charged with safeguarding the integrity of these markets, may initiate an investigation, pursue an enforcement action in administrative proceedings, or sue in federal court.  CFTC, Div. of Enforcement, Enforcement Manual § 3.3 (2020).  The CFTC may also pursue a variety of sanctions, including civil monetary penalties; injunctive relief; cease-and-desist orders; restitution; disgorgement; or "the suspension, denial, revocation, or restriction of registration and trading privileges."  *Id.*  And if the Commission discovers evidence of potential criminal violations, it may refer the matter to the Department of Justice or appropriate state authority for prosecution.  *Id.*

52.     Exchanges must also comply with federal law and regulations when listing event contracts.  *See* 17 C.F.R. 38.4, 40.2.  To list event contracts on a DCM, exchanges may either submit the new contracts to the CFTC for approval before listing or self-certify that the contracts comply with the Commission's requirements.  7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. 40.2(a), 40.3(a), 40.11(c).  The CFTC "shall approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  Certification does not allow a DCM to evade the CFTC's supervision:  The CFTC has a 10-day window to "stay[] the certification" for additional review.  *Id.* § 7a-2(c)(3).  If the Commission does not act within this period, the new contract is deemed approved and "shall become effective."  *Id.* § 7a-2(c)(2).

53.     Granted, when Congress created this regime, it understood that certain event contracts may warrant particular attention, such as those that "involve" "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming."  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii); *see also* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sens. Lincoln and Feinstein).  But rather than employ the blunt hammer of blanket prohibition, Congress provided the CFTC with the scalpel of case-by-case review.  Under the 2010 Special Rule, *see supra* ¶ 48, the CFTC has discretion to review and prohibit specific event contracts that fall within these enumerated categories, including those that involve "gaming," if the CFTC

determines that the contract is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Unless the CFTC so determines, however, such event contracts can be "listed" for "trading" on federally registered exchanges. *Id.*; *see* 17 C.F.R. 40.11(a)(1)-(2). But even as these markets have matured into a multi-billion-dollar industry, the CFTC has never prohibited an event contract listed by Kalshi on the grounds that it involves gaming or is contrary to the public interest.[18]

**D.    Coinbase Partners With Kalshi To Offer Event Contracts On Coinbase's Platform.**

54.    As noted above, Kalshi is a CFTC-registered DCM that lists swaps, including event contracts, for trading. Contracts traded on Kalshi's exchange involve events that run the gamut from politics to climate to public health. Listed contracts include whether the United States will experience a recession next year; whether Los Angeles will suffer another string of wildfires; whether India will achieve its 2030 climate goals; and whether the market share for electric vehicles will exceed 50% in 2030.

55.    On December 17, 2025, Coinbase announced that it would begin offering its customers the ability to trade event contracts on Coinbase's platform through a partnership with Kalshi. And as of January 28, 2026, Coinbase hosts event contracts on its platform, providing its customers with access to the array of contracts listed on Kalshi's exchange while using Coinbase's simple, familiar, and user-friendly interface. Coinbase customers place orders for event-contract trades through their Coinbase accounts, and the trades are executed on Kalshi's CFTC-designated exchange and settled through Kalshi's CFTC-registered clearinghouse. And by virtue of using Coinbase's trusted platform, users can be confident they are trading on a secure and compliant platform. They can likewise rely on Coinbase to perform the core functions of an FCM—*i.e.*, to hold customer funds in segregated accounts, to reconcile positions and trade data, and to provide customers with daily statements and regulatory reporting.

