1  Alex L. Fugazzi, Esq.
   Nevada Bar No. 9022
2  Brian Reeve, Esq.
   Nevada Bar No. 10197
3  SNELL & WILMER L.L.P.
   1700 S. Pavilion Center Drive, Suite 700
4  Las Vegas, Nevada 89135
   Telephone: (702) 784-5200
5  afugazzi@swlaw.com
   breeve@swlaw.com
6
7  Benjamin R. Walker *Pro Hac Vice Forthcoming*
   James M. McDonald *Pro Hac Vice Forthcoming*
8  Yaira Dubin *Pro Hac Vice Forthcoming*
   Akash M. Toprani *Pro Hac Vice Forthcoming*
9  SULLIVAN & CROMWELL LLP
   125 Broad Street
10 New York, NY 10004
   Tel: (212) 558-4000
11 walkerb@sullcrom.com
   mcdonaldj@sullcrom.com
12 dubiny@sullcrom.com
   toprania@sullcrom.com
13 *Attorneys for Plaintiff Coinbase*
   *Financial Markets, Inc.*

Jeffrey B. Wall *Pro Hac Vice Forthcoming*
Rishabh Bhandari *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C., 20006
Tel: (202) 956-7500
wallj@sullcrom.com
bhandarir@sullcrom.com

14                    **UNITED STATES DISTRICT COURT**
                             **DISTRICT OF NEVADA**
15
   COINBASE FINANCIAL MARKETS, INC.;    | Case No.: 2:26-cv-00256
16
                Plaintiffs,
17
        v.
                                         **PLAINTIFF'S MOTION FOR A**
18 AARON D. FORD, in his official capacity as    **TEMPORARY RESTRAINING**
   Attorney General of Nevada; MIKE DREITZER,    **ORDER AND PRELIMINARY**
19 in his official capacity as Chairman of the Nevada    **INJUNCTION AND POINTS AND**
   Gaming Control Board; GEORGE ASSAD, in his    **AUTHORITIES IN SUPPORT**
20 official capacity as a Member of the Nevada    **THEREOF**
   Gaming Control Board; CHANDENI K.
21 SENDALL, in her official capacity as a Member    **EMERGENCY MOTION**
   of the Nevada Gaming Control Board;
22 JENNIFER TOGLIATTI, in her official capacity
   as a Member of the Nevada Gaming Commission;
23 ROSA SOLIS-RAINEY in her official capacity as
   a Member of the Nevada Gaming Commission;
24 BRIAN KROLICKI, in his official capacity as a
   Member of the Nevada Gaming Commission;
25 GEORGE MARKANTONIS, in his official
   capacity as a member of the Nevada Gaming
26 Commission; ABBI SILVER, in her official
   capacity as a member of the Nevada Gaming
27 Commission

                Defendants.
28

- i -

4916-6813-3261

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

    A.    Coinbase, A Federally Registered Intermediary, Partners With Kalshi, A Federally Registered Exchange, To Offer Customers Access To Event Contracts Through Coinbase's Platform. ................................................... 3

    B.    Event Contracts Are Widespread. .......................................................... 3

    C.    Defendants Seek Emergency, *Ex Parte* Relief In State Court To Prevent Coinbase From Offering Any Event Contracts. ....................................... 4

    D.    Even If Coinbase Is Enjoined, Nevadans Can Instead Trade the Same Contracts Available Through Coinbase Directly Through Kalshi, Who Defendants Have Agreed Not To Enjoin. .......................................... 5

LEGAL STANDARD .................................................................................................. 5

POINTS AND AUTHORITIES .................................................................................... 6

I.     COINBASE IS LIKELY TO SUCCEED ON THE MERITS................................ 6

    A.    The CEA Expressly Preempts Nevada's Gambling Laws...................... 6

        1.    Because Congress expressly granted the CFTC "exclusive jurisdiction" over swaps traded on federally registered exchanges, state law that purports to regulate the same transactions is preempted........................... 6

        2.    The event contracts at issue here are (i) swaps (ii) traded on federally registered exchanges. ............................................ 8

    B.    The CEA Impliedly Preempts Nevada's Gambling Laws..................... 11

        1.    Congress intended to occupy the field. .................................... 11

        2.    Nevada's gambling laws are also conflict-preempted............... 13

II.    COINBASE WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER. ................................................................................ 15

III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF. .................................................................................... 16

CONCLUSION ......................................................................................................... 18

4916-6813-3261

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Am. Ag. Movement*, 977 F.2d at 1155 ................................................................. 12, 13

5

6

*Am. Libraries Ass'n* v. *Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997) ................................................................. 14

7

8

*Arizona* v. *United States*,
    567 U.S. 387 (2012) ..................................................................... 6, 11, 15

9

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................................ 6

10

11

*Bilski* v. *Kappos*,
    561 U.S. 593 (2010) ............................................................................... 11

12

13

*In re Blockratize (d/b/a Polymarket.com)*,
    CFTC No. 22-09, 2, 5 (Jan. 3, 2022) ......................................................... 10

14

*Chicago Mercantile Exch.* v. *SEC*,
    883 F.2d 537 (1989) ............................................................................... 7

15

16

*Clarke* v. *CFTC*,
    74 F.4th 627, 633-634 (5th Cir. 2023) ....................................................... 10

17

*Contracts & Products*,
    CFTC, https://tinyurl.com/bdmrjfew .......................................................... 3, 9

18

19

*Curran* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    622 F.2d 216 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ................................. 7, 12

20

21

*Felder* v. *Casey*,
    487 U.S. 131 (1988) ............................................................................... 18

22

23

*FTC* v. *Ken Roberts Co.*,
    276 F.3d 583 (2001) ............................................................................... 12

24

*Hines* v. *Davidowitz*,
    312 U.S. 52 (1941) ................................................................................ 11

25

26

*Hughes* v. *Talen Energy Mktg., LLC*,
    578 U.S. 150 (2016) ................................................................................ 7

27

*INS* v. *Cardoza-Fonseca*,
    480 U.S. 421 (1987) ................................................................................ 8

28

- ii -

SNELL
& WILMER

*KalshiEX LLC* v. *CTFC*,
2024 WL 4164694 (D.D.C. Sep. 12, 2024) ........................................................... 9

*KalshiEX LLC* v. *Flaherty*,
2025 WL 1218313 (D.N.J. Apr. 28, 2025) ............................................................ 7

*KalshiEX LLC* v. *Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ...................................................................... 7

*KalshiEX, LLC* v. *CFTC*,
119 F.4th 58 (D.C. Cir. 2024) .............................................................................. 10

