# EXHIBIT "A"

1  AARON D. FORD
   Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10  *Attorneys for Plaintiff*

REC'D & FILED

2026 FEB -2  PM 3: 09

WILLIAM SCOTT HOEN
E. TORRES
BY_____
              DEPUTY

11  **IN THE FIRST JUDICIAL DISTRICT COURT OF
    THE STATE OF NEVADA IN AND FOR CARSON CITY**

12

13  STATE OF NEVADA ex rel. NEVADA          Case No. 26 OC 00030 1B
    GAMING CONTROL BOARD,
14                                           Dept. No. II
        Plaintiff,
15
    vs.
16
    COINBASE FINANCIAL MARKETS,
17  INC.,

18      Defendant.

19

20  **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF**

21  COMES NOW, Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL

22  BOARD, by and through its attorneys, files this Complaint for COINBASE FINANCIAL

23  MARKETS, INC.'s violations of State of Nevada gaming laws and hereby asserts and

24  alleges as follows:

25                              **PARTIES**

26      1.    At all times relevant hereto, STATE OF NEVADA, ex rel. NEVADA GAMING

27  CONTROL BOARD ("BOARD") was and is a political subdivision of the State of Nevada

28  established pursuant to NRS 463.030. The BOARD is charged with the responsibility of

1  strictly regulating gaming in the State of Nevada because it is vitally important to the
2  State, its economy, and the general welfare of its inhabitants.

3      2.    At all times relevant hereto, COINBASE FINANCIAL MARKETS, INC.
4  ("COINBASE") was and is a financial services company incorporated in Delaware with its
5  principal place of business in New York. COINBASE is a CFTC-registered Futures
6  Commission Merchant ("FCM") that serves as an intermediatory for customers trading
7  regulated derivatives listed on a Designated Contract Market ("DCM") operated by a third
8  party. COINBASE offers products referred to as event contracts for sale on its mobile app
9  to persons located in Nevada.

10                    **GENERAL ALLEGATIONS**

11  **A.    Nevada has a strong interest in regulating gaming in Nevada.**

12     3.    The State of Nevada has a long history of gambling regulation and is the
13  leader in gambling regulation in the United States.

14     4.    In 1931, the Nevada Legislature legalized gambling in the State.

15     5.    The Nevada Gaming Control Act of 1949 shifted gaming licensing from local
16  government to state government.

17     6.    With the passage of the Nevada Gaming Control Act, Nevada became the first
18  State in the nation to legalize sports betting.

19     7.    "It is established beyond question that gaming is a matter of privilege
20  conferred by the State rather than a matter of right." *State v. Rosenthal*, 93 Nev. 36, 40,
21  559 P.2d 830, 833 (1977).

22     8.    Nevada's public policy, as expressed by the Legislature, is that "[t]he gaming
23  industry is vitally important to the economy of the State and the general welfare of the
24  inhabitants" and that "[a]ll establishments where gaming is conducted . . . must therefore
25  be licensed, controlled and assisted to protect the public health, safety, morals, good order
26  and general welfare of the inhabitants of the State, to foster the stability and success of
27  gaming and to preserve the competitive economy and policies of free competition of the
28  State of Nevada." NRS 463.0129(1)(a)-(d).

1      9.    The Legislature has conclusively determined that "[p]ublic confidence and
2  trust can only be maintained by strict regulation of all persons, locations, practices,
3  associations and activities related to the operation of licensed gaming establishments,"
4  NRS 463.0129(1)(c), and that any activity that reflects "discredit upon the State of Nevada
5  or the gaming industry" may be deemed an unsuitable method of operation by the BOARD
6  and the Nevada Gaming Commission ("COMMISSION"), Nev. Gaming Comm'n Reg.
7  5.011(1).

8      10.    Currently, the State of Nevada has a two-tiered regulatory structure to
9  regulate gaming within the State involving the BOARD and COMMISSION.

10      11.    Nevada law requires that all gaming activity be strictly regulated and
11  licensed, as the gaming industry is "vitally important to the economy of the State and the
12  general welfare of the inhabitants." NRS 463.0129(1)(a).

13      12.    Pursuant to Nevada law, the continued growth and success of gaming in the
14  State of Nevada is "dependent upon public confidence and trust that licensed gaming" is
15  "conducted honestly and competitively." NRS 463.0129(1)(b).

16      13.    Pursuant to Nevada law, "public confidence and trust can only be maintained
17  by strict regulation of all persons, locations, practices, associates, and activities related" to
18  the operation of gaming in Nevada. NRS 463.0129(1)(c) (emphasis added).

19      14.    Pursuant to Nevada law, all entities making gaming available in Nevada
20  must "be licensed, controlled and assisted to protect the public health, safety, morals, good
21  order and general welfare of the inhabitants of the State." NRS 463.0129(1)(d).

22      15.    Lack of enforcement of Nevada gaming laws against entities that make
23  gaming accessible to persons within the State will severely impact Nevada's ability to
24  strictly regulate gaming in Nevada and foster Nevada's gaming industry, which is vitally
25  important to its economy and citizens.

26  / / /
27  / / /
28  / / /

1

2

**B.   COINBASE operates a gambling game and/or sports pool and accepts wagers in or from Nevada.**

3

4

16.   "Gaming" in Nevada is synonymous with "gambling" and includes any regulated game.  NRS 463.0153.

5

6

7

17.   A "game" subject to regulation in Nevada includes "any game played with . . . equipment or any mechanical or electronic device or machine for money . . . or any representative of value" that is accessible in Nevada.  NRS 463.0152.

8

9

10

11

12

18.   COINBASE's products meet the requirements of NRS 463.0152 because a person accesses COINBASE's market through COINBASE's mobile app or website and the use of the Internet and enters wagers through COINBASE's market with the payment of money.  Moreover, COINBASE uses electronic devices such as computers and servers to make its wagers available on its mobile app and the Internet.

13

14

15

16

17

19.   A game subject to regulation in Nevada includes a "sports pool." NRS 463.160. A "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering."  NRS 463.0193.  A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962.

18

19

20

21

22

20.   COINBASE's products meet the requirement of NRS 463.160 and NRS 463.0193 because COINBASE's market allows users to wager on the outcomes of sporting events and other events for which the outcome is uncertain.  These sporting events and other events include, but are not limited to, college basketball games, college and professional football games, and elections.

23

24

25

26

27

21.   COINBASE's event contracts are wagers: A user spends a sum of money to buy an event contract on an outcome of an event and receives a payout if the outcome occurs and not if the outcome does not occur.  For example, as of February 1, 2026, a user could buy an event contract for $100 that would pay out $303 if the New England Patriots win the Superbowl—essentially, approximately 3/1 odds.   COINBASE, *The Big Game*,

28

1    https://www.coinbase.com/predictions/trending/the-big-game (last accessed February 2,
2    2026).

3        22.    A "game" subject to regulation in Nevada includes a "percentage game." NRS
4    463.1052. A "percentage game" exists where the "house" does not directly participate in a
5    wager and its only stake is a commission derived from wagers. *See Hughes Props. v. State*,
6    100 Nev. 295, 297 (1984).

7        23.    COINBASE's products meet this requirement because COINBASE takes a
8    commission, or percentage, on the wagers placed through its market. COINBASE takes a
9    percentage of money wagered through its market in the form of commissions styled as fees.
10   COINBASE, *How do fees work?*, https://www.coinbase.com/predictions/event/KXSB-26
11   (last accessed February 2, 2026).

12       24.    In taking a percentage of the wagers placed through its market, COINBASE
13   accepts wagers on sporting events and other events.

14       **C.    COINBASE's operation in Nevada cause harm to Nevada.**

15       25.    Despite making wagers, sports betting, and other gaming activity ("gaming")
16   accessible in the State of Nevada, COINBASE is not licensed in Nevada by the BOARD or
17   COMMISSION and does not comply with Nevada gaming law.

18       26.    Nevada law requires every entity that makes gaming activities, including
19   wagers, accessible in Nevada to be subject to a rigorous licensing process and an in-depth
20   investigation of all entities and natural persons who directly or indirectly have an
21   ownership interest in the entity offering the wagers.

22       27.    COINBASE has not undergone Nevada's rigorous licensing process for its
23   wagering activities.

24       28.    Entities conducting gaming activities in the State of Nevada must pay taxes
25   on gross gaming revenue derived from gaming activities accessible in the State.

26       29.    COINBASE does not pay taxes on gross gaming revenue derived from gaming
27   activities, including wagers, accessible in the State of Nevada.

28

30.    Entities accepting wagers from persons in the State of Nevada must have a physical location in Nevada.

31.    COINBASE does not have a physical location in Nevada for its wagering activity.

32.    Entities accepting wagers in the State of Nevada on sporting events may not allow persons under 21 years of age to place wagers.

33.    COINBASE allows persons under the age of 21 years of age to place wagers on its market. Specifically, it allows anyone over the age of 18 to create an account and trade on its platform. COINBASE, *Account Setup*, https://www.coinbase.com/legal/user_agreement/united_states (last accessed February 2, 2026).

34.    Entities accepting wagers in the State of Nevada on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and must communicate with Nevada gaming regulatory authorities about potential evidence of match fixing or point shaving.

35.    On information and belief, COINBASE does not employ adequate safeguards to ensure that wagers are not being placed on an event from owners, coaches, players, or officials participating in the event, and does not communicate about potential evidence of match fixing or point shaving with Nevada gaming regulatory authorities.

**D.    COINBASE's market violates NRS 463.160.**

36.    Pursuant to NRS 463.160, it is unlawful for a person to expose a game or a sports pool for play in Nevada without the required gaming licenses.

37.    COINBASE's market exposes a percentage game for play in Nevada.

38.    COINBASE's market exposes a sports pool for play in Nevada.

39.    COINBASE does not possess a Nevada gaming license.

40.    COINBASE does not possess a Nevada sports pool approval.

41.    COINBASE, in making its market available to persons located in Nevada, has violated, and continues to violate, NRS 463.160.

1    **E.    COINBASE's market violates NRS 463.350.**

2        42.    Pursuant to NRS 463.350, a person under the age of 21 may not play, be

3    allowed to play, place wagers at, or collect winnings from any game or sports pool.

4        43.    COINBASE's market does not restrict persons under the age of 21 from

5    participating.

6        44.    COINBASE's market constitutes a percentage game and/or sports pool.

7        45.    COINBASE, in making its market available to persons located in Nevada who

8    are under the age of 21, has violated, and continues to violate, NRS 463.350.

9    **F.    COINBASE's market violates NRS 465.086.**

10        46.    Pursuant to NRS 465.086(1), it is unlawful for any person to directly or

11    indirectly receive any compensation or any percentage or share of the money played for

12    accepting or facilitating any wager upon the result of any sporting event without a gaming

13    license.

14        47.    COINBASE is not licensed in the State of Nevada to accept wagers.

15        48.    COINBASE's market accepts wagers.

16        49.    In addition to accepting wagers on the results of sporting events and other

17    events, COINBASE's market facilitates wagers on sporting events and other events

18    between individual participants in its market.

19        50.    As set out above, these wagers are on sporting events and other events,

20    including elections.

21        51.    COINBASE takes a percentage of money wagered through its market in the

22    form of commissions.

23        52.    COINBASE, in making event-based contracts concerning the outcomes, or

24    partial outcomes, of sporting or other events available on its market in Nevada, is a person

25    directly or indirectly receiving compensation or a percentage or share of the money played

26    for accepting or facilitating wagers on the results of sporting events and other events

27    without a gaming license. As a result, it has violated, and continues to violate, NRS

28    465.086.

1

G.    **COINBASE's market violates NRS 465.092.**

2    53.    Pursuant to NRS 465.092, it is unlawful for a person to knowingly accept a
3    wager from a person inside of Nevada through a medium of communication unless the
4    person accepting the wager is licensed pursuant to Nevada law and otherwise complies
5    with applicable Nevada laws and regulations concerning wagering.

6    54.    COINBASE's market accepts wagers on sporting events and other events.

7    55.    COINBASE's market accepts wagers from persons inside of Nevada.

8    56.    The Internet is a medium of communication. NRS 465.091.

9    57.    COINBASE's market uses the Internet for wagering activities.

10    58.    COINBASE is not and has never been licensed to accept wagers in Nevada.

11    59.    COINBASE, in making event-based contracts concerning the outcomes, or
12    partial outcomes, of sporting or other events available on its market in Nevada without a
13    license to accept such wagers, is a person knowingly accepting wagers from persons inside
14    of Nevada through a medium of communication and has violated, and continues to violate,
15    NRS 465.092.

16

## FIRST CLAIM FOR RELIEF

17

### (Declaratory and Injunctive Relief - NRS 463.343 and 463.346)

18    60.    The BOARD repeats, realleges, and incorporates each and every paragraph
19    contained in the General Allegations above as though fully set forth herein.

20    61.    Pursuant to NRS 463.343, the BOARD may bring an action for declaratory
21    judgment in this Court to obtain "a judicial determination of any question of construction
22    or validity arising under" NRS chapter 463.  NRS 463.343(1).

23    62.    Pursuant to NRS 463.346, the BOARD may institute a civil action in this
24    Court "to restrain a violation" of NRS chapters 463 and 465.  NRS 463.346(1).

25    63.    The Court "shall give priority over other civil actions to an action brought
26    pursuant to" NRS 463.346.  NRS 463.345.

27    64.    A justiciable controversy exists as to the application of NRS 463.160 and
28    463.350 to the activities of COINBASE as they relate to the State of Nevada.

1    65.    The BOARD's and COINBASE's interests are adverse.

2    66.    The BOARD has a strong legal interest in this controversy as it directly
3    impacts the BOARD's ability to carry out its legislative charge to strictly regulate gaming
4    because it is vitally important to Nevada, its economy, and the general welfare of its
5    inhabitants.

6    67.    The issue involved in this controversy is ripe for judicial determination.