---

[18] In 2023, the CFTC issued an order prohibiting Kalshi from listing election-related event contracts on the ground that such contracts involve "gaming" and "unlawful" activity. But a federal district court vacated this order after concluding that such contracts did not "involve" either enumerated category, *see KalshiEX LLC* v. *CFTC*, No. 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), and the CFTC subsequently moved for dismissal of its appeal, *see* 2025 WL 1349979 (D.C. Cir. May 7, 2025).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL
& WILMER

### E. Nevada Brings A Civil Enforcement Action Against Coinbase For Hosting Event Contracts On Its Platform.

56.    On February 2, 2026, Nevada filed a civil enforcement action seeking declaratory and injunctive relief against Coinbase.  The State requested an alarmingly broad injunction that would restrain Coinbase for making available event contracts based on "sporting or other events" in the State. Ex. C at 11.  In support, Defendants allege that event contracts constitute "wagers," Nev. Rev. Stat. § 463.01962 (defining "wager" as "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain"), "sports pools," Nev. Rev. Stat. § 463.0193 (defining "sports pool" as "the business of accepting wagers on sporting events or other events by any system or method of wagering"), and "games," Nev. Rev. Stat. § 463.0152 (defining "game" as "any game played with . . . equipment or any mechanical or electronic device or machine for money"), under Nevada law.  *Id.* at 4-5.  And because Coinbase has not obtained a Nevada gaming license, Defendants alleged that the company's actions violate state law.  Ex. C at 6-8.

57.    Nevada's sweeping claims are not even limited to sports or election event contracts. Perhaps recognizing there is no principled distinction between sports, election or any other event contract, the State abandons any pretense of a limitation and asserts authority over *all* event contracts—in its words, event contracts based on "sporting events *and other events[.]*" *Id.* at 4 (emphasis added).  This position would forbid not only event contracts about whether the Las Vegas Raiders will make the playoffs next year, but also contracts about whether crude oil prices will reach a new threshold or whether the Federal Reserve will lower interest rates at the next meeting of the Federal Open Market Committee.  The State's position would render the CFTC's "exclusive jurisdiction" over event contracts a dead letter.

58.    Not only is Nevada extending its reach to the full scope of federally regulated event contracts, but it is doing so on an emergency basis.  Without so much as hinting that it had concerns with any—much less all—of the event contracts available through Coinbase, Nevada suddenly appeared on February 2, claiming in state court that it needed an *ex parte* temporary restraining order to avoid irreparable harm.  Nevada further rebuffed Coinbase's attempts to address this dispute in an orderly way, stating that it would "agree to a reasonable briefing schedule/argument

1    date" *only if* "Coinbase can agree to cease operations in Nevada while the Motion for PI is decided."

2    Ex. F at 1.

3                                          **CLAIMS FOR RELIEF**

4                                                **COUNT I**
                                         **United States Constitution**
5                    **(Supremacy Clause – Preemption by Commodity Exchange Act)**
                                          U.S. Const. art. VI, cl. 2.
6

7          59.     Coinbase repeats and incorporates by reference all the allegations set forth above.

8          60.     Under the Supremacy Clause, "state laws that interfere with, or are contrary to, the

9    laws of congress . . . are invalid." *Wisconsin Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991)

10   (internal quotation marks and citation omitted).  That is because, in our constitutional system, "the

11   [Federal] Constitution and laws passed pursuant to it are as much laws in the States as laws passed

12   by the state legislature[s]." *Howlett* v. *Rose*, 496 U.S. 356, 367 (1990).  Thus, any application of

13   state law that is preempted by a federal statute is null and void. *See Perez* v. *Campbell*, 402 U.S.

14   637, 652 (1971) (such laws are "rendered invalid by the Supremacy Clause" and "thus may not

15   stand").  In those instances, in other words, the state law is entirely "without effect." *Maryland* v.

16   *Louisiana*, 451 U.S. 725, 746 (1981).

17         61.     The Supreme Court has made clear that federal law can preempt state law both

18   expressly or impliedly.  *See Geier* v. *Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000).

19   Express preemption occurs when Congress's intent to foreclose state regulation is "explicitly stated

20   in the statute's language." *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 525 (1977).  In such cases,

21   courts are tasked with interpreting "the plain wording of the statute" to deduce the scope of

22   Congress's preemptive intent. *Am. Apparel & Footwear Ass'n, Inc.* v. *Baden*, 107 F.4th 934, 939

23   (9th Cir. 2024).