*KalshiEX, LLC* v. *Hendrick*,
2025 WL 3286282 (D. Nev. Nov. 24, 2025) ............................................... 2, 16, 18

*KalshiEX, LLC* v. *Hendrick*
et al., No. 25-07516 (9th Cir. Nov. 28, 2025) ..................................................... 5

*KalshiEX, LLC* v. *Hendrick*,
No. 25-7516, Dkt. 17.1 (9th Cir. Dec. 17, 2025) ............................................... 17

*KalshiEX, LLC* v. *Hendrick*,
No. 25-cv-00575, Dkt. 239-1 (D. Nev. Nov. 25, 2025) ................................ 15, 17

*Leist* v. *Simplot*,
638 F.2d 283 (2d Cir. 1980) ................................................................................. 7

*N. Am. Derivatives Exch., Inc.* v. *Nev. Gaming Control Bd.*,
2025 WL 2916151 (Oct. 14, 2025) ...................................................................... 10

*Nat'l Insts. of Health* v. *Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) (per curiam) ................................................................... 16

*Oneok, Inc.* v. *Learjet, Inc.*,
575 U.S. 373 (2015) ....................................................................................... 6, 11

*Pulsifer* v. *United States*,
601 U.S. 124 (2024) ........................................................................................... 11

*Rice* v. *Bd. of Trade of Chi.*,
331 U.S. 247 (1947) ............................................................................................. 8

*Stuhlbarg Intern. Sales Co.* v. *John D. Brush and Co.*,
240 F.3d 832 (9th Cir. 2001) ........................................................................ 6, 16

*In re Trade Exchange Network*,
CFTC No. 05-14, 1 (Sep. 29, 2005) ................................................................... 10

*United States* v. *Kern*,
2018 WL 1003744 (D. Nev. Feb. 20, 2018) ........................................................ 5

SNELL
& WILMER

4916-6813-3261

*Winter* v. *NRDC*,
        555 U.S. 7 (2008) ................................................................................................................ 5

**Statutes**

7 U.S.C. § 1(a)(47)(A)(ii) ........................................................................................................ 6

7 U.S.C. § 1a(47)(A)(ii) ............................................................................................................ 9

7 U.S.C. § 2(a)(1)(A) ...................................................................................................... *passim*

7 U.S.C. § 2(e) ......................................................................................................................... 12

7 U.S.C. § 7(a) ......................................................................................................................... 12

7 U.S.C. § 7a-2(c) .................................................................................................................... 10

7 U.S.C. § 7a-2(c)(1) ............................................................................................................... 12

7 U.S.C. § 7a-2(c)(4)(A) .......................................................................................................... 12

7 U.S.C. § 7a-2(c)(5)(C)(i) ...................................................................................................... 15

7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii) ................................................................................................. 9

7 U.S.C. § 13a-2(1) .................................................................................................................. 11

7 U.S.C. § 16(e)(1) ................................................................................................................... 12

Nev. Rev. Stat. § 463.0153 ........................................................................................................ 4

Nev. Rev. Stat. § 463.160 ........................................................................................................ 13

Nev. Rev. Stat. § 463.0193 ........................................................................................................ 4

Nev. Rev. Stat. § 463.01962 ...................................................................................................... 4

Ohio Rev. Code Ann. § 3775.11(A) ....................................................................................... 13

Ohio Rev. Code Ann. § 3775.12(A) ....................................................................................... 13

Pub. L. No. 74-675, 49 Stat. 1491, 1494 (1936) ...................................................................... 8

**Other Authorities**

17 C.F.R. 1.10(b) ..................................................................................................................... 12

17 C.F.R. 1.10(d) ..................................................................................................................... 12

17 C.F.R. 1.11(c) ..................................................................................................................... 12

4916-6813-3261

17 C.F.R. 1.11(e) ........................................................................................ 12

17 C.F.R. 1.12 ............................................................................................. 12

17 C.F.R. 1.14 ............................................................................................. 12

17 C.F.R. 1.17 ............................................................................................. 12

17 C.F.R. 1.18 ............................................................................................. 12

17 C.F.R. 1.55 ............................................................................................. 12

17 C.F.R. 1.71(b)(1) .................................................................................... 12

17 C.F.R. 17.00 ........................................................................................... 12

17 C.F.R. 38.3(a)(2) ..................................................................................... 12

17 C.F.R. 38.151(b) ..................................................................................... 16

17 C.F.R. 40.2(a) ......................................................................................... 12

17 C.F.R. 40.3(a) ......................................................................................... 12

17 C.F.R. 40.11(c) ....................................................................................... 12

17 C.F.R. 155.3(a) ....................................................................................... 12

120 Cong. Rec. 30464 (Sep. 9, 1974) (statement of Sen. Curtis) .................. 8

*Concept Release on Regulatory Treatment of Event Contracts,* 73 Fed. Reg.
    25669, 25670 (May 7, 2008) ................................................................. 10

*Exclusive*, Black's Law Dictionary (5th ed. 1979) ....................................... 7

*Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979) ................... 7

H.R. Rep. No. 93-975 (1974) ...................................................................... 13

H.R. Rep. No. 93-1383 (1973) .................................................................... 13

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657, 708 (1982) ...................................................................... 12

Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for
    the New Frontier of Finance* (Jan. 29, 2026) ................................. 16, 17

*Nevada Continued Double-Digit Population Growth*, U.S. Census Bureau:
    NEVADA 2020 Census (Aug. 25, 2021) ............................................... 17

- v -

Nevada.  Nev. Gaming Control Bd., *Regulation 22: Race Books and Sports Pools*
     14 (Nov. 2024) .................................................................................................. 13

Remarks of Chairman Michael S. Selig at CFTC-SEC Event on Harmonization
     (Jan. 29, 2026)................................................................................................. 10

*Thriving Economy*, Travel Nevada Industry Partners (2025) ....................................... 17

SNELL
& WILMER

4916-6813-3261

**PRELIMINARY STATEMENT**

The Nevada Gaming Control Board has manufactured a needless crisis. On December 17, 2025, Plaintiff Coinbase Financial Markets, Inc. ("Coinbase") publicly announced that it would offer its users access to trade federally regulated event contracts on nationwide exchanges. In the six weeks that followed, Coinbase heard not a word of protest from Nevada. But then, on Monday, on less than two hours' notice, Nevada sought an emergency, *ex parte* order from a Nevada state court to restrain Coinbase from making event contracts available to its Nevada users.[1]

Still worse, Nevada did not limit its requested relief to sports- or election-related event contracts, as it has in litigating against every other prediction-markets provider before this Court. Instead, Nevada seeks a do-over from its federal court litigation strategy, now trying to stop Coinbase from providing access to *any* event contracts in Nevada, full stop—whether those contracts relate to commodity prices, interest rates, weather patterns, or any other subject.