7    68.    The Court is required to construe all statutes at issue in this claim for relief
8    in a manner consistent with the declared public policy of Nevada.  NRS 463.343(3).

9    69.    The BOARD is entitled to a declaration from this Court that NRS 463.160
10   prohibits COINBASE from making event-based contracts concerning the outcomes, or
11   partial outcomes, of sporting or other events available on its market in Nevada without
12   obtaining the required gaming licenses.

13   70.    The BOARD is entitled to a declaration from this Court that NRS 463.350
14   prohibits COINBASE from making event-based contracts concerning the outcomes, or
15   partial outcomes, of sporting or other events available on its market to persons under the
16   age of 21.

17   71.    The BOARD is entitled to an injunction enjoining COINBASE from making
18   event-based contracts concerning the outcomes, or partial outcomes, of sporting or other
19   events available on its market in Nevada unless and until COINBASE obtains the
20   appropriate gaming licenses.

21   72.    The BOARD is entitled to an injunction enjoining COINBASE from making
22   event-based contracts concerning the outcomes, or partial outcomes, of sporting or other
23   events available on its market to persons under the age of 21.

24                           **SECOND CLAIM FOR RELIEF**

25               **(Declaratory and Injunctive Relief - NRS 30.030)**

26   73.    The BOARD repeats, realleges, and incorporates each and every paragraph
27   contained in the General Allegations above as though fully set forth herein.

28

1    74.    Pursuant to NRS 30.030, this Court has the "power to declare rights, status
2    and other legal relations whether or not further relief is or could be claimed." NRS 30.030.
3    The declaration "may be either affirmative or negative in form and effect" and "shall have
4    the force and effect of a final judgment or decree." *Id.*

5    75.    A justiciable controversy exists as to the application of NRS 465.086 and
6    465.092 to the activities of COINBASE as they relate to Nevada.

7    76.    The BOARD's and COINBASE's interests are adverse.

8    77.    The BOARD has a strong legal interest in this controversy as it directly
9    impacts the BOARD's ability to carry out its legislative charge to strictly regulate gaming
10   because it is vitally important to Nevada, its economy, and the general welfare of its
11   inhabitants.

12   78.    The issue involved in this controversy is ripe for judicial determination.

13   79.    The BOARD is entitled to a declaration from this Court that NRS 465.086 and
14   465.092 prohibit COINBASE from making event-based contracts concerning the outcomes,
15   or partial outcomes, of sporting or other events available on its market in Nevada without
16   obtaining the required gaming licenses.

17   80.    The BOARD is entitled to an injunction enjoining COINBASE from making
18   event-based contracts concerning the outcomes, or partial outcomes, of sporting or other
19   events available on its market in Nevada unless and until COINBASE obtains the
20   appropriate gaming licenses.

21                              **PRAYER FOR RELIEF**

22   WHEREFORE, the BOARD prays for judgment against COINBASE as follows:

23   1.     For a declaration that NRS 463.160, 465.086, and 465.092 prohibit
24   COINBASE from making event-based contracts concerning the outcomes, or partial
25   outcomes, of sporting or other events available on its market in Nevada without obtaining
26   the required gaming licenses;

27
28

1      2.    For a declaration that NRS 463.350 prohibits COINBASE from making event-

2  based contracts concerning the outcomes, or partial outcomes, of sporting or other events

3  available on its market to persons under the age of 21;

4      3.    For an injunction enjoining COINBASE from making event-based contracts

5  concerning the outcomes, or partial outcomes, of sporting or other events available on its

6  market in Nevada unless and until COINBASE obtains the appropriate gaming licenses;

7      4.    For an injunction enjoining COINBASE from making event-based contracts

8  concerning the outcomes, or partial outcomes, of sporting or other events available on its

9  market to persons under the age of 21;

10      5.    For reasonable attorneys' fees and costs of suit incurred herein; and

11      6.    For such other and further relief as the Court deems just and proper.

12  

**AFFIRMATION**
**(Pursuant to NRS 239B.030)**

13  

14      The undersigned does hereby affirm that the foregoing document does not contain

15  the social security number of any person.

16      Dated: February 2, 2026.

17                              AARON D. FORD
18                              Attorney General

19                              By:

20                                Jessica E. Whelan (Bar No. 14781)
                              Chief Deputy Solicitor General – Litigation

21                              John S. Michela (Bar No. 8189)
                              Senior Deputy Attorney General

22                              Sabrena K. Clinton (Bar No. 6499)
                              Senior Deputy Attorney General

23                              State of Nevada
                              Office of the Attorney General

24                              1 State of Nevada Way, Suite 100
                              Las Vegas, NV 89119

25                              jwhelan@ag.nv.gov
                            jmichela@ag.nv.gov

26                              sclinton@ag.nv.gov

27                              *Attorneys for Plaintiff*

28

1

## CERTIFICATE OF SERVICE

2        I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3   and that on February 2, 2026, I deposited for mailing in the United States Mail, first-class

4   postage prepaid, at Carson City, a true and correct copy of the foregoing document,

5   addressed to the following:

6   Banjamin R. Walker, Esq.                    Jeffrey B. Wall, Esq.
    Yaira Dubin, Esq.                           James M. McDonald, Esq.
7   Akash M. Toprani, Esq.                      Rishabh Bhandari, Esq.
    Sullivan & Cromwell LLP                     Sullivan & Cromwell LLP
8   125 Broad Street                            1700 New York Avenue, N.W.
    New York, NY 10004                          Washington, D.C. 20006
9   walkerb@sullcrom.com                        wallj@sullcrom.com
    dubiny@sullcrom.com                         mcdonaldj@sullcrom.com
10  toprania@sullcrom.com                       bhandarir@sullcrom.com

11  *Attorneys for Defendant*                   *Attorneys for Defendant*

12  Coinbase Financial Markets, Inc.
    c/o Corporation Service Company
13  251 Little Falls Drive
    Wilmington, DE 19808
14

15

16                                        AG Legal Secretary, an employee of the
                                          Office of the Nevada Attorney General
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "B"

1  AARON D. FORD
   Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10 *Attorneys for Plaintiff*

11           IN THE FIRST JUDICIAL DISTRICT COURT OF
           THE STATE OF NEVADA IN AND FOR CARSON CITY
12

13 STATE OF NEVADA ex rel. NEVADA          Case No. 26 OC 00030 1B
   GAMING CONTROL BOARD,
14                                         Dept. No. II
            Plaintiff,
15
   vs.
16
   COINBASE FINANCIAL MARKETS,
17 INC.,

18          Defendant.

19

20     **PLAINTIFF'S APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING
        ORDER AND MOTION FOR PRELIMINARY INJUNCTION**
21

22         Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD

23 ("BOARD"), by and through its attorneys, hereby files this Application for Immediate *ex*

24 *parte* Temporary Restraining Order ("Application") and Motion for Preliminary Injunction

25 ("Motion") against COINBASE FINANCIAL MARKETS, INC. ("COINBASE") The BOARD

26 seeks to restrain and enjoin COINBASE and any of its agents, employees, officers, or

27

28

1    affiliates[1] from operating a derivatives exchange and prediction market ("market") that
2    offers event-based contracts relating to sporting and other events to people within Nevada
3    without obtaining all required Nevada gaming licenses, and from allowing its market to
4    accept wagers from persons under the age of 21. This Application and Motion are made
5    pursuant to NRCP 65 and are based upon the following Memorandum of Points and
6    Authorities, the Declaration of Jessica Whelan, attached hereto as **Exhibit 1**, all papers
7    on file herein, and any oral argument this Court permits.

8                              **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.    FACTS**

10        **A.    The State Comprehensively Regulates Gaming in Nevada.**

11        Nevada has a long history of gaming regulation. Except for a brief period during
12    prohibition, Nevada has allowed some form of legalized gaming for over 150 years. *See*
13    Becky Harris & Husna Alikhan, *Nevada, Over 60 Years Regulating Gambling—A*
14    *Jurisdictional Overview*, 23 Gaming L. Rev. 645, 648 & n.18 (2019).

15        Nevada's gaming industry is "vitally important to the economy of the State and the
16    general welfare of the inhabitants." NRS 463.0129(1)(a). All entities that conduct gaming
17    in Nevada must "be licensed, controlled and assisted to protect the public health, safety,
18    morals, good order and general welfare of the inhabitants of the State." NRS
19    463.0129(1)(d).

20        The Nevada Legislature has found that the continued growth and success of gaming
21    "is dependent on public confidence and trust that licensed gaming" is "conducted honestly
22    and competitively." NRS 463.0129(1)(b). And the Legislature has made clear that "public
23    confidence and trust can only be maintained by *strict* regulation of all persons, locations,
24    practices, associates, and activities related" to the operation of gaming in Nevada. NRS
25    463.0129(1)(c) (emphasis added). The BOARD is statutorily charged with administering
26    and enforcing Nevada gaming law. NRS 463.140(1).

27

28        [1] For the avoidance of doubt, the BOARD does not seek an injunction against the
     Designated Contract Market ("DCM") on which Coinbase operates.

1    "Gaming" in Nevada is synonymous with "gambling" and includes any regulated
2    game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played
3    with . . . equipment or any mechanical or electronic device or machine for money . . . or any
4    representative of value" that is accessible in Nevada. NRS 463.0152. The games subject
5    to regulation in Nevada include "percentage game[s]." NRS 463.0152. A "percentage game"
6    exists where the "house" does not directly participate in a wager and its only stake is a
7    commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297 (1984).
8    Gaming includes operating a "sports pool," which is "the business of accepting wagers on
9    sporting events or other events by any system or method of wagering," NRS 463.0193; a
10   "wager" is "a sum of money or representative of value that is risked on an occurrence for
11   which the outcome is uncertain," NRS 463.01962.

12          Nevada law comprehensively regulates entities that conduct gaming activities in the
13   State. Every entity that makes gaming activities accessible in Nevada is subject to a
14   rigorous licensing process. NRS 463.160(1). Entities conducting gaming activities in the
15   State of Nevada must pay taxes on gross gaming revenue derived from gaming activities
16   accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons in
17   the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm. Reg.
18   22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS
19   463.350. Further, licensed entities accepting wagers on sporting events must employ
20   safeguards to ensure that wagers are not being placed on an event by owners, coaches,
21   players, or officials participating in the event, and must communicate with Nevada gaming
22   regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev.
23   Gam'g Comm. Reg. 22.1205(2). Failing to enforce these laws would severely weaken the
24   State's ability to strictly regulate gaming and would jeopardize the growth and integrity of
25   Nevada's gaming industry, which is vitally important to its economy and the welfare of its
26   citizens.

27   / / /
28   / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    COINBASE's Market is a Gambling Game and/or Sports Pool and Accepts Wagers from Nevada.**

COINBASE operates a market that offers event-based contracts relating to sporting and other events. Compl. ¶ 20. These events include, but are not limited to, college basketball games, college and professional football games, and elections. *Id.*

COINBASE's event contracts are wagers under NRS 463.01962: COINBASE's market allows persons located in Nevada to risk money on sporting events and elections, and the outcomes of sporting events and elections are, by their very nature, uncertain. *See, e.g.,* COINBASE, *The Big Game,* https://www.coinbase.com/predictions/trending/the-big-game (last accessed February, 2, 2026). COINBASE consequently operates a "sports pool" under Nevada law. NRS 463.0193.

Further, COINBASE takes a commission, or percentage, on the wagers placed through its market. *See* COINBASE, *How do fees work?,* https://www.coinbase.com/predictions/event/KXSB-26 (last accessed February 2, 2026). COINBASE accordingly offers a "percentage game"—a type of "gambling game"—under Nevada law. NRS 463.0152.

A person can access COINBASE's market through its mobile app or its website. Compl. ¶ 18. COINBASE uses computers and servers to make its event-based contracts available on the Internet. *Id.* A person enters into an event-based contract on COINBASE's market with the payment of money. *Id.*

**C.    COINBASE's Activities in Nevada Cause Harm to Nevada**

Although COINBASE conducts gaming activity in Nevada, including by operating a sports pool, COINBASE does not comply with Nevada gaming law. Among other things, COINBASE has not undergone Nevada's rigorous licensing process to obtain a gaming license for its wagering activities. Compl. ¶ 27. It accordingly does not possess a Nevada license to conduct gaming activities, including operating a sports pool. *Id.* ¶¶ 39–40. Further, COINBASE does not pay taxes on gross gaming revenue generated from wagers

1   placed by persons in Nevada. *Id.* ¶ 29. And COINBASE does not have a physical location
2   in Nevada. *Id.* ¶ 31.

3       COINBASE also does not comply with the various regulations on gaming that
4   Nevada has imposed to protect Nevada and its citizens. COINBASE does not require its
5   patrons to be at least 21 years of age to place a wager in its markets, Compl. ¶ 33; it allows
6   anyone over the age of 18 to create an account and trade on its platform, *see* COINBASE,
7   *Account Setup*, https://www.coinbase.com/legal/user_agreement/united_states   (last
8   accessed February 2, 2026). To Plaintiff's knowledge, COINBASE does not employ
9   adequate safeguards to ensure that wagers are not being placed on an event by owners,
10  coaches, players, or officials participating in the event, and does not communicate about
11  potential evidence of match fixing or point shaving to Nevada regulatory authorities.
12  Compl. ¶ 35.

13  ## II.   PROCEDURAL HISTORY

14      On February 2, 2026, the BOARD filed this action to obtain a declaration from this
15  Court that COINBASE is violating Nevada law and an injunction ordering COINBASE to
16  cease its violations of Nevada law. *See* Compl., pp. 10–11. In this Application and Motion,
17  the BOARD seeks an *ex parte* temporary restraining order and preliminary injunction
18  prohibiting COINBASE and any of its agents, employees, officers, or affiliates from
19  operating a market that offers event-based contracts relating to sporting and other events
20  to people within Nevada without obtaining the required Nevada gaming licenses, and
21  prohibiting COINBASE from allowing its market to accept wagers from persons under the
22  age of 21.