24         62.     Federal courts find implied preemption when Congress's preemptive intent is

25   "implicitly contained in [the statute's] structure and purpose." *Fid. Fed. Sav. & Loan Ass'n* v. *de

26   la Cuesta*, 458 U.S. 141, 153 (1982) (internal quotation marks omitted) (quoting *Jones*, 430 U.S.

27   at 525).  Field and conflict preemption are two different forms of implied preemption. *See Oneok,

28   Inc.* v. *Learjet, Inc.*, 575 U.S. 373, 377 (2015).  Field preemption occurs when Congress designs a

comprehensive and detailed regulatory scheme that demonstrates Congress's intent to "occup[y] an entire field," making "even complementary state regulation . . . impermissible." *Arizona* v. *United States*, 567 U.S. 387, 401 (2012). And conflict preemption is triggered when state law represents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941), whether the "'obstacle' goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference, or the like,'" *Geier*, 529 U.S. at 873 (internal quotation marks and citation omitted).

63.    Under any and all of these preemption frameworks, Nevada's gambling laws are preempted to the extent Defendants seek to enforce these laws against Coinbase for offering access to event contracts on federally registered exchanges. Text, context, statutory structure, and common sense all militate in favor of preemption.

64.    Most fundamentally, Congress wrote express preemption language into the CEA, and that deliberate choice should be dispositive. Congress expressly granted the CFTC "exclusive jurisdiction" to regulate "accounts," "agreements," and "transactions involving swaps . . . traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A). The term "swaps" as defined in the CEA and as interpreted by the CFTC encompasses the event contracts that Coinbase hosts on its platform, including those that are related to sporting events. And contemporaneous dictionaries define "exclusive" as "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," *Exclusive*, Black's Law Dictionary (5th ed. 1979), and similarly define "exclusive jurisdiction" as "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979). Accordingly, the CFTC's "exclusive jurisdiction" over swaps traded on DCMs must be understood as precluding State "interference" with transactions involving event contracts listed on federally registered exchanges. And when, as here, "Congress has made its [preemptive] intent known through explicit statutory language," *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), courts are tasked with giving effect

1  to the statute's "plain wording" to hold state law preempted, *Am. Apparel & Footwear*, 107 F.4th

2  at 939.[19]

3      65.    Indeed, federal courts hav e understood phrases like "exclusive jurisdiction" in

4  other federal statutes to broadly displace state law.  For example, the Third Circuit has reasoned

5  that the "explicit statutory conferral of exclusive jurisdiction" on a federal body—there, a federal

6  court—over a particular subject area "is a form of express preemption" that precludes state

7  authority "over that same subject matter." *Transcon. Gas Pipe Line Co., LLC* v. *Pa. Env't Hearing*

8  *Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024); *see also, e.g.*, *Slaney* v. *Int'l Amateur Athletic Fed'n*,

9  244 F.3d 580, 595-596 (7th Cir. 2001) (holding that a federal statute's grant of "exclusive

10  jurisdiction" to the United States Olympic Committee preempts state law).  That logic applies

11  equally to Congress's explicit grant of exclusive jurisdiction to the CFTC over swaps traded on

12  DCMs.  Any state-law regulation of the transactions falling within the CFTC's "exclusive

13  jurisdiction," including event contracts traded on federally registered exchanges, is thus expressly

14  preempted.[20]

15      66.    The statutory context and history reinforce the clear import of the CEA's text.  As

16  one commentator explained, "preemption was a central issue in the proceedings which culminated

17  in the 1974 amendments to the CEA."  Kevin T. Van Wart, *Preemption and the Commodity*

18  *Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).  Congress understood

19  that it would be unreasonable to expect investors and business owners relying on new technologies

---

[19] Although some courts have analyzed Section 2's exclusive-jurisdiction provision through the lens of field, rather than express, preemption, *see, e.g.*, *Hofmayer* v. *Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978), the critical point is that all these courts construed Section 2 to preempt state laws that would otherwise apply to derivative transactions on federally regulated exchanges.  *Cf. Crosby* v. *National Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (recognizing that "the categories of preemption are not rigidly distinct.") (cleaned up).