In other words, Nevada is seeking a breathtakingly expansive order against Coinbase, in a made-up emergency posture. For almost a year, Nevada has litigated in this Court against the derivatives exchange KalshiEX LLC ("Kalshi") over whether Kalshi's federally regulated event contracts pertaining to sports and elections can be regulated by state authorities. And while that process unfolds, Nevada has agreed not to enforce state laws against Kalshi pending the Ninth Circuit's resolution of Kalshi's request for a stay pending appeal. There is no reason to treat Kalshi and Coinbase any differently. The relevant contracts are one and the same—Coinbase provides its users with access only to *Kalshi's* event contracts (and no others). Yet the State is asking the Nevada state court to prohibit Coinbase from offering a far broader swath of Kalshi-listed event contracts than the State has sought to prohibit *Kalshi* itself from offering, while seeking to deny Coinbase the opportunity to even be heard first. If no emergency or imminent irreparable harm warrants extraordinary relief against Kalshi—or any relief at all as to most of Kalshi's event contracts—then the same must be true for Coinbase.

---

[1] Soon after Nevada filed its emergency, *ex parte* application to the state court, Coinbase filed a preliminary opposition asking to be heard on the State's request for emergency relief. As of this filing, the state court has not acted on the State's emergency application.

Far from being motivated by an actual emergency or the threat of irreparable harm, Nevada appears to be engaging in a blatant attempt at forum shopping. Rather than litigate in an orderly manner, Nevada seeks an end run around the Ninth Circuit, which is poised to hear Kalshi's appeal. With argument in the Ninth Circuit already calendared for April, there is no legitimate basis to short-circuit the judicial process by asking a different court to rush to decide weighty and complex issues in an emergency posture, on an *ex parte* basis. The Court should stop Nevada from jamming through a temporary restraining order, which would impose massive costs on Coinbase, undermine its reputation and goodwill, and shutter its event-contracts business in the State—all in an effort to leapfrog the existing litigation before the Ninth Circuit.

Given a fair shake to make its arguments, Coinbase will be able to show that Nevada's attempt to prevent Coinbase from offering *any* event contracts in the State runs headlong into federal law. This Court explained that Kalshi's arguments in favor of offering *sports- and election-related event contracts* raise "serious questions about how to properly interpret the statutory language, to divine congressional intent, and to resolve the tension between what constitutes state-regulated gambling versus federally regulated derivatives." *KalshiEX, LLC* v. *Hendrick*, 2025 WL 3286282, at \*12 (D. Nev. Nov. 24, 2025). But the question of whether *event contracts* on the whole fall within the CFTC's exclusive jurisdiction is straightforward. Congress granted the CFTC "exclusive jurisdiction" over derivatives traded on federally registered exchanges, including "swaps," displacing state law seeking to regulate those same derivatives. And event contracts, as a category, fall squarely within the Commodity Exchange Act's definition of "swap"—as the CFTC has explicitly made clear.

Nevada is on the precipice of imposing substantial and irreparable harm on Coinbase based on a serious misreading of federal law, and misusing the emergency, *ex parte* procedures to do so. Unless this Court acts promptly, Nevada may obtain this extraordinary *ex parte* relief in state court that will prohibit Coinbase from offering Nevada users access to *any* CFTC-regulated event contracts on *any* subject, causing Coinbase to lose market share, the company's investments in building this technology in reliance on federal law, and the goodwill of customers who trust Coinbase as a one-stop shop. This is a textbook case for injunctive relief and, as set forth in the

declaration of Alex Fugazzi, Esq. attached hereto, should be heard on an emergency basis. A temporary restraining order to maintain the status quo pending this Court's resolution of Coinbase's motion for a preliminary injunction, as well as a preliminary injunction to prevent Defendants from enforcing preempted Nevada law against Coinbase, are both warranted. Such relief would make clear that the State's effort to end-run the ongoing federal litigation is untenable.

## **FACTUAL BACKGROUND**

### A. **Coinbase, A Federally Registered Intermediary, Partners With Kalshi, A Federally Registered Exchange, To Offer Customers Access To Event Contracts Through Coinbase's Platform.**

Coinbase and its affiliated exchange, Coinbase, Inc., offer its customers nationwide a trusted, user-friendly platform to trade and transfer digital assets. On December 17, 2025, Coinbase announced that it would soon begin offering its customers, including those in Nevada, the ability to trade event contracts on its platform through a partnership with Kalshi, a CFTC-registered designated contract exchange ("DCM") that lists event contracts on its exchange for trading. Coinbase is a CFTC-registered futures commission merchant ("FCM") and acts as an intermediary between Coinbase customers and Kalshi's exchange. Kalshi-listed event contracts run the gamut from politics to economics to movies to sports. In the six weeks following Coinbase's announcement of its event contracts business, until Monday's supposed emergency, Defendants did not once contact Coinbase with any concerns.

### B. **Event Contracts Are Widespread.**

An event contract is a type of derivatives instrument that enables parties to trade on their predictions about "a specified event, occurrence, or value," "such as the value of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane."[2] Event contracts are typically structured as binary, yes-or-no questions in which each "yes" position corresponds to an opposing "no" position. For example, an event contract may ask whether the President will impose new tariffs on Europe by the end of 2026. Once the defined occurrence has taken place, the contract settles accordingly: The party who purchased the position representing the occurrence (*i.e.*, "tariffs imposed") receives the contract's payout, and the party representing

---

[2] *Contracts & Products*, CFTC, https://tinyurl.com/bdmrjfew.

4916-6813-3261

the non-occurrence (*i.e.*, "tariffs are not imposed") receives nothing.  Importantly, parties can exit their positions before the contract expires, so an event contract's price will fluctuate as parties trade positions based on, among other things, new information.  Because of these price-discovery dynamics, event contracts generate valuable predictive data about local, national, and world events.  At the same time, event contracts serve as a means for market participants to mitigate risk by offsetting underlying exposure to a particular event (for example, a retailer whose business is particularly vulnerable to tariff-related costs).  Given their predictive value and hedging utility, prediction-market platforms involving all sorts of underlying events have become widespread, reporting billions of dollars in transaction volume in 2025.

### C. Defendants Seek Emergency, *Ex Parte* Relief In State Court To Prevent Coinbase From Offering Any Event Contracts.