23      Because the BOARD seeks an *ex parte* temporary restraining order, it made
24  reasonable efforts to notify counsel for COINBASE of the filing of this Application and
25  Motion, via e-mail to counsel of record in related cases in Illinois, Michigan, and
26  Connecticut. *See* **Exhibit 1-1**, 2/2/26 email from J. Whelan. *See* NRCP 65(b)(2)(B).
27  / / /
28  / / /

1    **III.   LEGAL STANDARD**

2        A court should grant preliminary injunctive relief when it "appear[s] by the

3    complaint that the plaintiff is entitled to the relief demanded, and such relief or any part

4    thereof consists in restraining the commission or continuance of the act complained of,"

5    NRS 33.010(1), and when "the commission or continuance of some act, during the litigation,

6    would produce great or irreparable injury to the plaintiff," NRS 33.010(2).  The plaintiff

7    must demonstrate two elements: (1) there is a reasonable likelihood that the plaintiff will

8    prevail in the underlying case and (2) absent a preliminary injunction, the plaintiff will

9    suffer irreparable harm for which compensatory damages are not sufficient.  *Elk Point

10   Country Club Homeowners' Ass'n, Inc. v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d 837,

11   839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152

12   (Nev. 2024).  The court may also consider the balance of hardships and the public interest.

13   *See Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,* 120 Nev. 712, 721, 100

14   P.3d 179, 187 (2004).

15       Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an *ex parte*

16   temporary restraining order.   Courts often apply similar standards for temporary

17   restraining orders and preliminary injunctions, as both are forms of injunctive relief aimed

18   at preventing harm before a final resolution of the case.  *See, e.g., LIT Ventures, LLC v.

19   Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020).  The key question is whether the

20   Plaintiff has shown that it will suffer "immediate and irreparable injury" before "the

21   adverse party can be heard in opposition." NRCP 65(b); *see State ex rel. Friedman v. Eighth

22   Jud. Dist. Ct. In & For Clark Cnty.,* 81 Nev. 131, 134, 399 P.2d 632, 633 (1965). That

23   showing must be made through either affidavit[2] or verified complaint.

24       The requirements for both a preliminary injunction and for an *ex parte* temporary

25   restraining order are met here.  In particular, the BOARD is suffering serious, ongoing,

26

27

28       [2] Under Nevada law, a declaration signed under penalty of perjury is the equivalent
of an affidavit. NRS 53.045.

Page **6** of 14

1  irreparable harm every day that COINBASE operates its market in violation of Nevada
2  law, and so the Court should immediately issue a temporary restraining order.

3  **IV.    ARGUMENT**

4          COINBASE has been willfully circumventing Nevada law requiring all gaming
5  activity in the State to be strictly regulated and licensed. COINBASE operates a "sports
6  pool" and/or "gambling game" under Nevada law. Yet COINBASE does not possess a
7  Nevada license to operate a sports pool or conduct other gaming activity in Nevada.
8  COINBASE also does not follow many of the restrictions on licensed gaming in the State.
9  In particular, COINBASE allows persons under 21 years of age to wager on its market.
10  Accordingly, the BOARD is entitled to a temporary restraining order and preliminary
11  injunction prohibiting COINBASE from operating an unlicensed sports pool in Nevada and
12  prohibiting COINBASE from accepting wagers from persons under the age of 21.

13          **A.    Plaintiff is likely to succeed on the merits of its claims.**

14          The BOARD is likely to succeed in showing that COINBASE violates, at a minimum,
15  NRS 463.160, 463.350, 465.086, and 465.092.

16          COINBASE violates NRS 463.160. Pursuant to NRS 463.160, it is unlawful for a
17  person to expose a game or a sports pool for play in Nevada without the required gaming
18  licenses. COINBASE's market exposes a percentage game and/or sports pool for play in
19  Nevada. Compl. ¶¶ 18–24. COINBASE does not possess a Nevada gaming license either
20  to offer a percentage game or to operate a sports pool in Nevada. *Id.* ¶ 39. Accordingly,
21  COINBASE, in making its market available to persons located in Nevada, has violated and
22  continues to violate NRS 463.160.

23          COINBASE violates NRS 463.350. Pursuant to NRS 463.350, a person under the
24  age of 21 may not play, be allowed to play, place wagers at, or collect winnings from any
25  game or sports pool. COINBASE's market constitutes a percentage game and/or sports
26  pool. Compl. ¶¶ 18–24. Yet COINBASE's market does not restrict persons under the age
27  of 21 from participating. *Id.* ¶ 43. Accordingly, COINBASE, in making its market available

28

1   to persons located in Nevada who are under the age of 21, has violated and continues to
2   violate NRS 463.350.

3          COINBASE violates NRS 465.086.  Pursuant to NRS 465.086(1), it is unlawful for
4   any person to directly or indirectly receive any compensation or any percentage or share of
5   the money played for accepting or facilitating any wager upon the result of any sporting
6   event without a gaming license.  COINBASE is not licensed to accept wagers in Nevada.
7   Compl. ¶ 47.  COINBASE's market accepts wagers.  *Id.* ¶ 48.  In addition to accepting
8   wagers on the results of sporting events and other events, COINBASE's market facilitates
9   wagers on sporting events and other events between individual participants in its market.
10  *Id.* ¶ 49.  COINBASE takes a percentage of money wagered through its market in the form
11  of    commissions    styled    as    fees.    COINBASE,    *How    do    fees    work?*,
12  https://www.coinbase.com/predictions/event/KXSB-26 (last accessed February 2, 2026).
13  Accordingly, COINBASE, in operating its market, has violated and continues to violate
14  NRS 465.086.

15         COINBASE violates NRS 465.092.  Pursuant to NRS 465.092, it is unlawful for a
16  person to knowingly accept a wager from a person inside of Nevada through a medium of
17  communication unless the person accepting the wager is licensed pursuant to Nevada law
18  and otherwise complies with applicable Nevada laws and regulations concerning wagering.
19  COINBASE's market accepts wagers on sporting events and other events.  Compl. ¶ 54.
20  COINBASE's market accepts wagers from persons inside of Nevada.  *Id.* ¶ 55.  The Internet
21  is a medium of communication.  NRS 465.091.  COINBASE's market uses the Internet for
22  wagering activities.  Compl. ¶ 57.  Accordingly, in operating its market, COINBASE is a
23  person knowingly accepting wagers from persons inside of Nevada through a medium of
24  communication and has violated and continues to violate NRS 465.092.

25         For at least these reasons, COINBASE is violating Nevada gaming law.  Yet
26  COINBASE has made clear that it will not voluntarily obtain a gaming license or otherwise
27  comply with Nevada gaming law.  The BOARD therefore is likely to succeed on the merits
28

1  of its claims and obtain a permanent injunction from this Court enjoining COINBASE from
2  operating its market without complying with Nevada gaming law.

3  **B.    Plaintiff is suffering and will continue to suffer immediate and irreparable harm absent relief.**

4

5  Plaintiff suffers serious and irreparable harm every day that COINBASE operates
6  its market in violation of Nevada law.    The Nevada Legislature has enacted a
7  "comprehensive regulatory structure, coupled with strict licensing standards" to ensure the
8  integrity of gaming in the State.  NRS 463.745.  Plaintiff is statutorily charged with
9  enforcing Nevada gaming law and overseeing Nevada's gaming industry, to protect the
10 reputation of the State of Nevada, to protect the reputation of gaming in Nevada, and to
11 protect the public health, safety, morals, good order, and general welfare of the inhabitants
12 of Nevada.  NRS 463.140(1).

13 COINBASE's failure to comply with Nevada gaming law impairs the BOARD from
14 carrying out its statutory functions.  For example, in order to ensure that wagering is fair,
15 Nevada gaming regulations prohibit accepting wagers on sporting events from owners,
16 coaches, players, officials, or other participants in the event and require licensees to take
17 reasonable steps to avoid circumvention of this regulation.  Nev. Gam'g Comm. Reg.
18 22.1205(2).  Licensed sports books also must: (1) obtain certain identification information
19 from patrons who place wagers of a certain size; (2) prevent multiple wagers designed to
20 circumvent the identification requirements for wagers of a certain size; and (3) prevent
21 wagers structured to circumvent the identification requirements.  Nev. Gam'g Comm. Reg.
22 22.061, 22.062, and 22.063.  Further, licensed sports books must communicate with the
23 BOARD about potential evidence of match fixing or point shaving. *See* Nev. Gam'g Comm.
24 Reg. 22.121.  To Plaintiff's knowledge, COINBASE does not adhere to these requirements,
25 which harms the BOARD by preventing it from ensuring the integrity of gaming in the
26 State.

27 COINBASE's failure to comply with Nevada gaming law gives it a massive and
28 unfair competitive advantage over its competitors, which greatly disrupts the gaming

1  industry. That advantage is both pecuniary, in that COINBASE does not need to spend
2  the money its competitors need to spend on licensing fees, taxes, and compliance (including
3  maintaining a physical location in Nevada), as well as strategic, in that COINBASE's
4  products are not subject to the same requirements as its competitors. Plaintiff, which is
5  charged with ensuring that gaming in Nevada is fair, suffers irreparable harm when
6  COINBASE is able to distort the playing field and disrupt the industry in this manner. *See*
7  *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1509 (9th
8  Cir. 1993).

9      The harm only increases the longer COINBASE is allowed to operate unfettered.
10  COINBASE's ability to profit from unlicensed gaming will incentivize others to enter into
11  prediction markets instead of becoming (or remaining) licensed under by the State. Indeed,
12  that already has started to happen: DraftKings and FanDuel have decided to forgo
13  licensing in Nevada so that they can enter the prediction-markets industry in other States.
14  *See KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025), *appeal*
15  *pending*, No. 25-7516 (9th Cir. filed Nov. 25, 2025). Other sportsbooks could follow suit,
16  "unleashing even more unregulated gambling." *Id.*

17      Thus, the harms caused by COINBASE are ongoing, serious, and irreparable. Now
18  that the BOARD is no longer prohibited from enforcing its statutory charge to strictly
19  regulate gaming, it seeks to stop the myriad harms caused by COINBASE.

20  **C.  The balance of hardships and the public interest weigh heavily in
favor of granting a temporary restraining order and preliminary
injunction.**

22  Compared to the ongoing, severe, irreparable harm that COINBASE's market causes
23  to the BOARD and to the State, any harms that COINBASE claims to suffer from an
24  injunction are insignificant. Indeed, the BOARD seeks only for COINBASE to follow
25  Nevada gaming law, and following the law is not a harm. *See Goldman v. Newage Lake*
26  *Las Vegas, LLC*, 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).

27  COINBASE may contend that federal law preempts Nevada gaming law, and that it
28  is harmed by being required to follow preempted law. But a federal district court

1  evaluating this argument brought by COINBASE's partner, and the Designated Contract
2  Market ("DCM") on which COINBASE's market operates, concluded that that entity is not
3  likely to prevail on the argument, *KalshiEX*, 2025 WL 3286282, at *6–12. In any event, as
4  the federal court explained, any claimed harms from being required to stop operating are
5  "largely monetary"—"essentially that [the company] will not be able to profit from [its]
6  trades"—and pale in comparison to the harms to the BOARD. *Id* at *12. Notably, the
7  federal agency COINBASE may claim to regulate it expressly told COINBASE to "account[]
8  for" "State regulatory actions and pending and potential litigation, including enforcement
9  actions," and that it should have "contingency plans," including "liquidation or close-out
10 policies and procedures" in the event it cannot operate in a State. U.S. Commodity Futures
11 Trading Comm'n, CFTC Letter No. 25-36, at 2 (Sept. 30, 2025), perma.cc/B26G-SBH5.[3] The
12 balance of harms thus weighs in the BOARD's favor. *KalshiEX*, 2025 WL 3286282, at *13.

13      The public interest similarly weighs in favor of enjoining COINBASE from violating
14 Nevada gaming law. The Legislature has determined that "[p]ublic confidence and trust
15 can only be maintained by strict regulation of all persons, locations, practices, associations
16 and activities related to the operation of licensed gaming establishments." NRS
17 463.0129(1)(c). "All establishments where gaming is conducted . . . must therefore be
18 licensed, controlled and assisted to protect the public health, safety, morals, good order and
19 general welfare of the inhabitants of the State." NRS 463.0129(1)(d). The Legislature thus
20 has determined that the public interest requires *all* gaming operators to be licensed and to
21 follow Nevada gaming law. Any gaming business, including COINBASE, that does not
22 comply with Nevada gaming law poses a threat to this vital industry.

23      In particular, COINBASE does not adhere to the consumer-protection requirements
24 in Nevada law. To start, COINBASE's operations harm some of Nevada's most vulnerable
25 residents. Nevada law prohibits persons under 21 from placing sports wagers, NRS
26 463.350(1)(a), but COINBASE does not require its participants to be 21 years of age.

27
28 [3] The newly appointed CFTC chairman recently made public comments indicating that this guidance may be rescinded. However, on information and belief, the guidance has not yet been rescinded.

Page 11 of 14

1   Nevada law also protects those suffering from problem gaming by requiring, among other
2   measures, that gaming licensees letting patrons set deposit limits, "conspicuously display"
3   information about responsible-gaming resources, train employees to identify signs of
4   problem gaming, and refrain from marketing to customers who have excluded themselves.
5   Nev. Gam'g Comm. Reg. 5.225(18)(a)-(b). To Plaintiff's knowledge, COINBASE does not
6   adhere to these requirements to the extent required by Nevada law.

7        COINBASE's operations further harm the gaming public because COINBASE does
8   not participate in the State's process to resolve patron disputes. *See* NRS 463.362 *et seq.*
9   Patrons of licensed gaming establishments may utilize a process with the BOARD to
10  resolve disputes related to wagering activities.   But this structure is in place only for
11  disputes between a Nevada licensee and its patron. NRS 463.362. A person entering a
12  wager through an event contract available on COINBASE's market is not a patron of a
13  Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse should
14  there be a dispute over the wager. COINBASE's market thus harms the public interest
15  because it does not provide adequate protection to purchasers of event contracts.