[20] The CEA's grant of exclusive jurisdiction contains limited carveouts.  The first preserves the independent jurisdiction of the SEC and other federal agencies over instruments within their preexisting statutory mandates.  The second provides a narrow grant of authority to States to enforce generally applicable laws against off-exchange transactions or against persons who fail to obtain CFTC registration.  7 U.S.C. § 16(e)(1); *see also see* H.R. Rep. No. 97-565, Pt. 1, at 43 (1982) (States may regulate "those who offer fraudulent *off-exchange* investments" and other "transactions *outside those preserved exclusively* for the jurisdiction of the CFTC" (emphasis added)).  Neither exception applies to the event contracts that Coinbase intends to make available to its customers because those contracts are traded exclusively on federally registered exchanges and do not fall within the portfolio of another federal agency.

SNELL
& WILMER

to navigate a patchwork of state-level gambling regulations; "[i]t [wa]s abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 44-45 (1974). The conference report accompanying the 1974 amendments made clear that the amendments were designed to "*preempt the field* insofar as futures regulation is concerned"; Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (emphasis added). Federal courts have honored Congress's "firmly expressed" mandate that the "futures industry" be federally regulated, *Kelly* v. *Carr*, 691 F.2d 800, 803 (6th Cir. 1980), recognizing that any state law that would "directly affect trading on or the operation of a futures market" is preempted. *Am. Agric. Movement* v. *Board of Trade*, 977 F.2d at 1156-1157.

67. And in 2010, Congress took the same approach by vesting "exclusive jurisdiction" in the CFTC over, as relevant here, transactions "involving swaps or contracts" that are "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A); *see* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019) (explaining that the 2010 amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures").

68. The extensive regulatory framework established by the CEA also demonstrates Congress's intent to occupy the field of commodity futures and swaps trading on CFTC-designated markets with federal regulation. Pursuant to express statutory authority, the CFTC has created a comprehensive regulatory scheme to govern transactions encompassing event contracts traded on a DCM, from start to finish.

69. Indeed, federal law governs every aspect of event-contract transactions on federally registered exchanges, facilitated by federally registered intermediaries. First, the CFTC has exclusive jurisdiction to review and approve the event contracts themselves. *See supra* ¶¶ 48, 52-53. Second, the DCMs that list the contracts must be designated by the CFTC and are subject to extensive regulations under the CEA and the CFTC's rules, including those governing market access, trade integrity, and market monitoring (17 C.F.R. 38.151, 38.250-255), public disclosure of contract terms and market rules (17 C.F.R. 38.400-38.401), and protection of market participants

- 23 -

SNELL
& WILMER

from abusive practices (17 C.F.R. 38.650-651). Third, FCMs—like Coinbase—that facilitate customer access to event contracts are subject to an additional layer of comprehensive regulatory oversight, which requires, among other things, maintaining minimum financial capital (17 C.F.R. 1.17), managing and disclosing conflicts of interest (17 C.F.R. 1.71), and safeguarding customer assets through strict segregation requirements (17 C.F.R. Part 22). This three-layered federal regulatory scheme prohibits concurrent state authority over the same transactions; Nevada's enforcement of state law against Coinbase for those same transactions encroach on the field that the CFTC exclusively occupies. Simply put, the CEA leaves no room for state participation in the regulation of swaps and event contracts traded on CFTC-designated exchanges.

70.     Additionally, Nevada's enforcement of its state gambling laws against Coinbase creates an impermissible obstacle to achieving Congress's objectives and purposes. *See Am. Agric. Movement*, 977 F.2d at 1156-57 (recognizing that any state law that would "directly affect trading on or the operation of a futures market" is preempted). One of Congress's principal goals in enacting the CEA was to create a uniform approach to regulating futures, thereby preventing the "total chaos" that would ensue if "different State laws" could be applied to the futures market. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (statement of Sen. Clark). In granting the CFTC "exclusive" jurisdiction over swaps traded on a DCM, Congress codified this objective into law. Permitting States—including Nevada—to separately decide whether and how to regulate activity involving event contracts traded on a DCM would frustrate Congress's goal of creating uniformity in the futures market and necessarily create State-by-State "chaos."