On February 2, 2026, at 1:27 PM, Defendants notified counsel for Coinbase via email that they intended to file a civil enforcement action against Coinbase in the First Judicial District Court for the State of Nevada, seeking an *ex parte* temporary restraining order "to be issued before Coinbase is afforded the opportunity to respond."  Ex. B. at 1.  At 3:09 PM, less than two hours later, before Coinbase could consult with counsel and respond, Defendants filed their complaint, application for an *ex parte* temporary restraining order, and motion for preliminary injunction.  Exs. C at 1, D at 1.

In its complaint, the State requested an alarmingly broad injunction that would restrain Coinbase from making available *any* event contracts in the State.  Ex. C at 4.   In support, Defendants allege that  event contracts traded by Coinbase customers constitute "wagers," Nev. Rev. Stat. § 463.01962 (defining "wager" as "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain"), "sports pools," Nev. Rev. Stat. § 463.0193 (defining "sports pool" as "the business of accepting wagers on sporting events or other events by any system or method of wagering"), and "games," Nev. Rev. Stat. § 463.0153 (defining "game" as "any game played with . . . equipment or any mechanical or electronic device or machine for money"), under Nevada law.  *Id.*  And because Coinbase has not obtained a Nevada gaming license, Defendants alleged that the company's actions violate state law.  *Id.* at 5.

-4-

Nevada's state court action is not limited to sports or election event contracts. In the State's own words, it seeks "to prohibit COINBASE from offering or facilitating the offering of event contract[s] in Nevada"—period, full stop. Ex. G at 7. The injunction the State requests would forbid not only event contracts about whether the Raiders will make the playoffs next year, but also contracts about whether crude oil prices will reach a new threshold, whether the United States will experience a recession next year, whether Los Angeles will suffer another string of wildfires, whether India will achieve its 2030 climate goals, whether the market share for electric vehicles will exceed 50% in 2030, and whether the Federal Reserve will lower interest rates at the next meeting of the Federal Open Market Committee.

> **D.** **Even If Coinbase Is Enjoined, Nevadans Can Instead Trade the Same Contracts Available Through Coinbase Directly Through Kalshi, Who Defendants Have Agreed Not To Enjoin.**

Defendants have been actively litigating since early 2025 against Kalshi on a substantially similar—albeit narrower—question: whether the Commodity Exchange Act preempts Nevada's regulation of sports- and election-related event contracts listed on Kalshi's exchange. Unlike in their state-court enforcement action against Coinbase, Defendants have not sought to limit Kalshi's ability to offer event contracts other than those related to sports and elections.

The Kalshi action is currently on appeal in the Ninth Circuit, and Kalshi has moved for a stay of enforcement pending the disposition of the appeal. *See KalshiEX, LLC* v. *Hendrick* et al., No. 25-07516 (9th Cir. Nov. 28, 2025), Dkt. Nos. 1, 17, 20. While Kalshi's stay motion is pending, Defendants have agreed that they will not initiate any enforcement action against Kalshi, which continues to offer its Nevada customers the ability to trade event contracts. *See id.* Dkt. No. 17.1 at 9. If Coinbase is enjoined from allowing its Nevada customers to trade event contracts, those Nevadans can simply move their business over to Kalshi to trade the exact same event contracts.

### LEGAL STANDARD

To obtain a preliminary injunction, the moving party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter* v. *NRDC*, 555 U.S. 7, 20 (2008). "The legal standard for obtaining a temporary restraining

1    order and the legal standard for preliminary injunctive relief are 'substantially identical.'" *United*

2    *States* v. *Kern*, 2018 WL 1003744, at *3 (D. Nev. Feb. 20, 2018) (quoting *Stuhlbarg Intern. Sales*

3    *Co.* v. *John D. Brush and Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

### POINTS AND AUTHORITIES

## I.    COINBASE IS LIKELY TO SUCCEED ON THE MERITS

"[W]hen state and federal law clash," federal law must prevail. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). Federal law may preempt state law either "expressly" or "impliedly," and implied preemption may involve either field or conflict preemption. *Oneok, Inc.* v. *Learjet, Inc.*, 575 U.S. 373, 377 (2015).

Under any of these rubrics, Nevada's gambling laws are squarely preempted as applied to the event contracts Coinbase offers. Nevada's gambling laws are expressly preempted because Section 2 of the CEA grants the CFTC "*exclusive* jurisdiction" over all "transactions involving swaps" that are "traded or executed" on a federally regulated DCM, 7 U.S.C. § 2(a)(1)(A) (emphasis added), and event contracts fall squarely within the Act's definition of "swap," *id.* § 1(a)(47)(A)(ii). Nevada's laws are also impliedly preempted. As the CEA's text, context, and history confirm, Congress intended federal law to occupy the field for swaps traded on CFTC-regulated trading platforms, accessed through CFTC-regulated intermediaries. Nevada's laws also impermissibly conflict with federal law because they stand as an obstacle to the accomplishment and execution of the CEA's objectives, and it is impracticable for Coinbase to comply with both sets of laws.

### A.    The CEA Expressly Preempts Nevada's Gambling Laws.

#### 1.    Because Congress expressly granted the CFTC "exclusive jurisdiction" over swaps traded on federally registered exchanges, state law that purports to regulate the same transactions is preempted.

"There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona* v. *United States*, 567 U.S. 387, 399 (2012). Congress did precisely that here, expressly preempting state regulation of swaps traded on DCMs by granting the CFTC "exclusive jurisdiction" over those transactions.

a.    Specifically, the CEA grants the CFTC "*exclusive jurisdiction*" to regulate

1    "transactions involving swaps . . . traded or executed on a [federally designated] contract market."

2    7 U.S.C. § 2(a)(1)(A) (emphasis added).  The ordinary meaning of "exclusive" is "debarring from

3    interference or participation; vested in one [entity] alone."  *Exclusive*, Black's Law Dictionary (5th

4    ed. 1979).  Likewise, "exclusive jurisdiction" is defined as "power . . . over a[n entity] to the

5    exclusion of all other[s]."  *Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979).  Most

6    naturally read, the CFTC's "exclusive jurisdiction" over swaps traded on DCMs thus precludes—

7    *i.e.*, preempts—State "interference" in those transactions.

8         b.    Courts consistently understand phrases like "exclusive jurisdiction" to broadly

9    displace state law.  For example, the Supreme Court held that the Federal Power Act's grant of

10   "exclusive jurisdiction" to the Federal Energy Regulatory Commission over the appropriate rates

11   for interstate wholesale energy sales precluded state law from "invad[ing] FERC's regulatory turf."