16       COINBASE also harms the State's economy and the public fisc. Licensed gaming is
17  "vitally important to the economy of the State and the general welfare of the inhabitants."
18  NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see* NRS 463.370—
19  revenues that finance "indispensable" State functions, from schools to highways. *Sacco v.*
20  *State*, 105 Nev. 844, 847 (1989). COINBASE's unlicensed gaming operations threatens
21  that revenue, by evading taxes and diverting business from licensed sports books that pay
22  taxes, and thus "represents a serious threat to the state's economic base." *Id.* Allowing
23  COINBASE to offer unlawful gaming activities risks "devastating the Nevada economy and
24  related tax revenues." *KalshiEX*, 2025 WL 3286282, at *14. The public interest thus
25  weighs decisively in favor of enjoining COINBASE.

26                                **CONCLUSION**

27       The Court should grant this application for *ex parte* temporary restraining order and
28  preliminary injunction, and enter an order prohibiting COINBASE and any of its agents,

1  employees, officers, or affiliates from operating a market that offers event-based contracts

2  relating to sporting and other events to people in Nevada without obtaining all required

3  Nevada gaming licenses, and prohibiting COINBASE from allowing its market to accept

4  wagers from persons under the age of 21.

**AFFIRMATION**
**(Pursuant to NRS 239B.030)**

7    The undersigned does hereby affirm that the foregoing document does not contain

8  the social security number of any person.

9    Dated: February 2, 2026.

10
AARON D. FORD
Attorney General

By:
Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff*

# EXHIBIT 1

1  AARON D. FORD
     Attorney General
2  Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
     Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
5  State of Nevada
     Office of the Attorney General
6  1 State of Nevada Way, Suite 100
     Las Vegas, NV 89119
7  (702) 486-3420 (phone)
     (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
     jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10  *Attorneys for Plaintiff*

11        **IN THE FIRST JUDICIAL DISTRICT COURT OF
           THE STATE OF NEVADA IN AND FOR CARSON CITY**
12

13  STATE OF NEVADA ex rel. NEVADA        Case No.
     GAMING CONTROL BOARD,
14                                         Dept. No.
            Plaintiff(s),
15
     vs.
16
     COINBASE FINANCIAL MARKETS,
17  INC.,

18          Defendants.

19

20   **DECLARATION OF JESSICA E. WHELAN IN SUPPORT OF PLAINTIFF'S
                          APPLICATION FOR
21          EX PARTE TEMPORARY RESTRAINING ORDER**

22        I, Jessica E. Whelan, declare as follows:

23        1.      I am the Chief Deputy Solicitor General—Litigation in the Nevada Attorney

24  General's Office, and I make this declaration in support of Plaintiff's application for an *ex*

25  *parte* temporary restraining order under NRS 463.346 and NRCP 65(b). All facts stated

26  herein are based on my personal knowledge unless otherwise specified.

27        2.      On October 15, 2025, the Nevada Gaming Control Board ("BOARD") issued

28  public guidance explaining that "it considers offering sports event contracts, or certain

1   other events contracts, as constituting wagering activity under NRS 463.0193 and
2   463.01962," regardless of whether "the contract is listed on an exchange regulated by the
3   Commodity Futures Trading Commission (CFTC) or elsewhere." Nev. Gaming Control Bd.,
4   *Notice to Licensees No. 2025-77: Sports Event Contracts Are Wagers* 1 (Oct. 15, 2025),
5   perma.cc/7XEH-BZLV. The BOARD further explained that "[e]xamples of event contracts
6   that the Board specifically considers to be wagering subject to its jurisdiction include event
7   contracts based on the outcome or partial outcome of any sporting or athletic event, or other
8   selected events such as the World Series of Poker, the Oscars, Esports, and political
9   elections." *Id.*

10      3.      The BOARD also explained that "[o]fferings for Sports and Other Events
11  Contracts may be conducted in Nevada only if the offering entity possesses a nonrestricted
12  gaming license with sports pool approval in Nevada and meets the other requirements for
13  sports wagering including, without limitation, wagering accounts and sports book
14  systems." *Id.*

15      4.      Accordingly, as of October 15, 2025, the Board had provided public notice to
16  all entities that allow for the purchase or sale of event contracts based on the outcome of
17  sporting and certain other events in Nevada without possessing a gaming license with
18  sports pool approval that such conduct violates Nevada law.

19      5.      Defendant COINBASE FINANCIAL MARKETS, INC. ("COINBASE")
20  operates a market that offers event-based contracts relating to sporting and other events.
21  Compl. ¶ 20. These events include, but are not limited to, college basketball games, college
22  and professional football games, and elections. *Id.* Users in Nevada are able to access
23  COINBASE by signing up for an account through its mobile app or its website. *Id.* ¶ 18.

24      6.      COINBASE's activities meet the definition of a "game" subject to regulation
25  in Nevada—specifically, it operates a "sports pool" under Nevada law. *See* Compl. ¶¶ 18–
26  23. But despite conducting gaming accessible in the State of Nevada, COINBASE is not
27  licensed in Nevada and does not comply with Nevada gaming law. *Id.* ¶ 25. It has not
28  undergone Nevada's rigorous licensing process for its gaming activities, nor has does it

1  comply with the restrictions and requirements of Nevada law for operators of sports pools.
2  *See id.* ¶¶ 27, 39.

3      7.     Although COINBASE is an unlicensed entity in Nevada and the BOARD does
4  not have contact information to provide COINBASE notice of this application, the BOARD
5  is aware that COINBASE has recently brought affirmative litigation in Illinois, Michigan,
6  and Connecticut. I therefore reached out to counsel of record in those lawsuits in an attempt
7  to reasonably inform COINBASE that the BOARD was filing this application. *See* **Exhibit**
8  **1-1**, 2/2/26 email from J. Whelan.

9      8.     The BOARD enforces Nevada gaming law and oversees the State's gaming
10 industry to protect the integrity and reputation of gaming in Nevada and to safeguard the
11 public. COINBASE's failure to comply with Nevada gaming law harms the public. For
12 example, Nevada law prohibit persons under the age 21 from engaging in gaming, yet
13 COINBASE allows those as young as 18 to wager on its platform. Nevada law also prohibits
14 wagers by owners, coaches, players, officials, or other participants in sporting events and
15 require licensees to take reasonable steps to prevent circumvention of that rule. To the
16 undersigned counsel's knowledge, COINBASE does not comply with these requirements.

17     9.     COINBASE's failure to comply with Nevada gaming law also gives it a
18 massive and unfair competitive advantage over its competitors, which upends the gaming
19 industry. That advantage is both pecuniary, in that COINBASE does not need to spend
20 the money its competitors need to spend on licensing fees, taxes, and compliance (including
21 maintaining a physical location in Nevada), as well as strategic, in that COINBASE's
22 products are not subject to the same requirements as its competitors. The BOARD suffers
23 irreparable harm when COINBASE is able to distort the playing field and disrupt the
24 industry in this manner.

25     10.    The harm only increases the longer COINBASE is allowed to operate
26 unfettered. COINBASE's ability to profit from unlicensed gaming will incentivize others to
27 enter into prediction markets rather than becoming (or remaining) licensed by the State.
28

1        11.    Plaintiff and the State of Nevada are currently suffering the serious, ongoing,

2    and irreparable harms outlined above every day that COINBASE operates its market in

3    violation of Nevada law. These harms justify issuance of the temporary restraining order

4    on an *ex parte* basis without allowing COINBASE an opportunity to respond.

5        I declare under penalty of perjury that the foregoing is true and correct.

6    **AFFIRMATION**
**(Pursuant to NRS 239B.030)**

7

8        The undersigned does hereby affirm that the foregoing document does not contain

9    the social security number of any person.

10       Dated this 2nd day of February, 2026.

11

12                     By: _____
                      JESSICA E. WHELAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1-1

| From: | Jessica E. Whelan |
|---|---|
| To: | walkerb@sullcrom.com; dubiny@sullcrom.com; toprania@sullcrom.com; wallj@sullcrom.com; mcdonaldj@sullcrom.com; bhandarir@sullcrom.com |
| Cc: | Sabrena K. Clinton; John S. Michela; Jeny M. Beesley |
| Subject: | Coinbase Financial Markets, Inc. - Notice of Nevada Civil Enforcement Action and Application for ex parte TRO |
| Date: | Monday, February 2, 2026 1:27:05 PM |
| Attachments: | image001.png |

Counsel,

Pursuant to Rule 65(b) of the Nevada Rules of Civil Procedure, I write to notify you that the Nevada Gaming Control Board ("Board") is filing a civil enforcement action today against your client, Coinbase Financial Markets, Inc. ("Coinbase") in Nevada state court, First Judicial District. It has come to the Board's attention that Coinbase is operating unlawfully in Nevada. The Board is seeking an *ex parte* temporary restraining order, to be issued before Coinbase is afforded the opportunity to respond. This is due to the immediate and irreparable harm that the State of Nevada is suffering in light of Coinbase's unlawful and unlicensed operation within its borders.

I understand that you represented Coinbase in litigation across the country related to its operation of its so-called prediction market. However, if you are not the appropriate counsel to notify of this forthcoming enforcement action, I would appreciate if you would let me know who the appropriate contact is.

We will provide a courtesy copy by email of the documents once filed.

Thank you,
Jessica

Jessica E. Whelan
Chief Deputy Solicitor General - Litigation
Office of the Attorney General
1 State of Nevada Way
Suite 100
Las Vegas, Nevada 89119
jwhelan@ag.nv.gov

D: 702-486-4346



*Notice: This e-mail message and any attachments thereto may contain confidential, privileged, or non-public information. Use, dissemination, distribution, or reproduction of this information by unintended recipients is strictly prohibited. If you have*

*received this message in error, please notify the sender immediately and destroy all copies.*

1

## CERTIFICATE OF SERVICE

2      I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3  and that on February 2, 2026, I deposited for mailing in the United States Mail, first-class

4  postage prepaid, at Carson City, a true and correct copy of the foregoing document,

5  addressed to the following:

6  Banjamin R. Walker, Esq.
   Yaira Dubin, Esq.
7  Akash M. Toprani, Esq.
   Sullivan & Cromwell LLP
8  125 Broad Street
   New York, NY 10004
9  walkerb@sullcrom.com
   dubiny@sullcrom.com
10 toprania@sullcrom.com

   Jeffrey B. Wall, Esq.
   James M. McDonald, Esq.
   Rishabh Bhandari, Esq.
   Sullivan & Cromwell LLP
   1700 New York Avenue, N.W.
   Washington, D.C. 20006
   wallj@sullcrom.com
   mcdonaldj@sullcrom.com
   bhandarir@sullcrom.com

11 *Attorneys for Defendant*

   *Attorneys for Defendant*

12 Coinbase Financial Markets, Inc.
   c/o Corporation Service Company
13 251 Little Falls Drive
   Wilmington, DE 19808

14

15 _____
   AG Legal Secretary, an employee of the
16 Office of the Nevada Attorney General

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "C"

1    Alex L. Fugazzi (NV Bar No. 9022)
     Janine C. (Jacey) Prupas (NV Bar No. 9156)
2    SNELL & WILMER L.L.P.
     5520 Kietzke Lane, Suite 200
3    Reno, Nevada 89511-3041
     Telephone: 775.785.5440
4    Facsimile: 775.785.5441
     Email: jprupas@swlaw.com
5          adhalla@swlaw.com

6    Benjamin R. Walker *Pro Hac Vice Forthcoming*
     James M. McDonald *Pro Hac Vice Forthcoming*
7    Yaira Dubin *Pro Hac Vice Forthcoming*
     Akash M. Toprani *Pro Hac Vice Forthcoming*
8    SULLIVAN & CROMWELL LLP
     125 Broad Street
9    New York, NY 10004
     Tel: (212) 558-4000
10   walkerb@sullcrom.com
     mcdonaldj@sullcrom.com
11   dubiny@sullcrom.com
     toprania@sullcrom.com
12
     Jeffrey B. Wall *Pro Hac Vice Forthcoming*
13   Rishabh Bhandari *Pro Hac Vice Forthcoming*
     SULLIVAN & CROMWELL LLP
14   1700 New York Avenue, N.W.
     Washington, D.C., 20006
15   Tel: (202) 956-7500
     wallj@sullcrom.com
16   bhandarir@sullcrom.com

17   *Attorneys for Defendant Coinbase*
     *Financial Markets, Inc.*

18

19              **FIRST JUDICIAL DISTRICT COURT OF NEVADA**

20                  **IN AND FOR CARSON CITY**

21   STATE OF NEVADA ex rel. NEVADA       Case No.: 26 OC 00030 LB
     GAMING CONTROL BOARD.,
22                     Dept. No.: II
           Plaintiff,
23   v.

24   COINBASE FINANCIAL MARKETS, INC.,

25           Defendant.

26

27   **DEFENDANT'S (I) PRELIMINARY OPPOSITION TO PLAINTIFF'S APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION, *And* (II) REQUEST FOR OPPORTUNITY TO FILE A FULL OPPOSITION AND TO BE HEARD THEREON**

28

4897-1750-2349

1   Defendant Coinbase Financial Markets, Inc. ("Coinbase") respectfully asks this Court to
2   deny the State's request for extraordinary relief in the form of an *ex parte* temporary restraining
3   order and preliminary injunction. Nevada seeks a sweeping order to stop Defendant from offering
4   access to *all* federally regulated event contracts—even though those contracts will remain available
5   to Nevada users on another platform and even if the contract has nothing to do with sports. And
6   the State asks this Court to issue that order now, thus answering this industry-defining question of
7   first impression without affording Defendants the chance to respond or be heard.