71.     Defendants would subject Coinbase to legal requirements that are fundamentally inconsistent with the company's status as a nationwide FCM and would invite the "total chaos" that Congress intended to avoid via the CEA. For example, if Coinbase obtained a Nevada gambling license—as the State alleges is legally mandated, *see* Ex. C at 11—the company would be required to restrict its services to only people who are physically located within Nevada, *see* Nev. Gaming Control Bd., *Regulation 22: Race Books and Sports Pools* 14 (Nov. 2024),

https://tinyurl.com/2aa452nt. And if Coinbase intended to serve customers in nearby States, the company would be forced to obtain a similar license imposing similar geographic limitations. *See, e.g.*, Ariz. Rev. Stat. Ann. § 5-1302(G)(4). Besides being impractical and prohibitively costly due to the compliance, capitalization, and other requirements Coinbase must adhere to as an FCM, these geographic barriers would sap prediction markets of their liquidity, a necessary element for survival because event contracts can only be executed if a buyer and a seller can be paired at the same odds (because, unlike a bookmaker, Coinbase is not on either side of the trade).

72. Further, according to Nevada, the DCMs with which Coinbase must partner are *also* subject to these geographic limitations.[21] But it would be impossible for DCMs to comply with this state-law restriction while also adhering to the federal-law requirement that DCMs provide "impartial [market] access" to all "persons with trading privileges," many of whom reside in one of the other 49 States. 17 C.F.R. 38.151(b). Given these direct conflicts, state law must yield.

73. Moreover, the State's enforcement of its gambling laws against event contracts are premised on the thesis that these contracts involve gaming. But the 2010 Special Rule expressly grants the CFTC authority to "review" event contracts involving "gaming" to determine if such contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c); *see supra* ¶ 48. If Nevada is right that event contracts are not "swaps" because they concern gaming, they would fall outside the CFTC's jurisdiction altogether, making this provision of the Special Rule entirely superfluous. There is no basis to read that language out of the statute. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("the canon against surplusage applies with special force" when a proposed statutory construction "render[s] an entire subparagraph meaningless" (brackets in original)).

\* \* \*

74. The CEA thus preempts Nevada's law many times over. Indeed, nearly every court to interpret Section 2(a)(1)(A)'s grant of exclusive jurisdiction has construed that provision to

---

[21] *See* Press Release, Nev. Gaming Control Bd., *Nevada Gaming Control Board Issues Cease and Desist Order to Company Engaged in Unlawful Gaming* (Mar. 4, 2025), https://tinyurl.com/5797273m.

preempt state laws that purport to regulate transactions on CFTC-regulated exchanges.[22]  And Congress has never considered disturbing this judicial consensus.  Just the opposite:  Congress has *broadened* the CEA's reach by adding "swaps" to the CFTC's exclusive jurisdiction and conferring special discretion on the Commission to review and prohibit particular event contracts.  These amendments, moreover, came against a settled backdrop of judicial opinions interpreting the CEA to preempt state-law regulation of covered transactions.  Those amendments thus provide forceful evidence that Congress intended for the CEA to be construed broadly.  *Cf. Goodyear Atomic Corp.* v. *Miller*, 486 U.S. 174, 176 (1988) (Congress is presumed to know the state of the "existing law pertinent to the legislation it enacts").