12   *Hughes* v. *Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).  That logic applies with equal force

13   to the CFTC's exclusive jurisdiction here.  Indeed, virtually every court to interpret Section

14   2(a)(1)(A)'s grant of exclusive jurisdiction has understood it to preempt state laws that purport to

15   regulate transactions on CFTC-regulated exchanges.  As Judge Friendly put it: "[Section 2(a)(1)]

16   of the CEA preempts the application of state law."  *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir.

17   1980).  The Seventh Circuit has likewise recognized that the CFTC is "the sole lawful regulator"

18   where "its jurisdiction is exclusive"—*i.e.*, where the at-issue derivative instrument falls within

19   Section 2's reach.  *Chicago Mercantile Exch.* v. *SEC*, 883 F.2d 537, 548 (1989).  And the Sixth

20   Circuit has emphasized that "the thrust of the [CEA's exclusive-jurisdiction] provision was to

21   ensure that regulatory bodies other than the CFTC would not interfere with the orderly development

22   and enforcement of commodities regulation."  *Curran* v. *Merrill Lynch, Pierce, Fenner & Smith,*

23   *Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982).  Indeed, another district court

24   has already determined that Section 2 preempts state-law attempts to regulate sports-related event-

25   contract transactions on DCMs.  *See KalshiEX LLC* v. *Flaherty*, 2025 WL 1218313, at *6 (D.N.J.

26   Apr. 28, 2025).[3]

27

28   ────────────────
     [3] To be sure, a Maryland district court refused to recognize the preemptive effect of Section 2, holding that
     Congress did not "clearly and manifestly intend[] to strip states of their authority to regulate gambling."
     *KalshiEX LLC* v. *Martin*, 793 F. Supp. 3d 667, 677 (D. Md. 2025).  But the CEA does reflect Congress's

     -7-

     4916-6813-3261

c.    That conclusion is reinforced, moreover, by the CEA's history, which eliminates any doubt that Congress intended the grant of "exclusive jurisdiction" to the CFTC to preempt state regulation of derivatives traded on federally regulated exchanges.  The CEA, as originally enacted, did not "impair any State law applicable to any transaction" regulated by the Act.  Pub. L. No. 74-675, 49 Stat. 1491, 1494 (1936).   That provision "serv[ed] the function of preventing supersedure and preserving state control."  *Rice* v. *Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).

When amending the Act to create the CFTC in 1974, however, Congress eliminated this provision to "assure that Federal preemption is complete."  120 Cong. Rec. 30464 (Sep. 9, 1974) (statement of Sen. Curtis).  Congress instead enacted a far more limited clause that preserves the jurisdiction of state "regulatory authorities"—but only "*[e]xcept as hereinabove provided*."  7 U.S.C.  § 2(a)(1)(A)  (emphasis  added).    Because  the  immediately  preceding  sentence  in Section 2(a)(1)(A) provides the CFTC with "exclusive jurisdiction" over "swap[s]" traded on federal exchanges, state regulation is not preserved as to those transactions.  *Id.*

There are few "principles of statutory construction . . . more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).  A holding that state laws like Nevada's gambling laws apply to transactions within the CFTC's exclusive jurisdiction would run headlong into that principle by resurrecting the since-discarded 1936 regime.

**2.    The event contracts at issue here are (i) swaps (ii) traded on federally registered exchanges.**

The CEA leaves no doubt that event contracts traded on federally registered exchanges qualify as swaps; state laws that purport to regulate those transactions are thus preempted.  That rule applies with equal force to event contracts no matter the subject matter, whether sports, elections, commodities, the weather, or anything else.

a.    Since 2010, the CFTC's "exclusive jurisdiction" has encompassed all "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed

---

"clear[] and manifest[] inten[t] to strip states of their authority to regulate" swaps listed on federally registered exchanges.  *Id.*  That some States seek to incorrectly label these transactions as "gambling" does not alter their status as "swaps"—or Section 2's preemptive force.

SNELL
& WILMER

on a contract market designated" by the CFTC (a DCM). 7 U.S.C. § 2(a)(1)(A). Congress defined a "swap," in part, as "any agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1(a)(47)(A)(ii).

The event contracts that Coinbase offers fall squarely within the statutory "swap" definition: They are "contract[s]" that pay out depending on the "occurrence[ or] nonoccurrence" of a future "event or contingency" that carries potential economic consequences. *Id.* Specifically, event contracts are a type of derivatives instrument that enables parties to trade on their predictions about "a specified event, occurrence, or value," "such as the value of a macroeconomic indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane."[4] Such contracts are typically structured as binary, yes-or-no questions in which each "yes" position corresponds to an opposing "no" position. When the contract expires, the party who correctly predicted the "occurrence [or] nonoccurrence" of an "event or contingency" receives a payout. The contracts at issue in this case will be executed on Kalshi's exchange, a DCM that is registered with and regulated by the CFTC, in compliance with the CEA's robust regulatory requirements. *See* Ex. E at 1; *KalshiEX LLC* v. *CTFC*, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024).

The event contracts also satisfy the statutory requirement that the underlying "event or contingency" bears "a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Take an event contract that asks whether Democrats will win control of the House of Representatives in 2026. The prospect of a divided government will have predictable, tangible consequences for the Nation's economy, affecting consumers, businesses, and investors alike.

That event contracts qualify as "swaps" within the CFTC's exclusive jurisdiction is further confirmed by Congress's simultaneous enactment in 2010 of a "Special Rule" governing the CFTC's "approval of event contracts." 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). That Congress expressly vested the CFTC with authority to review "event contracts" underscores that these instruments are "swaps" falling within the CFTC's "exclusive jurisdiction," consistent with the "swap" definition

---

[4] *Contracts & Products*, CFTC, https://tinyurl.com/bdmrjfew.

1    itself.

2         Indeed, the CFTC has repeatedly recognized that event contracts are swaps, observing that

3    "event contracts are a form of options, typically known as binary options" and that those "binary

4    options fall within the definition of a swap," and maintaining this position across several

5    administrations.[5]  Tellingly, the CFTC has never entertained the contrary position since Congress

6    granted the agency jurisdiction over swaps in 2010.  To the contrary, less than a week ago, the Chair

7    of the CFTC publicly commented on the potential need for the Commission to intervene in

8    prediction-markets litigation "to defend its exclusive jurisdiction over commodity derivatives."[6]

9         b.    Nevada's position, moreover, is premised on the thesis that certain (or even all) event

10   contracts cannot be "swaps" because these contracts constitute "gaming."  *See* Nevada's Opposition

11   to Preliminary Injunction Motion at 9, *N. Am. Derivatives Exch., Inc.* v. *Nev. Gaming Control Bd.*,

12   2025 WL 2916151 (Oct. 14, 2025) (No. 25-cv-00978).  Nevada reaches too far trying to fit all event

13   contracts into "gaming," which the statute makes clear is a subset of event contracts and not the

14   whole body.  In any event, the 2010 Special Rule expressly authorizes the CFTC to "review" certain

15   event contracts, including those involving "gaming," to determine if such contracts are "contrary

16   to the public interest," and therefore should be prohibited.  7 U.S.C. § 7a-2(c).  The rule thus

17   explicitly envisions event contracts involving "gaming" as a type of swap within the CFTC's remit.