8   Plaintiffs come nowhere close to justifying that extraordinary request. Most obviously, the
9   State cannot make the heightened showing of immediate, irreparable harm required to justify *ex*
10  *parte* relief. The question of whether States may regulate federally registered event contracts is
11  actively being litigated in courts across country. Indeed, the very event contracts at issue in this
12  case—event contracts that are offered by Defendant's partner, Kalshi, to users in Nevada—are
13  already the subject of ongoing litigation that has advanced to the U.S. Court of Appeals for the
14  Ninth Circuit, in which the State is a party. And critically, during the pendency of Kalshi's stay
15  application to the Ninth Circuit, the State *has agreed to refrain* from enforcing its laws against
16  Kalshi. This means that a consumer in Nevada who wishes to trade a Kalshi-issued event contract
17  can log into the Kalshi platform and trade event contracts. But for some inexplicable reason, the
18  State believes that *ex parte* TRO relief is warranted so that Nevadans cannot access the *very same*
19  Kalshi-issued event contracts on *Coinbase*'s platform. Indeed, the State is asking this Court to
20  prohibit Coinbase from offering a *far broader* scope of Kalshi-issued event contracts than it has
21  sought in the federal-court proceedings to prohibit Kalshi itself from offering, without even hearing
22  from Coinbase first. None of that makes sense, which is reason enough to deny the State's late-
23  breaking motion for a TRO that strips Coinbase of the opportunity to respond and be heard.

24  Nevada also cannot satisfy the other factors for injunctive relief. The merits strongly favor
25  Coinbase: the plain text of the Commodity Exchange Act, along with its context and history,
26  confirms that event contracts fall within the CFTC's exclusive jurisdiction, and that any
27  countervailing state law is therefore preempted. And the balance of hardships and public interest
28  cut decidedly in Coinbase's favor because the State has no interest in enforcing a preempted law—

- 2 -

4897-1750-2349

1  particularly when the State intends only selective, uneven enforcement. This Court should deny

2  Nevada's request for a TRO and set an expedited briefing schedule and hearing on the State's

3  preliminary-injunction motion.

4  **MEMORANDUM OF POINTS AND AUTHORITIES**

5  **I.   FACTS**

6  Coinbase and its affiliated exchange, Coinbase, Inc., offer its customers a trusted, user-

7  friendly platform to trade digital assets. In January 2026, Coinbase began offering its customers,

8  including Nevada users, the ability to trade event contracts on its platform through a partnership

9  with KalshiEx, LLC ("Kalshi"), a CFTC-registered exchange that lists event contracts for trading.

10  Kalshi-listed event contracts run the gamut from politics to music to climate to movies to sports.

11  Coinbase Financial Markets is a CFTC-registered intermediary between Coinbase customers and

12  Kalshi's exchange, assuring users that they are trading on a secure platform that fully complies with

13  all relevant laws.

14  An event contract is a type of derivative instrument that enables parties to trade on their

15  predictions about "a specified event, occurrence, or value," "such as the value of a macroeconomic

16  indicator, corporate earnings, level of snowfall, or dollar value of damages caused by a hurricane."[1]

17  Event contracts are typically structured as binary, yes-or-no questions in which each "yes" position

18  corresponds to an opposing "no" position. For example, an event contract may ask whether the

19  President will impose new tariffs on Europe by the end of 2026. Once the defined occurrence has

20  taken place, the contract settles accordingly: The party who purchased the position representing

21  the occurrence (*i.e.*, "tariffs imposed") receives the contract's payout, and the party representing

22  the non-occurrence (*i.e.*, "tariffs are not imposed") receives nothing.

23  Importantly, parties can exit their positions before the contract expires, so the price will

24  fluctuate as parties trade positions based on, among other things, new information. Because of

25  these price-discovery dynamics, event contracts generate valuable predictive data about local,

26  national, and world events. At the same time, event contracts allow market participants to mitigate

27  risk by offsetting underlying exposure to a particular event (for example, a retailer whose business

28

SNELL & WILMER
L.L.P.
LAW OFFICES
3530 Meeloe Lane,
Suite 200
Reno, Nevada 89511
51863

[1] *Contracts & Products*, CFTC, https://tinyurl.com/bdmrjfew.

4897-1750-2349

- 3 -

1  is particularly vulnerable to tariff-related costs).

2          Much like the market for event contracts relating to political or economic issues, the market

3  for sports-related event contracts has also grown substantially. Although such event contracts

4  sometimes concern the same underlying events as state-regulated sportsbooks, the financial

5  products themselves are markedly different. Unlike traditional sportsbooks, sports-related event

6  contracts are derivative instruments listed on centralized exchanges pursuant to extensive federal

7  product-certification, registration, market-integrity, and approval procedures. Event-contract

8  prices are formed by matching buyers and sellers on these national exchanges, much like a public

9  company's stock price is set at a stock exchange through the buying and selling of its securities.

10          In other words, like all other derivative exchanges, an event-contract exchange serves as a

11  neutral market operator; it does not set prices or act as a counterparty to its members' trades. And

12  intermediaries, like Coinbase, likewise do not take the other side of their customers' trades but

13  instead act as execution and clearing agents that facilitate access to these markets. A traditional

14  state-regulated sportsbook, by contrast, sets the terms of its wagers and acts as the counterparty to

15  each bettor, who bets against the house. Unlike event-contract exchanges, the sportsbook's interest

16  is directly adverse to each bettor's. And the odds (price) offered by a sportsbook are determined

17  not by transparent competition across a unified market but by the operator's own risk exposure and

18  revenue objectives.

19          As the CFTC has consistently recognized, event contracts—including those that Coinbase

20  intends to offer—are "swaps," subject to the CFTC's exclusive jurisdiction. *See, e.g.*, *In re*

21  *Blockratize (d/b/a Polymarket.com)*, CFTC No. 22-09, at *1 (Jan. 3, 2022). The CEA expressly

22  authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those

23  contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-

24  (ii). Indeed, just a week ago, CFTC Chairman Selig reaffirmed that event contracts have "operated

25  within the CFTC's regulatory perimeter for more than two decades" and directed CFTC staff to

26  "draft[] an event contracts rulemaking." Remarks at Joint SEC-CFTC Event (Jan. 29, 2026),

27  https://tinyurl.com/ydv9r8wf. The companies that offer access to event contracts are extensively

28  regulated under federal law. *See, e.g.*, 7 U.S.C. §§ 2(e), 7b-3(a)(1), 7a-2(c)(5)(B).

SNELL & WILMER
L.L.P.
LAW OFFICES
3530 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

- 4 -

Kalshi began offering event contracts in July 2021.  In January 2025, the company added sports-related event contracts after certifying that the contracts complied with applicable requirements under the CEA and federal regulations.  *See* Ex. A.  As event-contract markets have matured into a multi-billion-dollar industry, the CFTC has never prohibited any of Kalshi's sports-related contracts.

## II.    PROCEDURAL HISTORY

Last night, Nevada moved for an *ex parte* TRO without providing any meaningful notice.  On February 2, 2026, at 4:27 PM ET, Nevada's lawyers informed Coinbase that the State intended to file a lawsuit seeking an *ex parte* TRO.  By the time Coinbase responded at 6:40 PM ET with a request to confer before Nevada seeks extraordinary relief, Nevada's lawyers explained that the State had already filed its application at 6:09 PM ET—less than two hours after the State provided illusory notice.

Nevada is currently litigating the same preemption question against several other entities that provide event contracts, including Kalshi, in the U.S. Court of Appeals for the Ninth Circuit.  But Nevada's approach there sharply diverges from its approach here.  Critically, Nevada has entered into a non-enforcement agreement with Kalshi that allows Nevadans to access Kalshi's event contracts on Kalshi's platform until the Ninth Circuit rules on Kalshi's stay application.  Nevada's application here is also an outlier in the breadth of its requested relief.  Rather than simply target sports-based event contracts, Nevada also requests that this Court prohibit Coinbase from offering "event-based contracts relating to . . . other events," such as "elections," seemingly capturing the entire universe of event contracts that Coinbase currently offers its customers.

## III.    LEGAL STANDARD

To obtain an emergency TRO without notice, a movant must show "specific facts" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Nev. R. Civ. P. 65(b).  And for injunctive relief, more generally, a movant must show "a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice."  *Posner* v. *U.S. Bank N.A.*, 545 P.3d 1150, 1152 (Nev. 2024).  Courts may also consider

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway
Suite 1100
Las Vegas, Nevada 89169

4897-1750-2349

1  the balance of hardships and the public interest in determining whether injunctive relief is

2  warranted. *University & Cmty. Coll. Sys. of Nev.* v. *Nevadans for Sound Gov't*, 120 Nev. 712, 721

3  (2004).

4  IV.    **ARGUMENT**

5  **A.    Nevada Has Not Shown That It Will Suffer Irreparable Harm Without A TRO.**

6  Nevada's application for *ex parte* relief fails at the most basic level: Nevada's own course

7  of conduct conclusively demonstrates that it will not suffer irreparable harm absent the immediate

8  relief it seeks. If Nevada's request for a TRO were granted in full, Coinbase would be prohibited

9  from offering *any* Kalshi event contracts, but *Kalshi* itself would still be allowed to offer its full

10  range of event contracts at least until the Ninth Circuit decides its stay application (and longer still,

11  if that court grants the application). Nevadans thus will retain access to Kalshi event contracts

12  whether or not the Court grants a TRO here, revealing that the State does not genuinely fear any

13  irreparable harm from the offering of Kalshi's products while the Ninth Circuit litigation is pending.

14  Moreover, Nevada has been litigating these questions with Kalshi for almost a year through

15  the federal courts. And Kalshi has been offering its event contracts, which fully comply with all

16  relevant federal laws, in the State in the interim—again, pursuant to an agreement with the State

17  that it would not enforce its laws against Kalshi during the pendency of the federal district court

18  proceedings. There is no reason to distinguish between Kalshi's offering of event contracts and

19  Coinbase's offering the same contracts, and the State makes no attempt to justify its disparate

20  treatment of two identically situated entities—or to explain why the State will suffer irreparable

21  harm if Nevadans continue to trade event contracts on Coinbase's platform but not on Kalshi's.

22  And in any event, because Coinbase has made a robust case on the merits that the State's

23  gambling laws are preempted with respect to the event contracts it offers on a federally regulated

24  exchange, *see infra* at 6-9, Nevada lacks any cognizable interest in enforcing those laws. It is

25  blackletter law that the State has no legitimate interest in enforcing a preempted law. *See Felder*

26  v. *Casey*, 487 U.S. 131, 138 (1988). It would turn our constitutional system on its head if a State

27  can override federal law by simply spelling out the elements of a preempted law in an application

28  for emergency relief and asserting that the State suffers irreparable harm because it cannot enforce

SNELL & WILMER
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169

- 6 -

1  its unconstitutional law at this very moment. Indeed, if Nevada is right about this, then courts will

2  be forced to answer weighty, difficult questions of public law regularly on the emergency docket.

3  That is the opposite of the proper process for ventilating the difficult, weighty questions that

4  animate cases like this one.

5      Moreover, this case is a particularly poor candidate for emergency relief because the State's

6  proposed TRO extends far further than just sports event contracts. If the State's requested relief is

7  accepted wholesale, then Coinbase would be unable to offer *any* event contracts in Nevada—

8  including event contracts that relate to paradigmatic commodities such as soybean futures or oil

9  prices. No judicial decision made with the benefit of adversarial briefing has come close to

10  embracing this sweeping conclusion, and the State provides no argument for why this Court should

11  enter a TRO that would shut down an entire market for a single company without, at a minimum,

12  full briefing and an opportunity to be heard. Thus, to the extent this Court is inclined to agree with

13  Nevada's position, it should provide some meaningful opportunity for the parties to join issue

14  before it effectively imposes a categorical ban on Coinbase's operations in the State.

15      **B.**    **Nevada Cannot Show That It Is Likely To Succeed On The Merits Because The CEA Expressly Preempts Nevada's Gambling Laws.**

16

17      "[W]hen state and federal law clash," federal law must prevail. *Armstrong* v. *Exceptional*

18  *Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). Here, among other things, federal law expressly

19  preempts Nevada's gambling laws.[2] *See* Plaintiff's Motion for Preliminary Injunction, *Coinbase*

20  *Financial Markets, Inc.* v. *Tong*, No. 25-cv-02121 (D. Conn. Nov. 18, 2025). That is because the

21  CEA squarely preempts any state laws that purport to regulate swaps traded on DCMs.

22      The CEA grants the CFTC "*exclusive jurisdiction*" to regulate "transactions involving

23  swaps . . . traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A)

24  (emphasis added). The ordinary meaning of "exclusive" is "debarring from interference or

25  participation; vested in one [entity] alone." *Exclusive*, Black's Law Dictionary (5th ed. 1979).

26

SNELL & WILMER
L.L.P.
LAW OFFICES
3530 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

27  [2] The CEA also preempts Nevada's gambling laws through field preemption and conflict preemption. The CEA's structure evinces "a comprehensive scheme for regulation" of event contracts, DCMs, and FCMs, from start to finish.

28  *CFTC* v. *Brit. Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977). Nevada's attempts to regulate sports event contracts also frustrate Congerss's efforts to create uniformity in the derivatives market and directly conflict with federal law.

- 7 -

4897-1750-2349

1    Likewise, "exclusive jurisdiction" is defined as "power . . . over a[n entity] to the exclusion of all

2    other[s]." *Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979). Most naturally read, the

3    CFTC's "exclusive jurisdiction" over swaps traded on DCMs thus precludes State interference in

4    those transactions. Indeed, virtually every court to consider Section 2(a)(1)(A)'s grant of exclusive

5    jurisdiction has interpreted that provision to preempt state laws that purport to regulate transactions

6    on CFTC-regulated exchanges. *See, e.g.*, *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The

7    CEA's history buttresses this conclusion. Originally, the CEA did not "impair any State law

8    applicable to any transaction" regulated by the Act. But in 1974, Congress eliminated this provision

9    to "assure that Federal preemption is complete." 120 Cong. Rec. 30, 418, 30,464 (Sep. 9, 1974)

10   (statement of Sen. Curtis). The 1974 amendments therefore "preempt[ed] the field insofar as futures

11   regulation is concerned." H.R. Rep. No. 93-1383, at 35-36.