75.    As courts have recognized time and again, when it comes to inherently interstate technologies like online event-contract markets, federal rules are generally preferable to state ones.  *See, e.g.*, *Am. Booksellers Found.* v. *Dean*, 342 F.3d at 104 (2d Cir. 2003); *ACLU* v. *Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999).  And given the impracticality of complying with 50 state laws and 50 different standards, Nevada must show that Congress blessed a state-by-state legislative regime that would effectively make "the most stringent" state "standard" a *de facto* national standard, turning our system of federalism upside down and raising serious Dormant Commerce Clause concerns.  *Am. Libraries Ass'n* v. *Pataki*, 969 F. Supp. 160, 183 (S.D.N.Y. 1997).  Nevada cannot provide any such evidence—all textual, structural, and historical indicia are to the contrary.

---

[22] *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156 (state law affecting trading on a futures market is preempted); *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[Section] 2(a)(1) of the CEA preempts the application of state law."); *Jones* v. B.*C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("[S]tate regulatory agencies are . . . preempted by the 'exclusive jurisdiction' of the CFTC."); *Hofmayer* v. *Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) (highlighting Congress's "plainly stated intent to . . . preempt the field of regulation of commodity futures trading"); *Paine, Webber, Jackson & Curtis, Inc.* v. *Conaway*, 515 F. Supp. 202, 204 (N.D. Ala. 1981) (Alabama gambling law voiding futures contracts not intended for delivery is preempted); *Int'l Trading, Ltd.* v. *Bell*, 556 S.W.2d 420, 423-24 (Ark. 1977) (emphasizing Congress's "clear intention to vest exclusive jurisdiction of the regulation of commodity options in the [CFTC] and to supersede the jurisdiction of all state and federal agencies"); *Clayton Brokerage Co. of St. Louis, Inc.* v. *Mouer*, 531 S.W.2d 805, 806 (Tex. 1975) (Texas securities law applied to "London commodity options" is preempted); *see also KalshiEX LLC* v. *Flaherty*, 2025 WL 1218313, at *5 (D.N.J. Apr. 28, 2025) (CEA's "exclusive-jurisdiction language reflects an intent to occupy the field").  *But see KalshiEX LLC* v. *Martin*, 793 F. Supp. 3d 667, 676 (D. Md. 2025) (finding that the CEA does not preempt Maryland's gaming laws); *KalshiEX LLC* v. *Hendrick*, 2025 WL 3286282, at *1 (D. Nev. Nov. 24, 2025) (finding that the CEA does not preempt Nevada's gaming laws).

SNELL
& WILMER

76.     Accordingly, Coinbase is entitled to a preliminary injunction.    To obtain a preliminary injunction, the moving party must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without immediate relief; (3) the balance of the equities supports equitable relief; and (4) the injunction is in the public's interest.    *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).    As explained above, Coinbase is likely to succeed on the merits because the CEA preempts Nevada law several times over.

77.     Additionally, Coinbase will suffer irreparable harm without injunctive relief.    It is hornbook law that a regulated party satisfies the irreparable-harm prong if the party risks ruinous criminal or civil liability by failing to comply with a preempted state law.    *Ex parte Young*, 209 U.S. 123, 148 (1908).    This case perfectly illustrates why.    Unless and until Coinbase obtains clarity about whether Nevada gambling laws are preempted as to event contracts traded on federally registered exchanges, Coinbase confronts a Hobson's choice.    The company must either refrain from offering event contracts on its platforms altogether—even though they are a critical part of the company's business plan and a product that Coinbase has invested significant resources building over the last six months for its customers—or subject itself to Nevada's bet-the-farm enforcement action.    Nevada's laws are clear on this front:    If Coinbase is judged to have violated the Nevada Revised Statutes—which the State wrongly contends cover Coinbase's offering of event contracts—then it will be subject to civil penalties.

78.     Nevada's enforcement action also jeopardizes Coinbase's reputation as a company that complies with all relevant federal and state laws.    That is a crucial pillar of Coinbase's business strategy; the company has won investors' and consumers' trust by establishing a name for itself as a sophisticated, law-abiding player in the industry.    That hard-earned reputation is critical to Coinbase's mission of building a new and transparent financial system.    Without it, Coinbase would not be able to partner with millions of Americans who purchase digital assets on its platforms. Absent correction, Nevada's civil enforcement action and public stance that a critical piece of Coinbase's business violates the State's gambling laws threatens to erode the company's good name and standing.