18   If Nevada was right that event contracts are not "swaps" because they concern "gaming," there

19   would be no gaming-related contracts that the CFTC could review to approve or prohibit in the first

20

21   [5] *See, e.g.*, *In re Trade Exchange Network*, CFTC No. 05-14, 1 (Sep. 29, 2005) (entering a consent order against Defendants who solicited and accepted orders from U.S. residents for binary options, structured similarly to modern event contracts); *Concept Release on Regulatory Treatment of Event Contracts,* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are structured as all-or-nothing binary transactions commonly described as binary options"); *In re Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09, 2, 5 (Jan. 3, 2022) ("Polymarket is an online trading platform that offers binary options in the form of winner-take-all 'event contracts' … Binary options are swaps as defined under Section 1(a)(47) of the Act."); *Clarke* v. *CFTC*, 74 F.4th 627, 633-634 (5th Cir. 2023) (CFTC staff have permitted PredictIt to operate a "futures market for politics" under a no-action letter issued in 2014); Appellant CFTC's Brief at 12 & n.11, *KalshiEX, LLC* v. *CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205) ("Kalshi's event contracts are a form of options, typically known as binary options. . . . [T]hese particular binary options fall within the definition of a swap.").

[6] Remarks of Chairman Michael S. Selig at CFTC-SEC Event on Harmonization (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

-10-

4916-6813-3261

instance—this provision of the Special Rule would cover a null set.  *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("the canon against surplusage applies with special force" when proposed interpretation "renders an entire subparagraph meaningless"); *Bilski* v. *Kappos*, 561 U.S. 593, 606-608 (2010) (declining to interpret statutory definition of patentable "process[es]" to exclude business methods when another provision "explicitly contemplates the existence" of business-method patents).

## B.  The CEA Impliedly Preempts Nevada's Gambling Laws.

Federal law also displaces state law if the federal scheme evinces Congress's intent to occupy the field or if the two laws irreconcilably conflict.  *Oneok*, 575 U.S. at 377.  Here, the CEA preempts Nevada's gambling laws as applied to event contracts traded on DCMs for both reasons.

### 1.  Congress intended to occupy the field.

State law is displaced from the field when Congress has enacted a comprehensive scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole,'" *Arizona*, 567 U.S. at 401 (citation omitted)—as a "single integrated and all-embracing system," *Hines* v. *Davidowitz*, 312 U.S. 52, 74 (1941).  Even "complementary state regulation" has no role to play under those circumstances.  *Arizona*, 567 U.S. at 401.  Here, the CEA's text, structure, and history all confirm that Congress intended to create a comprehensive, uniform set of federal rules to occupy the field with respect to derivative instruments, including event contracts, traded on DCMs.

a.  To start, the CEA's grant of "exclusive jurisdiction" over swaps traded on a DCM plainly evinces Congress's intent to oust the States from this field.  7 U.S.C. § 2(a)(1)(A). Whether characterized as express or field preemption, the conclusion is the same:  Congress intended the CFTC, and the CFTC alone, to regulate these transactions.

Other CEA provisions confirm Congress's intent.  The CEA's savings clause, 7 U.S.C. § 2(a)(1)(A), preserves state-law regulation *except* for transactions that fall within the scope of the exclusive-jurisdiction provision.  Section 13a-2(1) authorizes state officials to sue over "any act or practice constituting a violation of any provision of [the CEA] or any [CFTC] rule," but they cannot sue federally registered exchanges.  7 U.S.C. § 13a-2(1).  The CEA further states that it shall not

SNELL
& WILMER

"supersede or preempt" the application of state law to transactions "*not* conducted" on a DCM or to unregistered entities who are "required to be registered" as a DCM, 7 U.S.C. § 16(e)(1) (emphasis added)—indicating that state law *is* preempted as to transactions conducted on DCMs.

Taken together, these provisions reflect Congress's careful division of labor.  The CFTC is responsible for "enforc[ing] the CEA with respect to [federally regulated] exchanges" and the transactions that the Act requires to be conducted on such exchanges, while States are permitted to regulate off-exchange conduct under State law.  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 708 (1982).

b.    The CEA's structure evinces a "comprehensive regulatory scheme" governing event contracts, DCMs, and FCMs, from start to finish—further demonstrating Congress's intent to preempt state regulation of the field of event contracts traded on DCMs.  *Curran*, 622 F.2d at 232. Indeed, federal law governs the entire life cycle of an event contract, as well as the DCMs and FCMs that facilitate trading of such contracts.  An exchange like Kalshi only attains DCM status if it complies with the full panoply of relevant federal laws and regulations, *see* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. 38.3(a)(2).  FCMs like Coinbase that serve as intermediaries to facilitate trading on the DCM must likewise be registered with the CFTC and adhere to comprehensive federal requirements, *see* 17 C.F.R. 1.10(b), 1.10(d), 1.11(c), 1.11(e), 1.12, 1.14, 1.17, 1.18, 1.55, 1.71(b)(1), 17.00, 155.3(a).  And exchanges cannot list event contracts without either seeking affirmative approval from the CFTC or certifying that the new product complies with the CEA's many strictures, *see* 7 U.S.C. § 7a-2(c)(1), (4)(A); 17 C.F.R. 40.2(a), 40.3(a), 40.11(c).  This "comprehensive regulatory structure" leaves no room for supplementation by state law.  *Am. Ag. Movement*, 977 F.2d at 1155.

c.    As the D.C. Circuit recognized in *FTC* v. *Ken Roberts Co.*, the CEA's "history repeatedly emphasizes that the CFTC's jurisdiction was to be exclusive with regard to the trading of futures on organized contract markets."  276 F.3d 583, 590-591 (2001) (citation omitted).  For example, the conference report accompanying the 1974 amendments made clear that the amendments were designed to "*preempt the field* insofar as futures regulation is concerned"; Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by

-12-

the States." H.R. Rep. No. 93-1383, at 35-36 (1973) (emphasis added). Congress effectuated that goal by conferring "exclusive jurisdiction" on the CFTC over derivates traded on federal exchanges, and eliminating concurrent state-law jurisdiction; States that would otherwise regulate derivatives trading on a DCM—like Nevada here—must therefore retreat from the field.