12       Here, the CEA preempts Nevada's attempts to apply state law because the event contracts

13   at issue are swaps traded on federally registered exchanges. Congress defined a "swap" broadly to

14   reach, among other things, "any agreement, contract, or transaction" that "provides for any

15   purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the

16   extent of the occurrence of an event or contingency associated with a potential financial, economic,

17   or commercial consequence." *Id.* § 1a(47)(A)(ii). The event contracts that Coinbase plans to offer

18   fall squarely within this definition, and thus within the CFTC's exclusive jurisdiction. The

19   contracts at issue here are executed on Kalshi's exchange, a DCM that is registered with and

20   regulated by the CFTC, in compliance with the CEA's robust regulatory requirements. *See* Ex. G.

21   And event contracts are binary "contract[s]" that pay out depending on the "occurrence [or]

22   nonoccurrence" of a future "event or contingency" that carries potential economic consequences.

23   *Id.* § 1(a)(47)(A)(ii).[3]

24

25   [3] That event contracts qualify as "swaps" within the CFTC's exclusive jurisdiction is further confirmed by
     Congress's enactment in 2010 of a "Special Rule" governing the CFTC's "approval of event contracts." 7 U.S.C.

26   § 7a-2(c)(5)(C)(i)-(ii). Congress's decision to vest the CFTC with authority to review "event contracts" underscores
     that these instruments are "swaps" falling within the CFTC's "exclusive jurisdiction," consistent with the "swap"

27   definition itself. Moreover, the 2010 Special Rule expressly authorizes the CFTC to "review" certain event contracts,
     including those involving "gambling," to determine if such contracts should be approved or prohibited. 7 U.S.C.

28   § 7a-2(c). The Rule is thus predicated on the premise that event contracts involving "gambling" *are* swaps within the
     CFTC's remit. But on the State's logic, event contracts involving gambling would fall categorically outside the
     CFTC's jurisdiction, leaving no gambling-related contracts for the CFTC to review in the first instance—this

SNELL & WILMER
L.L.P.
LAW OFFICES
3550 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

1       The State has no response to these arguments. Instead, it simply recites (at 7-8) the elements
2   of Nevada's gambling laws, and concludes that Coinbase's offering of event contracts satisfies
3   those elements. But it is *Congress*, not the States, that determines the scope of the CFTC's
4   jurisdiction. And on Nevada's view, all sorts of federal derivatives could be subject to state
5   gambling laws. Consider, for instance, Michigan's gambling laws, which prohibit "accept[ing]
6   from any person any money or valuable thing with the agreement . . . that any money or valuable
7   thing will be paid . . . where the payment or delivery is . . . contingent upon the result of any . . .
8   happening of any event not known by the parties to be certain." Mich. Penal Code § 750.301.
9   Michigan could criminalize the trading of soybean futures or weather event contracts or emissions
10  swaps by copying and pasting Nevada's application for emergency relief and changing out the
11  relevant nouns. That cannot be right, but Nevada provides no plausible basis whatsoever for
12  drawing the line between sports-related event contracts and other event contracts when the CEA
13  does not distinguish between these subjects. Indeed, Nevada requests relief that, if granted, would
14  prohibit parties from trading commodity-based event contracts on federal exchanges whenever a
15  State drafts its gambling laws to cover such products. Nevada does not explain why it should be
16  allowed to upend the Nation's derivative markets.

17          **C.      The Balance Of The Equities And Public Interest Favor Injunctive Relief.**

18          The balance of equities and the public interest decidedly favor Coinbase. The public interest
19  is furthered when state officials comply with, rather than flout, federal law. And the balance of
20  equities in our constitutional system favors the regulated party rather than the government.

21          Nevada's harms lack any legitimate foundation because its laws are preempted with respect
22  to these contracts. And if Coinbase is wrong on the merits (it is not), then, at most, Nevada will be
23  delayed in preventing its citizens from accessing event contracts on Coinbase's platform. But
24  Nevada already committed to that outcome when it agreed to suspend enforcement of its laws
25  against Kalshi until the stay application in the Ninth Circuit was resolved. Thus, Nevada cannot
26  prevail on the public-interest or balance-of-equities prongs.

27
---
28  provision of the Special Rule would cover a null set. There is no basis to read the Special Rule out of the statute. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024).

1    Moreover, the CFTC's forthcoming rulemaking and likely participation in prediction-

2 markets litigation also counsel against emergency relief. The CFTC has blessed the availability of

3 event contracts for many years, and just last week, Chairman Selig announced that the CFTC will

4 "reassess the Commission's participation" in ongoing federal-court litigation to ensure that it is

5 "defend[ing] its exclusive jurisdiction over commodity derivatives." Selig, *supra*. The States

6 cannot rush to the courthouse in an effort to obtain a quick victory before the CFTC has an

7 opportunity to weigh in.

8    The public interest also firmly supports Coinbase's preliminary-injunction motion. There

9 is "a strong public interest in ensuring the Supremacy Clause is properly effectuated." *Ill. Bankers*

10 *Ass'n* v. *Raoul*, 760 F. Supp. 3d 636, 665 (N.D. Ill. 2024). Indeed, the public's interest in this case

11 is "represented by . . . Congress' decision to ensure the uniformity of law" governing derivatives

12 trading. *Staffing Servs. Ass'n of Ill.* v. *Flanagan*, 720 F. Supp. 3d 627, 642 (N.D. Ill. 2024). And

13 the public has a substantial interest in accessing the event contracts that Coinbase seeks to offer and

14 that federal law authorizes. Granting the requested relief would both vindicate these interests and

15 protect Coinbase from existential harm.

16                                    **CONCLUSION**

17    For the foregoing reasons, Coinbase respectfully requests that the Court deny Defendants'

18 application for emergency TRO relief, and clarify that Coinbase may continue offering access to

19 event contracts traded on federally registered exchanges.

20                                    **AFFIRMATION**

21                              **Pursuant to NRS 239B.030**

22    The undersigned does hereby affirm that the preceding document does not contain any

23 personal information of any person.

24

25

26

27

28

SNELL & WILMER
L.L.P.
LAW OFFICES
3530 Kestrel Lane
Suite 200
Reno, Nevada 89511
51865

1  Dated: February 3, 2026.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL & WILMER L.L.P.
LAW OFFICES
5520 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

SNELL & WILMER L.L.P.

By: _____
Alex L. Fugazzi (NV Bar No. 9022)
Janine C. (Jacey) Prupas (NV Bar No. 9156)
SNELL & WILMER L.L.P.
5520 Kietzke Lane, Suite 200
Reno, Nevada 89511-3041

Benjamin R. Walker *Pro Hac Vice Forthcoming*
James M. McDonald *Pro Hac Vice Forthcoming*
Yaira Dubin *Pro Hac Vice Forthcoming*
Akash M. Toprani *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Jeffrey B. Wall *Pro Hac Vice Forthcoming*
Rishabh Bhandari *Pro Hac Vice Forthcoming*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C., 20006
Tel: (202) 956-7500
wallj@sullcrom.com
bhandarir@sullcrom.com

*Attorneys for Defendant Coinbase*
*Financial Markets,* Inc.

4897-1750-2349

1

**CERTIFICATE OF SERVICE**

2    I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18)

3  years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a

4  true and correct copy of the foregoing **DEFENDANT'S (I) PRELIMINARY OPPOSITION TO**

5  **PLAINTIFF'S APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER**

6  **AND MOTION FOR PRELIMINARY INJUNCTION, And (II) REQUEST FOR**

7  **OPPORTUNITY TO FILE A FULL OPPOSITION AND TO BE HEARD THEREON** by

8  the method indicated:

9  XXXXXXX        by U. S. Mail

10  _____        by Facsimile Transmission

11  _____        by Overnight Mail

12  _____        by Federal Express

13  XXXXXXX        by Email

14  _____        by Hand Delivery

15

and addressed to the following:

16

Jessica E. Whelan (Bar o. 14781)
17  Chief Deputy Solicitor General - Litigation
John S. Michela (Bar No. 8189)
18  Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
19  Senior Deputy Attorney General
STATE OF NEVADA
20  Office of the Attorney General
1 State of Nevada Way, Suite 100
21  Las Vegas, NV 89119
jwhelan@ag.nv.gov
22  jmichela@ag.nv.gov
sclinton@ag.nv.gov
23

*Attorneys for Plaintiff*
24

Dated: February 3, 2026.
25

26                                          By: _____

27                                          An employee of Snell & Wilmer L.L.P.

28

SNELL & WILMER
L.L.P.
LAW OFFICES
3503 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

# EXHIBIT "D"

1    Alex L. Fugazzi (NV Bar No. 9022)
     Janine C. (Jacey) Prupas (NV Bar No. 9156)
2    SNELL & WILMER LLP
     5520 Kietzke Lane, Suite 200
3    Reno, Nevada 89511-3041
     Telephone:  775.785.5440
4    Facsimile:  775.785.5441
     afugazzi@swlaw.com
5    jprupas@swlaw.com

6    Benjamin R. Walker *Pro Hac Vice*
     *Forthcoming*
7    James M. McDonald *Pro Hac Vice*
     *Forthcoming*
8    Yaira Dubin *Pro Hac Vice Forthcoming*
     Akash M. Toprani *Pro Hac Vice Forthcoming*
9    SULLIVAN & CROMWELL LLP
     125 Broad Street
10   New York, NY 10004
     Telephone:  (212) 558-4000
11   walkerb@sullcrom.com
     mcdonaldj@sullcrom.com
12   dubiny@sullcrom.com
     toprania@sullcrom.com
13
     Jeffrey B. Wall *Pro Hac Vice Forthcoming*
14   Rishabh Bhandari *Pro Hac Vice Forthcoming*
     SULLIVAN & CROMWELL LLP
15   1700 New York Avenue, N.W.
     Washington, D.C., 20006
16   Telephone: (202) 956-7500
     wallj@sullcrom.com
17   bhandarir@sullcrom.com

18   *Attorneys for Defendant*
     *Coinbase Financial Markets, Inc.*

19

20          **FIRST JUDICIAL DISTRICT COURT OF NEVADA**
                    **IN AND FOR CARSON CITY**
21

22   STATE OF NEVADA ex rel. NEVADA          No. 26 OC 00030 LB
     GAMING CONTROL BOARD.,
23                                           Dept. No. II
                         Plaintiff,
24
     v.
25
     COINBASE FINANCIAL MARKETS, INC.,
26
                         Defendant.
27

28

SNELL & WILMER
LAW OFFICES
3520 Kietzke Lane,
Suite 200
Reno, Nevada 89511
51865

1

## [PROPOSED] ORDER

2     Before the Court is *Plaintiff's Application for* Ex Parte *Temporary Restraining Order and*

3   *Motion for Preliminary Injunction*, filed on February 2, 2026 by Plaintiff State of Nevada ex rel.

4   Nevada Gaming Control Board ("Board").  On February 3, 2026, Defendant Coinbase Financial

5   Markets, Inc. ("Coinbase") filed *Defendant's (I) Preliminary Opposition to Plaintiff's Application*

6   *for* Ex Parte *Temporary Restraining Order and Motion for Preliminary Injunction,* And *(II) Request*

7   *for Opportunity to File a Full Opposition and To Be Heard Thereon*.  Having carefully reviewed

8   and considered all pleadings and moving papers, this Court DENIES Plaintiff's application for an

9   *ex parte* temporary restraining order and ORDERS a briefing schedule and hearing on Plaintiff's

10   motion for preliminary injunction as set forth below.

11     Injunctions are governed by NRS 33.010 and NRCP 65. They may be issued to restrain the

12   continuation of an act during litigation where such continuation would "produce great or irreparable

13   injury to plaintiff," or when it appears the defendant is doing some act in violation of the plaintiff's

14   rights respecting the subject of the action. NRS 33.010(2)-(3). The applicant must show: 1) "a

15   likelihood of success on the merits," and 2) a reasonable probability that the non-moving party's

16   conduct, if allowed to continue, will cause "irreparable harm for which compensatory damage is an

17   inadequate remedy." Dangberg Holdings v. Douglas Co., 115 Nev. 129, 142, 978 P.2d 311,319

18   (1999) (citing Pickett v. Comanche Construction, Inc., 108 Nev. 422, 426, 836 P.2d 42, 44 (1992));

19   see also NRS 33.010. In considering preliminary injunctions, courts also weigh the potential

20   hardships to the relative parties and others, and to the public interest. University Sys. v. Nevadans

21   for Sound Gov't, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

22     The party moving for injunctive relief has the burden of proving the injunction is supported

23   by substantial evidence. Finkel v. Cashman Prof'l, Inc., 128 Nev. 68, 72-73, 270 P.3d 1259, 1262

24   (2012); 5.O.C. Inc. v. Mirage Casino-Hotel, 117 Nev. 403, 408, 23 P.3d 243, 246 (2001).

25   Substantial evidence is "that which 'a reasonable mind might accept as adequate to support a

26   conclusion.'" McClanahan v. Raley's Inc., 117 Nev. 921, 924, 34 P.3d 573, 576 (2001) (quoting

27   State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986)).

28

The Board has not established that it will suffer irreparable harm warranting the extraordinary remedy of an *ex parte* temporary restraining order. The Court understands that the event contracts Coinbase makes available to its customers are also being made available by a third party, KalshiEX, LLC ("Kalshi"), and that the Board has not sought a temporary restraining order to prohibit Kalshi from offering the at-issue event contracts. This casts doubt on whether the Board will suffer irreparable harm in the time needed to adequately brief the court on the serious issues raised in the Board's complaint.