79.     Meanwhile, if Coinbase instead refrains from offering Nevada users access to prediction markets until it eventually obtains a favorable final judgment, Coinbase would risk losing the goodwill of its customers and market share while waiting for legal certainty—and neither type of loss would be easily recoverable through routine litigation.  These threats to Coinbase thus constitute additional irreparable harms.  *See Abdou* v. *Davita, Inc.*, 734 F. App'x 506, 506 (9th Cir. 2018) ("Damage to a company's goodwill and reputation can constitute irreparable harm because this sort of harm is difficult to measure.").  And the doctrine of sovereign immunity would bar Coinbase from obtaining monetary damages at the end of this litigation, even if those damages could be calculated.  Selectively prohibiting Nevada users from accessing event contracts on Kalshi's exchange, moreover, puts Coinbase and its partner at risk of being accused of violating *federal* law, which requires a federally registered exchange to provide "impartial access to its markets and services."  17 C.F.R. 38.151(b).

80.     Coinbase also satisfies the other prongs of the preliminary-injunction test.  The balance of the equities decisively cuts in Coinbase's favor because Nevada has no cognizable interest in enforcing state laws when those laws are preempted by federal law.  *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988) ("Under the Supremacy Clause of the Federal Constitution, the relative importance to the State of its own law is not material when there is a conflict with a valid federal law" (internal quotation marks and citation omitted)).  And likewise, the public's interest is in ensuring that the State follows the Constitution, which establishes the supremacy of federal law.  *See Valle del Sol Inc.* v. *Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("It is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law." (cleaned up)).

81.     Granting injunctive relief to Coinbase appropriately recognizes that the CFTC has permitted a large and robust market in event contracts to flourish, creating substantial reliance interests among all market participants.  Coinbase and other market facilitators being targeted by state gambling regulators have devoted significant resources to building CEA-compliant infrastructure to host event contract trading given substantial interest from investors and consumers,

SNELL
& WILMER

and Nevada's civil enforcement action takes direct aim at those extensive efforts taken in compliance with federal law.

82.  For these reasons, Coinbase seeks declaratory and injunctive relief preventing Defendants from enforcing Nevada laws insofar as they seek to prohibit Coinbase from offering event contracts traded on a CFTC-designated exchange.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Coinbase respectfully requests that this Court enter judgment in Coinbase's favor and against Defendants as follows:

(i)  Issue a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Coinbase the Nevada Revised Statutes, any rules adopted thereunder, and any other Nevada law that attempts to regulate Coinbase's involvement in transactions encompassing event contracts traded on a DCM;

(ii)  Award a declaratory judgment that the Nevada Revised Statutes, any rules adopted thereunder, and any other Nevada law are preempted by federal law, and thus violate the Supremacy Clause of the United States Constitution, insofar as Defendants seek to apply these laws to prohibit Coinbase from offering customers access to event contracts traded on a DCM; and

(iii)  Grant any further relief that the Court deems just and proper.

Dated: February 4, 2026                    SNELL & WILMER L.L.P.


By: */s/ Alex L. Fugazzi*
    Alex L. Fugazzi, Esq.
    Nevada Bar No. 9022
    Brian Reeve, Esq.
    Nevada Bar No. 10197
    SNELL & WILMER L.L.P.
    1700 S. Pavilion Center Drive, Suite 700
    Las Vegas, Nevada 89135

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Benjamin R. Walker *Pro Hac Vice Forthcoming*
James M. McDonald *Pro Hac Vice Forthcoming*
Yaira Dubin *Pro Hac Vice Forthcoming*
Akash M. Toprani *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Jeffrey B. Wall *Pro Hac Vice Forthcoming*
Rishabh Bhandari *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C., 20006

*Attorneys for Plaintiff Coinbase
Financial Markets, Inc.*

SNELL
& WILMER