### 2. Nevada's gambling laws are also conflict-preempted.

Nevada's gambling laws, when applied to event contracts traded on DCMs, pose an obstacle to effectuating Congress's goals in enacting and amending the CEA: to prevent States from "step[ping] in to regulate the futures markets themselves," *Am. Ag. Movement*, 977 F.2d at 1156, and to ensure that "all exchanges and all persons in the industry" would operate "under the same set of rules and regulations." H.R. Rep. No. 93-975, at 41-42 (1974). As the Seventh Circuit recognized, Congress's grant of "exclusive jurisdiction" to the CFTC preempts "state law[s]" that "would directly affect trading on or the operation of a futures market" because such laws necessarily "stand as an obstacle to the accomplishment and execution of" the CEA's "full purposes and objectives." *Am. Ag. Movement*, 977 F.2d at 1156-57. The Seventh Circuit elaborated that any state-law claim is preempted under that test if it is "intimately tied to the operation of a contract market." *Id.* at 1157. Defendants seek to apply Nevada's laws directly to event-contract trading on a DCM, but such claims are preempted because they "would frustrate Congress's intent to bring the[se] markets under a *uniform* set of regulations." *Id.* at 1156.

b. Defendants also seek to subject Coinbase to legal requirements that are fundamentally inconsistent with the company's status as a nationwide FCM. For example, if Nevada's gambling laws applied to event contracts listed on federally registered exchanges, Coinbase would need to obtain a gambling license to facilitate those transactions, as Defendants have alleged in their state court action. *See* Nev. Rev. Stat. § 463.160. Such a license would obligate Coinbase—a global company that operates nationwide and has users in all 50 States—to restrict its services to only people who are physically located within Nevada. Nev. Gaming Control Bd., *Regulation 22: Race Books and Sports Pools* 14 (Nov. 2024), https://tinyurl.com/2aa452nt. And since Coinbase serves customers in other States, the company would be forced to obtain a similar license imposing similar geographic limitations in those jurisdictions. *See, e.g.*, Ohio Rev.

1    Code Ann. §§ 3775.11(A), 3775.12(A).  These geographic barriers, besides being impractical and

2    prohibitively costly to maintain, would sap prediction markets of their liquidity, a necessary

3    element for survival because event contracts can be executed only if a buyer and a seller can be

4    paired at the same price.

5         Still worse, on Nevada's view, 49 other States could attempt to overlay their own laws onto

6    the CEA, creating an impenetrable regulatory thicket that is wholly inconsistent with the

7    nationwide, unified framework Congress designed.  At a minimum, Nevada's view would create a

8    state-by-state free-for-all where "the most stringent [state] standard" would become a *de facto*

9    national standard, turning our system of federalism upside down.  *Am. Libraries Ass'n* v. *Pataki*,

10   969 F. Supp. 160, 183 (S.D.N.Y. 1997).  Just as it would be unthinkable to require interest rate

11   swaps or foreign exchange and cross-currency swaps—markets with enormous daily volumes and

12   cross-border liquidity—to trade under 50 different state regulatory frameworks rather than a

13   uniform, centralized exchange like the Chicago Mercantile Exchange, it is equally unworkable to

14   expect Coinbase to offer nationwide event contracts while navigating a patchwork of divergent and

15   potentially conflicting state rules.  Nevada's enforcement is case in point; while certain other state

16   regulators have asserted the right to regulate *sports*-related event contracts, Nevada asserts

17   jurisdiction over *all* event contracts.  So while a trader could hedge using an event contract on future

18   interest rates in Arizona or Idaho, Defendants would outlaw that same event contract as illegal

19   gambling here in Nevada, without any foundation in statute or authority.

20        Indeed, Nevada's scattershot approach would result in different rules for providers of the

21   same event contracts in the same state.  If Nevada has its way, Coinbase will imminently be stopped

22   from offering access to any event contracts, whereas Kalshi continues to provide access to those

23   very same contracts.  And to date, Nevada has taken the position that Kalshi should (at some future

24   time) be barred only from offering sports- and election-related event contracts, without ever

25   contending (as it has for Coinbase) that *all* event contracts are prohibited in Nevada.  This frenetic

26   approach to regulation is precisely what Congress sought to avoid with a single, nationwide

27   framework for derivatives regulation.

28        c.    Finally, the Supreme Court has explained that even when a federal and state law

-14-

4916-6813-3261

share the same policy goals, the state statute is nevertheless preempted if it includes a different "method of enforcement" than the federal law. *Arizona*, 567 U.S. at 406. Here, Congress already granted the CFTC the authority to prohibit contracts related to gaming if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Rather than employ the blunt hammer of blanket prohibition, Congress thus provided the CFTC with the scalpel of case-by-case review. Nevada, however, seeks to circumvent the CFTC's case-by-case public-interest review by taking civil and criminal enforcement actions under the State's gambling laws against entities that offer access to event contracts listed on CFTC-designated exchanges. Exs. C at 1, D at 1. "This is not the system Congress created." *Arizona*, 567 U.S. at 408.

## II.   COINBASE WILL SUFFER IRREPARABLE HARM WITHOUT A TEMPORARY RESTRAINING ORDER.

Defendants are seeking to obtain—and may well succeed in obtaining—a state court order shutting down Coinbase's entire event contracts business in Nevada. That will cause Coinbase immediate and irreparable harm.

For starters, if Coinbase is ordered to cease offering access to event contracts on its platform altogether, Coinbase will be forced to forgo a critical part of its business plan, disrupt its partnerships, and abandon a product that the company invested significant resources to build over the last year for its millions of customers. Declaration of Andrew Sears ("Sears Decl.") ¶ 19; *see Hendrick*, 2025 WL 1073495, at *7 (noting that Kalshi would suffer "substantial economic and reputational harm" from being enjoined).

Any attempt to comply with Defendants' enforcement mandate would likewise impose irreparable harm on Coinbase. Given its druthers, Defendants would forbid Coinbase from allowing any user that steps foot in the State from accessing event contracts, but Coinbase currently lacks the technical capacity to carry out that instruction. Sears Decl. ¶ 32. Crafting the bespoke solution Defendants seek would require Coinbase to undertake a massive engineering project at untold cost, diverting the company's focus from building its business to tearing it down in one state.