To ensure that the Court is adequately briefed and has sufficient time to consider the issues raised in the Board's motion for preliminary injunction, Coinbase is ordered to file an opposition brief (not to exceed 25 pages) on or before February 25, 2026, and the Board may submit a reply brief (not to exceed 10 pages) on or before March 11, 2026. The Court will hold a hearing on the Board's motion for preliminary injunction on _____, 2026 at _____.

Coinbase's counsel, Mr. Fugazzi, will serve a notice of entry of this Order on all other parties and file proof of such service within seven days after the date the court sends this Order to Coinbase's counsel.

**IT IS SO ORDERED.**

Dated this ____ day of _____, 2026.

_____
KRISTIN LUIS
DISTRICT JUDGE

1    Date: February 3, 2026

2    Respectfully Submitted,

3

4    Alex L. Fugazzi (NV Bar No. 9022)
     Janine C. (Jacey) Prupas (NV Bar No. 9156)

5    SNELL & WILMER LLP
     5520 Kietzke Lane, Suite 200

6    Reno, Nevada 89511-3041

7    Benjamin R. Walker *Pro Hac Vice Forthcoming*
     James M. McDonald *Pro Hac Vice Forthcoming*

8    Yaira Dubin *Pro Hac Vice Forthcoming*
     Akash M. Toprani *Pro Hac Vice Forthcoming*

9    SULLIVAN & CROMWELL LLP
     125 Broad Street

10   New York, NY 10004

11   Jeffrey B. Wall *Pro Hac Vice Forthcoming*
     Rishabh Bhandari *Pro Hac Vice Forthcoming*

12   SULLIVAN & CROMWELL LLP
     1700 New York Avenue, N.W.

13   Washington, D.C., 20006

14   *Attorneys for Defendant*
     *Coinbase Financial Markets, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

# EXHIBIT "E"

AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General - Litigation
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
jmichela@ag.nv.gov
sclinton@ag.nv.gov

*Attorneys for Plaintiff*

**IN THE FIRST JUDICIAL DISTRICT COURT OF
THE STATE OF NEVADA IN AND FOR CARSON CITY**

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD, | Case No. 26 OC 00030 1B |
|       Plaintiff, | Dept. No. II |
| vs. | |
| COINBASE FINANCIAL MARKETS, INC., | |
|       Defendant. | |

**[PROPOSED] ORDER GRANTING PLAINTIFF'S APPLICATION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER**

      This matter having come before the Court on Plaintiff, STATE OF NEVADA, ex rel. NEVADA GAMING CONTROL BOARD's ("BOARD") Complaint for Permanent Injunction and Declaratory Relief and its Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed by the BOARD on February 2, 2026. On February 3, 2026, Defendant COINBASE FINANCIAL MARKETS, INC.("COINBASE") filed a Preliminary Opposition to Plaintiff's Application for Ex Parte Temporary Restraining

Order and Motion for Preliminary Injunction, and Request for Opportunity to File a Full Opposition and to be Heard Thereon.

The Court having reviewed the Complaint, the Application, and Opposition, hereby CONCLUDES as follows:

The BOARD seeks to restrain and enjoin COINBASE and any of its agents, employees, officers, or affiliates from operating a derivatives exchange and prediction market that offers event-based contracts relating to sporting and other events to people within Nevada without obtaining all required Nevada gaming licenses, and from allowing its market to accept wagers from persons under the age of 21.

A temporary restraining order or a preliminary injunction may be issued pursuant to NRCP 65. Under Nevada law a temporary restraining order is authorized when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief involves "restraining the commission or continuance of the act complained of"; and when continuance of the act "would produce great or irreparable injury to the plaintiff." NRS 33.010; *Posner v. U.S. Bank N.A.,* 140 Nev. Adv. Op. 22, 545 p.3d 1150, 1152 (Nev. 2024) (holding injunctive relief is "'proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent [such relief], it will suffer irreparable harm for which compensatory damages would not suffice.'" (internal citation omitted)).

In addition, the balance of hardships and public interest may be considered in determining whether injunctive relief is warranted and, if so, the scope and nature of that relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov 't,* 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

Although the doctrine of horizontal *stare decisis* does not strictly apply in Nevada, *see* NRS 3.220 (district courts of state have equal and coextensive jurisdiction), the Court is persuaded by the reasoning of Judge Woodbury in *State ex rel. Nevada Gaming Control Board v. Blockratize, Inc.*, No. 26 OC 00012 1B (Order Granting Plaintiff's Renewed Ex

Parte Application for Temporary Restraining Order, January 29, 2026). The Court therefore adopts that reasoning in large part below.

**I.     The BOARD is reasonably likely to prevail on the merits.**

The Complaint, Application, and Declaration in support of Application satisfy the requirements of NRCP 65(b)(l) for issuance of the requested temporary restraining order without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success on the merits."

**First**, the Complaint establishes that gaming in Nevada is expansively and strictly regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually comprehensive statutory authority over gaming in Nevada. *See generally* NRS Chapter 463 et seq. The strict regulation of gaming promotes the public interest in several respects, including the prevention of underage gambling, preservation of the integrity of the events which are the subject of gaming wagers, and exclusion of unsuitable individuals from gaming activities. NRS 463.166, .350, *Nev. Gam 'g Comm. Reg.* 22.1205(2). Gaming in Nevada may only be conducted by an entity licensed under the authority of the Nevada Gaming Control Act. NRS 463.160.

**Second**, "gaming" as used in Nevada law includes a "percentage game," and a "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are ... games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.'" *Hughes Properties v. State,* 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). A "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of accepting wagers on sporting events or other events by any system or method of wagering." NRS 463.0193.

**Third**, the record at this early stage in the proceedings indicates COINBASE is not licensed under the Nevada Gaming Control Act.

**Fourth**, the record at this early stage in the proceedings indicates COINBASE offers "event-based contracts" that relate to sporting and other events, including college

Page **3** of **9**

basketball games, college and professional football games and elections. Under Nevada law, this conduct constitutes the operation of a "sports pool" as it involves the acceptance of "wagers" concerning "sporting events or other events" "for which the outcome is uncertain." Further, the record indicates COINBASE takes a commission on contracts purchased through its system, meaning it is operating a "percentage game" as defined in Nevada law.

**Finally**, the Court has considered COINBASE's assertions that it offers Nevada users the ability to trade event contracts on its platform through a partnership with KalshiEX, LLC ("KALSHI"), a CFTC-registered exchange that lists event contracts for trading; that COINBASE is a CFTC-registered intermediary between COINBASE customers and KALSHI's exchange acting as execution and clearing agents that facilitate access to markets; that Nevada gaming laws are preempted with respect to the event contracts offered on a federally regulated exchange; and that the CEA grants the CFTC exclusive jurisdiction to regulate "transactions involving swaps traded or executed on a [federally designated] contract market."  7 U.S.C. §2(a)(1)(A).

The question of federal preemption in this regard is nuanced and rapidly evolving. At the moment, the balance of convincing legal authority weighs against federal preemption in this context. *See KalshiEx, LLC v. Hendrick,* No. 2:25-cv-00575-APG-BNW, 2025 U.S. Dist. LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as *"KalshiEx"]; see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.,* No. 2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding contracts based on outcome of sporting events are not "swaps" under the Commodity Exchange Act and are not subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v. Martin,* No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D. Maryland Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as applied to sports-related event contracts). *But see KalshiEx, LLC v. Flaherty,* No. 25-cv-

02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. April 28, 2025) (holding state law preempted by Commodity Exchange Act as applied to sports-related event contracts).[1]

The reasoning in *KalshiEx* is persuasive. Therefore, this Court concludes that based on the current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C. §2(a)(l)(A), fairly interpreted, does not vest exclusive jurisdiction over COINBASE event contracts with the Commodity Futures Trading Commission. As such, Nevada law is not preempted and the BOARD has authority to prosecute the enforcement action presented by the Complaint and the Application.

## II.    The BOARD's injuries are irreparable and non-compensable.

If COINBASE's acts are wrongful, the resulting harm to Nevada's "comprehensive regulatory structure" and "strict licensing standards" is immediate, irreparable and not sufficiently remediable by compensatory damages. The BOARD has a statutory duty to protect the public and advance Nevada's interest in administering a reputable gaming industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently and equitably monitor and enforce regulatory and statutory compliance among all industry participants and protect the health, safety, morals, good order, and general welfare of gaming consumers. An unlicensed participant beyond the BOARD's control, such as COINBASE, obstructs the BOARD's ability to fulfill its statutory functions. For example, the BOARD lacks authority to ensure that wagers are not being accepted by COINBASE from owners, coaches, players or officials who are in a position to influence the outcome of a sporting event. The BOARD also has no means to ensure that underage individuals are not allowed to purchase COINBASE's contracts and no ability to enforce any sanction against COINBASE if it determined this to be the case. Additionally, the BOARD has no way to know, much less prevent, if unsuitable individuals are involved with COINBASE's activities in Nevada. By their nature, the nature of these injuries cannot be mitigated,

---

[1] Notably, the New Jersey federal district court relied primarily on the reasoning of the Nevada federal district court in *KalshiEx* in that court's initial grant of KALSHI's motion for preliminary injunction—an injunction that was later dissolved. *See generally Flaherty*, 2025 U.S. Dist. LEXIS 79893

much less restored, by compensatory damages after the injury is incurred.   The fact that KALSHI is not currently enjoined from offering event contracts in Nevada does not negate the harm caused by COINBASE's facilitation of event contracts absent a temporary restraining order.[2]

These potential consequences must be characterized as irreparable under Nevada law. As such, they support issuance of a temporary restraining order.

III.   **The *Declaration* establishes that immediate and irreparable injury will result if COINBASE is allowed a full opportunity to respond before the temporary restraining order is issued.**

As the *Declaration* and the record establish, COINBASE has been provided notice of the BOARD's filings as well as the actual filings themselves. Further, COINBASE has been given some opportunity to respond and, in fact, responded with its Preliminary Opposition. COINBASE requests an opportunity to file a full opposition and be heard thereon, or that the Court deny the BOARD's request for a TRO and set an expedited briefing schedule and hearing on the BOARD's motion for preliminary injunction.   Issuance of the temporary restraining order in advance of COINBASE's comprehensive response may necessitate conversion of the response to a motion to dissolve under NRCP 65(b)(4), but there is nothing to otherwise prevent COINBASE from being fully and fairly heard on the issues in dispute and on an expedited basis.   The nature of the BOARD's injuries which are alleged and, at least preliminarily, substantiated are imminent. They are also the types of injuries that exacerbate with each day that COINBASE operates in Nevada outside the authority of the BOARD. A day means more consumers. More consumers mean more transactions. More transactions means more potential harm to the BOARD. As such, every day matters in this case in a literal sense. For these reasons, this Court deems immediate action to be necessary and issues the temporary restraining order in advance of COINBASE providing the comprehensive response it contemplates.

---

[2] KALSHI is currently involved in litigation with the BOARD in *KalshiEx*, and its unique circumstances are not before this Court.

**IV.    The balance of hardships and public interest weigh in favor of issuing the temporary restraining order.**

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of the temporary restraining order. Beyond the factors previously addressed, if it is later determined that the temporary restraining order was issued wrongfully, COINBASE would have been denied a brief period in the market which damaged them in an amount that should be relatively straightforward to quantify and, if legally redressable, compensate. There is no reciprocal remedy for the BOARD if the temporary restraining order is wrongfully denied.

**V.    No security is required.**

A party who is the beneficiary of a temporary restraining order is typically required to post security for damages resulting from wrongful issuance of the temporary restraining order. NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id*. Therefore, no security will be required.

**VI.    The duration of the temporary restraining order is limited to 14 days.**

NRCP 65(b )(2) limits the duration of a temporary restraining order without notice to a maximum of 14 days unless it is extended for good cause or the adverse party consents to a longer period.   There is no request to extend the deadline nor has COINBASE consented to a longer period, so the duration of the TRO is 14 days from the date of this Order.

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed on February 2, 2026 is **GRANTED** insofar as it requests issuance of a temporary restraining order to prohibit COINBASE from offering or facilitating the offering of event contract in Nevada.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IT IS HEREBY FURTHER ORDERED** that a hearing on Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed February 2, 2026 will be held in the First Judicial District Court, located at 885 East Musser Street, Carson City, Nevada, Department II, on **February \_\_\_, 2026, at \_\_a.m.**

**IT IS HEREBY FURHTER ORDERED** that the BOARD will serve a notice of entry of the order on COINBASE and file proof of such service within 7 days after the date the court sent the order to the attorney.

_____
KRISTIN LUIS
DISTRICT COURT JUDGE

*Respectfully submitted:*
AARON D. FORD
Attorney General
By: *_/s/ Jessica E. Whelan_*
Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General – Litigation
John S. Michela (Bar No. 8189)
 Senior Deputy Attorney General
Sabrena K. Clinton (Bar No. 6499)
Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
jwhelan@ag.nv.gov, jmichela@ag.nv.gov,
sclinton@ag.nv.gov

# EXHIBIT "F"

1  AARON D. FORD
   Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General - Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

10 *Attorneys for Plaintiff*

11          IN THE FIRST JUDICIAL DISTRICT COURT OF
            THE STATE OF NEVADA IN AND FOR CARSON CITY
12

13 STATE OF NEVADA ex rel. NEVADA        Case No. 26 OC 00030 1B
   GAMING CONTROL BOARD,
14                                        Dept. No. II
              Plaintiff,
15
   vs.
16
   COINBASE FINANCIAL MARKETS,
17 INC.,

18            Defendant.

19

20 [PROPOSED] ORDER GRANTING PLAINTIFF'S APPLICATION FOR *EX PARTE*
                  TEMPORARY RESTRAINING ORDER
21

22     This matter having come before the Court on Plaintiff, STATE OF NEVADA, ex rel.

23 NEVADA GAMING CONTROL BOARD's ("BOARD") Complaint for Permanent Injunction

24 and Declaratory Relief and its Ex Parte Application for Temporary Restraining Order and

25 Motion for Preliminary Injunction filed by the BOARD on February 2, 2026. On February

26 3, 2026, Defendant COINBASE FINANCIAL MARKETS, INC.("COINBASE") filed a

27 Preliminary Opposition to Plaintiff's Application for Ex Parte Temporary Restraining

28

1    Order and Motion for Preliminary Injunction, and Request for Opportunity to File a Full

2    Opposition and to be Heard Thereon.

3         The Court having reviewed the Complaint, the Application, and Opposition, hereby

4    CONCLUDES as follows:

5         The BOARD seeks to restrain and enjoin COINBASE and any of its agents,

6    employees, officers, or affiliates from operating a derivatives exchange and prediction

7    market that offers event-based contracts relating to sporting and other events to people

8    within Nevada without obtaining all required Nevada gaming licenses, and from allowing

9    its market to accept wagers from persons under the age of 21.