These harms to Coinbase are incalculable. Sears Decl. ¶¶ 31-36. And even if the damage could be quantified, it "cannot be recouped" because of state sovereign immunity, making the harm

irreparable.  *Nat'l Insts. of Health* v. *Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) (citation omitted); see *Hendricks*, 2025 WL 3286282, at *12 ("Kalshi may not be able to recover damages from the defendants if it turns out that it can offer these contracts without violating Nevada law, which is a factor to consider in balancing the hardships.").

Defendants' enforcement threats also jeopardize Coinbase's reputation and goodwill. Customers look to Coinbase as the "everything exchange" for financial products and services, and that position would be dealt a blow if the company were forced to withdraw its event contract offerings.  Saddling Coinbase with the label of having violated state law would likewise threaten to tarnish the company's hard-earned reputation, undermining its status as an industry leader that obeys all applicable federal and state laws.  In both cases, Coinbase would suffer a "harm to . . . business reputation and goodwill" that is "irreparable."  *John D. Brush & Co.*, 240 F.3d at 838.

Selectively prohibiting Nevada users from accessing event contracts, moreover, puts Coinbase and its exchange partner at risk of running afoul of federal law, which requires a federally-registered exchange to provide "impartial access to its markets and services."  17 C.F.R. 38.151(b). While the Court has previously questioned whether the CFTC would enforce such violations of federal law, *see Hendricks*, 2025 WL 3286282, at *12, the Commission's intensions will be illuminated in short order.  CFTC Chair Selig has recently "directed CFTC staff to reassess the Commission's participation in matters currently pending before the federal district and circuit courts,"[7] reaffirming the federal government's position over its jurisdiction.  There is no reason for Defendants to obtain extraordinary relief on the eve of the CFTC providing much-needed guidance to the courts and industry.

## III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.

Subjecting Coinbase to these harms would be particularly inequitable given that Coinbase justifiably relied on its compliance with the federal regulatory regime that it reasonably understood to be controlling.  As the CFTC Chair recently explained, event contracts have "operated within the

---

[7] Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

CFTC's regulatory perimeter for more than two decades."[8]  This history includes the Commission green-lighting event contracts that pertain to political elections, and allowing countless event contracts to be traded or executed on federal exchanges in recent years, Sears Decl. ¶ 16.  Coinbase has devoted substantial energy and expense to complying with this robust federal regulatory regime, including those provisions designed to protect the very same users that Defendants purport to represent.  It would turn our constitutional system on its head if companies that painstakingly comply with costly federal regulations, pursuant to a federal agency's "exclusive jurisdiction," could nonetheless face crippling liability under a state's civil or criminal code.

While there is no way to unscramble the egg if Coinbase is forced to shutter its event contracts business in Nevada, there is no competing concern on the other side of the ledger.  Indeed, Defendants' own conduct belies any suggestion of irreparable harm to the state.

Most obviously, Defendants have expressly agreed not to take any enforcement action against Kalshi, which offers the exact same event contracts at issue here.  In Kalshi's appeal before the Ninth Circuit, Defendants "have agreed not to initiate enforcement proceedings against Kalshi" pending Kalshi's motion for a stay.[9]  There is no plausible explanation for why Kalshi offering an event contract does not warrant immediate enforcement, while Coinbase facilitating access to the exact same event contract constitutes imminent, irreparable harm.

Indeed, Defendants' acceptance of half-measures shows that it does not seriously believe that it is suffering any irreparable harm.  Late last year, Defendants entered into an agreement with Crypto.com in which the company would restrict event-contract access only for Nevada's 3 million residents, while allowing the State's 50 million plus annual visitors to keep trading.[10]  This agreement cannot be reconciled with Defendants' position that Nevada continues to be irreparably

---

[8] *Id.*

[9] KalshiEX LLC's Motion for a Stay Pending Appeal of the District Court's November 24, 2025 Order, *KalshiEX, LLC* v. *Hendrick*, No. 25-7516, Dkt. 17.1 at 9 (9th Cir. Dec. 17, 2025).

[10] Ex. 1 at 2, Declaration of Andrew L. Porter, *KalshiEX, LLC* v. *Hendrick*, No. 25-cv-00575, Dkt. 239-1 (D. Nev. Nov. 25, 2025); *Tourism in Nevada Means a Thriving Economy*, Travel Nevada Industry Partners (2025), https://perma.cc/Q2F2-2YAM; *Nevada Continued Double-Digit Population Growth*, U.S. Census Bureau: NEVADA 2020 Census (Aug. 25, 2021), https://perma.cc/KK26-DRSH.

1    harmed by any event-contract trading in the State.

2         Moreover, as a legal matter, the State lacks any cognizable interest in enforcing a preempted

3    law.  See *Felder* v. *Casey*, 487 U.S. 131, 138 (1988).  At a minimum, given that there are "serious

4    questions" as to whether Nevada law is preempted here, *Hendricks*, 2025 WL 3286282, at *12, the

5    State's interest in enforcing its laws cannot outweigh the harms Coinbase will suffer absent relief.

6                                <u>**CONCLUSION**</u>

7         For the foregoing reasons, Coinbase respectfully requests that the Court issue a temporary

8    restraining order to maintain the status quo pending this Court's resolution of Coinbase's motion

9    for a preliminary injunction, as well as a preliminary injunction to prevent Defendants from

10   enforcing preempted Nevada law against Coinbase.

11   Dated: February 4, 2026              SNELL & WILMER L.L.P.

12

13                                By: */s/ Alex L. Fugazzi*
                                     Alex L. Fugazzi, Esq.
14                                   Nevada Bar No. 9022
                                     Brian Reeve, Esq.
15                                   Nevada Bar No. 10197
                                     SNELL & WILMER L.L.P.
16                                   1700 S. Pavilion Center Drive, Suite 700
                                     Las Vegas, Nevada 89135
17
                                     Benjamin R. Walker *Pro Hac Vice Forthcoming*
18                                   James M. McDonald *Pro Hac Vice Forthcoming*
                                     Yaira Dubin *Pro Hac Vice Forthcoming*
19                                   Akash M. Toprani *Pro Hac Vice Forthcoming*
                                     SULLIVAN & CROMWELL LLP
20                                   125 Broad Street
                                     New York, NY 10004
21
                                     Jeffrey B. Wall *Pro Hac Vice Forthcoming*
22                                   Rishabh Bhandari *Pro Hac Vice Forthcoming*
                                     SULLIVAN & CROMWELL LLP
23                                   1700 New York Avenue, N.W.
                                     Washington, D.C., 20006
24
                                     *Attorneys for Plaintiff Coinbase*
25                                   *Financial Markets, Inc.*

26

27

28

SNELL
& WILMER

4916-6813-3261