10        A temporary restraining order or a preliminary injunction may be issued pursuant

11   to NRCP 65.  Under Nevada law a temporary restraining order is authorized when it

12   "appear[s] by the complaint that the plaintiff is entitled to the relief demanded"; the relief

13   involves "restraining the commission or continuance of the act complained of"; and when

14   continuance of the act "would produce great or irreparable injury to the plaintiff."  NRS

15   33.010; *Posner v. U.S. Bank N.A.,* 140 Nev. Adv. Op. 22, 545 p.3d 1150, 1152 (Nev. 2024)

16   (holding injunctive relief is "'proper where the moving party can demonstrate that it has a

17   reasonable likelihood of success on the merits and that, absent [such relief], it will suffer

18   irreparable harm for which compensatory damages would not suffice.'" (internal citation

19   omitted)).

20        In addition, the balance of hardships and public interest may be considered in

21   determining whether injunctive relief is warranted and, if so, the scope and nature of that

22   relief. *University & Cmty. College Sys. of Nev. v. Nevadans for Sound Gov 't,* 120 Nev. 712,

23   721, 100 P.3d 179, 187 (2004).

24        Although the doctrine of horizontal *stare decisis* does not strictly apply in Nevada,

25   *see* NRS 3.220 (district courts of state have equal and coextensive jurisdiction), the Court

26   is persuaded by the reasoning of Judge Woodbury in *State ex rel. Nevada Gaming Control*

27   *Board v. Blockratize, Inc.,* No. 26 OC 00012 1B (Order Granting Plaintiff's Renewed Ex

28

1  Parte Application for Temporary Restraining Order, January 29, 2026). The Court
2  therefore adopts that reasoning in large part below.

3  **I.      The BOARD is reasonably likely to prevail on the merits.**

4        The Complaint, Application, and Declaration in support of Application satisfy the
5  requirements of NRCP 65(b)(l) for issuance of the requested temporary restraining order
6  without notice. As a threshold matter, the BOARD has a "reasonable likelihood of success
7  on the merits."

8        **First**, the Complaint establishes that gaming in Nevada is expansively and strictly
9  regulated. The BOARD, in conjunction with the Nevada Gaming Commission, has virtually
10  comprehensive statutory authority over gaming in Nevada. *See generally* NRS Chapter 463
11  et seq. The strict regulation of gaming promotes the public interest in several respects,
12  including the prevention of underage gambling, preservation of the integrity of the events
13  which are the subject of gaming wagers, and exclusion of unsuitable individuals from
14  gaming activities. NRS 463.166, .350, *Nev. Gam 'g Comm. Reg.* 22.1205(2). Gaming in
15  Nevada may only be conducted by an entity licensed under the authority of the Nevada
16  Gaming Control Act. NRS 463.160.

17        **Second**, "gaming" as used in Nevada law includes a "percentage game," and a
18  "wager" in a "sports pool." NRS 493.0152, .0193, .01962. "Percentage games are ... games
19  where patrons wager against each other and the house takes a percentage of each wager
20  as a 'rake-off.'" *Hughes Properties v. State,* 100 Nev. 295,297,680 P.2d 970,971 (1984). A
21  "wager" is "a sum of money or representative of value that is risked on an occurrence for
22  which the outcome is uncertain." NRS 463.01962. And a "sports pool" is "the business of
23  accepting wagers on sporting events or other events by any system or method of wagering."
24  NRS 463.0193.

25        **Third**, the record at this early stage in the proceedings indicates COINBASE is not
26  licensed under the Nevada Gaming Control Act.

27        **Fourth**, the record at this early stage in the proceedings indicates COINBASE offers
28  "event-based contracts" that relate to sporting and other events, including college

1   basketball games, college and professional football games and elections. Under Nevada law,

2   this conduct constitutes the operation of a "sports pool" as it involves the acceptance of

3   "wagers" concerning "sporting events or other events" "for which the outcome is uncertain."

4   Further, the record indicates COINBASE takes a commission on contracts purchased

5   through its system, meaning it is operating a "percentage game" as defined in Nevada law.

6       **Finally**, the Court has considered COINBASE's assertions that it offers Nevada

7   users the ability to trade event contracts on its platform through a partnership with

8   KalshiEX, LLC ("KALSHI"), a CFTC-registered exchange that lists event contracts for

9   trading; that COINBASE is a CFTC-registered intermediary between COINBASE

10  customers and KALSHI's exchange acting as execution and clearing agents that facilitate

11  access to markets; that Nevada gaming laws are preempted with respect to the event

12  contracts offered on a federally regulated exchange; and that the CEA grants the CFTC

13  exclusive jurisdiction to regulate "transactions involving swaps traded or executed on a

14  [federally designated] contract market." 7 U.S.C. §2(a)(1)(A).

15      The question of federal preemption in this regard is nuanced and rapidly evolving.

16  At the moment, the balance of convincing legal authority weighs against federal

17  preemption in this context. *See KalshiEx, LLC v. Hendrick,* No. 2:25-cv-00575-APG-BNW,

18  2025 U.S. Dist. LEXIS 234246 at *11-38 (D. Nev. Nov. 24, 2025) [hereinafter referred to as

19  *"KalshiEx"]; see also North American Derivatives Ex., Inc. v. Nev. Gaming Control Bd.,* No.

20  2:25-cv-00978-APG-BNW, 2025 U.S. Dist. LEXIS 466366 (D. Nev. Oct. 14, 2025) (holding

21  contracts based on outcome of sporting events are not "swaps" under the Commodity

22  Exchange Act and are not subject to exclusive jurisdiction of CFTC), *KalshiEx, LLC v.*

23  *Martin,* No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815 (D.

24  Maryland Aug. 1, 2025) (holding state law not preempted by Commodity Exchange Act as

25  applied to sports-related event contracts). *But see KalshiEx, LLC v. Flaherty,* No. 25-cv-

26

27

28

1  02152-ESK-MJS, 2025 U.S. Dist. LEXIS 79893 (D.N.J. April 28, 2025) (holding state law
2  preempted by Commodity Exchange Act as applied to sports-related event contracts).[1]
3  The reasoning in *KalshiEx* is persuasive. Therefore, this Court concludes that based on the
4  current state of the law, the Commodities Exchange Act, more specifically 7 U.S.C.
5  §2(a)(l)(A), fairly interpreted, does not vest exclusive jurisdiction over COINBASE event
6  contracts with the Commodity Futures Trading Commission. As such, Nevada law is not
7  preempted and the BOARD has authority to prosecute the enforcement action presented
8  by the Complaint and the Application.

9  **II.    The BOARD's injuries are irreparable and non-compensable.**

10          If COINBASE's acts are wrongful, the resulting harm to Nevada's "comprehensive
11  regulatory structure" and "strict licensing standards" is immediate, irreparable and not
12  sufficiently remediable by compensatory damages. The BOARD has a statutory duty to
13  protect the public and advance Nevada's interest in administering a reputable gaming
14  industry with integrity. In furtherance of that duty, the BOARD is obliged to consistently
15  and equitably monitor and enforce regulatory and statutory compliance among all industry
16  participants and protect the health, safety, morals, good order, and general welfare of
17  gaming consumers. An unlicensed participant beyond the BOARD's control, such as
18  COINBASE, obstructs the BOARD's ability to fulfill its statutory functions. For example,
19  the BOARD lacks authority to ensure that wagers are not being accepted by COINBASE
20  from owners, coaches, players or officials who are in a position to influence the outcome of
21  a sporting event. The BOARD also has no means to ensure that underage individuals are
22  not allowed to purchase COINBASE's contracts and no ability to enforce any sanction
23  against COINBASE if it determined this to be the case. Additionally, the BOARD has no
24  way to know, much less prevent, if unsuitable individuals are involved with COINBASE's
25  activities in Nevada. By their nature, the nature of these injuries cannot be mitigated,

26  ───────────────
27          [1] Notably, the New Jersey federal district court relied primarily on the reasoning of
   the Nevada federal district court in *KalshiEx* in that court's initial grant of KALSHI's
   motion for preliminary injunction—an injunction that was later dissolved. *See generally*
28  *Flaherty*, 2025 U.S. Dist. LEXIS 79893

1   much less restored, by compensatory damages after the injury is incurred.  The fact that

2   KALSHI is not currently enjoined from offering event contracts in Nevada does not negate

3   the harm caused by COINBASE's facilitation of event contracts absent a temporary

4   restraining order.[2]

5        These potential consequences must be characterized as irreparable under Nevada

6   law. As such, they support issuance of a temporary restraining order.

7   **III.   The *Declaration* establishes that immediate and irreparable injury will**
8   **result if COINBASE is allowed a full opportunity to respond before the**
    **temporary restraining order is issued.**
9
10       As the *Declaration* and the record establish, COINBASE has been provided notice of

11  the BOARD's filings as well as the actual filings themselves. Further, COINBASE has been

12  given some opportunity to respond and, in fact, responded with its Preliminary Opposition.

13  COINBASE requests an opportunity to file a full opposition and be heard thereon, or that

14  the Court deny the BOARD's request for a TRO and set an expedited briefing schedule and

15  hearing on the BOARD's motion for preliminary injunction.  Issuance of the temporary

16  restraining order in advance of COINBASE's comprehensive response may necessitate

17  conversion of the response to a motion to dissolve under NRCP 65(b)(4), but there is nothing

18  to otherwise prevent COINBASE from being fully and fairly heard on the issues in dispute

19  and on an expedited basis.   The nature of the BOARD's injuries which are alleged and, at

20  least preliminarily, substantiated are imminent. They are also the types of injuries that

21  exacerbate with each day that COINBASE operates in Nevada outside the authority of the

22  BOARD. A day means more consumers. More consumers mean more transactions. More

23  transactions means more potential harm to the BOARD. As such, every day matters in this

24  case in a literal sense. For these reasons, this Court deems immediate action to be

25  necessary and issues the temporary restraining order in advance of COINBASE providing

26  the comprehensive response it contemplates.

27  _____

28      [2] KALSHI is currently involved in litigation with the BOARD in *KalshiEx*, and its
    unique circumstances are not before this Court.

## IV.   The balance of hardships and public interest weigh in favor of issuing the temporary restraining order.

Largely for the reasons that have already been explained above, the balance of hardships and public interest in maintaining meaningful control over Nevada's gaming industry for the purpose of ensuring its integrity strongly supports issuance of the temporary restraining order. Beyond the factors previously addressed, if it is later determined that the temporary restraining order was issued wrongfully, COINBASE would have been denied a brief period in the market which damaged them in an amount that should be relatively straightforward to quantify and, if legally redressable, compensate. There is no reciprocal remedy for the BOARD if the temporary restraining order is wrongfully denied.

## V.   No security is required.

A party who is the beneficiary of a temporary restraining order is typically required to post security for damages resulting from wrongful issuance of the temporary restraining order. NRCP 65(c). However, the BOARD, as an agency of the State of Nevada, is exempted from that typical requirement. *Id.* Therefore, no security will be required.

## VI.   The duration of the temporary restraining order is limited to 14 days.

NRCP 65(b )(2) limits the duration of a temporary restraining order without notice to a maximum of 14 days unless it is extended for good cause or the adverse party consents to a longer period.   There is no request to extend the deadline nor has COINBASE consented to a longer period, so the duration of the TRO is 14 days from the date of this Order.

Therefore, good cause appearing,

**IT IS HEREBY ORDERED** that Plaintiff's Ex Parte Application for Temporary Restraining Order and Motion for Preliminary Injunction filed on February 2, 2026 is **GRANTED** insofar as it requests issuance of a temporary restraining order to prohibit COINBASE from offering or facilitating the offering of event contract in Nevada.

1    **IT IS HEREBY FURTHER ORDERED** that a hearing on Plaintiff's Ex Parte

2    Application for Temporary Restraining Order and Motion for Preliminary Injunction filed

3    February 2, 2026 will be held in the First Judicial District Court, located at 885 East

4    Musser Street, Carson City, Nevada, Department II, on **February** _17_, **2026, at** _2:00 p.m._

5

6    **IT IS HEREBY FURHTER ORDERED** that the BOARD will serve a notice of

7    entry of the order on COINBASE and file proof of such service within 7 days after the date

8    the court sent the order to the attorney.

9
                        2/5/2026        _Kristin Luis_
10
                                        KRISTIN LUIS
11                                      DISTRICT COURT JUDGE

12

13

14   *Respectfully submitted:*
15   AARON D. FORD
     Attorney General
16   By: */s/ Jessica E. Whelan*
17   Jessica E. Whelan (Bar No. 14781)
     Chief Deputy Solicitor General – Litigation
18   John S. Michela (Bar No. 8189)
      Senior Deputy Attorney General
19   Sabrena K. Clinton (Bar No. 6499)
     Senior Deputy Attorney General
20   State of Nevada
     Office of the Attorney General
21   1 State of Nevada Way, Suite 100
22   Las Vegas, NV 89119
     jwhelan@ag.nv.gov, jmichela@ag.nv.gov,
23   sclinton@ag.nv.gov

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

